**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. __26-mj-03259-LOUIS_____

IN THE MATTER OF THE EXTRADITION
OF TRISTAN TATE,

_____/

```
FILED BY_____D.C.

    JUL 2 0 2026

  ANGELA E. NOBLE
  CLERK U.S. DIST. CT.
  S. D. OF FLA. - MIAMI
```

**MEMORANDUM OF EXTRADITION LAW AND REQUEST**
**FOR DETENTION PENDING EXTRADITION PROCEEDINGS**

The United States, in fulfilling its treaty obligations to the United Kingdom,[1] respectfully

requests that the fugitive in this case, Tristan Tate ("T. TATE"), be held without bond pending the

hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq.* This action

was developed and led by the Office of International Affairs ("OIA") within the Criminal Division

of the U.S. Department of Justice in Washington, D.C. and was approved by the Assistant Attorney

General for the Criminal Division, A. Tysen Duva. This memorandum summarizes the framework

of extradition law in the United States and sets forth the reasons why T. TATE should be detained.

In short, T. TATE should be detained because he cannot overcome the strong presumption against

bail in international extradition cases. Specifically, he cannot meet his burden of showing that he

is not a flight risk nor a danger to the community and that special circumstances warrant his release.

---

[1]      Extradition Treaty Between the Government of the United States of America and the
Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31,
2003, S. Treaty Doc. No. 108-23 (2004) (the "2003 Treaty"), and related Exchanges of Letters, *as
amended by* the Instrument as contemplated by Article 3(2) of the Agreement on Extradition
Between the United States of America and the European Union signed June 25, 2003, as to the
application of the Extradition Treaty Between the Government of the United States of America
and the Government of the United Kingdom of Great Britain and Northern Ireland signed March
31, 2003, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006) (the "Instrument"), with
Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty
and the Instrument (collectively, the "Treaty").

## BACKGROUND

The United Kingdom seeks the extradition of T. TATE so that he may be prosecuted for rape, in violation of Section 1 of the Sexual Offences Act of 2003, and assault occasioning actual bodily harm, in violation of Section 47 of the Offenses Against the Person Act of 1861.[2]  On January 19, 2024, Senior District Judge Paul Goldspring of the Westminster Magistrates Court signed a warrant for T. TATE's arrest.  The warrant remains valid and enforceable.  The United Kingdom alleges the following facts in support of its arrest warrant and provisional arrest request:

Complainant contacted the UK authorities in January 2020 because she saw in the media that T. TATE and his brother were being investigated.  She reported to UK authorities that on multiple occasions between April 1, 2012, and December 26, 2013, T. TATE, with whom she was in a long-term romantic relationship, raped her both vaginally and anally and assaulted her to the point of physical injury at his apartment in Luton, England.  She had previously disclosed these events to a colleague, who also provided a witness statement to UK authorities.

Complainant told authorities that, during the specified time period, T. TATE regularly choked Complainant to the point that she was unconscious and simultaneously penetrated her vagina with his penis.  After she would lose consciousness, T. TATE would forcefully slap Complainant's face to wake her up, and upon awaking, Complainant would find that T. TATE was

---

[2]    The United States sought, and obtained, a warrant for TATE's provisional arrest on an urgent basis based only on these charges, but doing so is without prejudice to proceeding on additional charges when the UK's formal request for extradition has been received and reviewed by the U.S. Department of State and is presented to the Court.  *See* Treaty, Article 12(1) ("In an urgent situation, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition."); *see also* Article 12(4) ("[a] person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the formal request for extradition and the documents supporting the extradition request as required in Article 8.").

penetrating her anus with his penis.

Complainant conveyed that she made it clear to T. TATE that she did not consent to being anally penetrated while unconscious.  Nonetheless, according to her, T. TATE repeated this behavior multiple times over the course of more than a year and a half.

Complainant recalled a specific occasion in mid-November 2012 where T. TATE choked her until she lost consciousness and anally raped her, ejaculating inside her anus.  She described the pain as excruciating, like she was being ripped apart. She recalled crying and could not focus on what hurt more, her body from the weight of T. TATE, the pain in her eye where T. TATE had hit her, or the pain in her anus from T. TATE raping her.

Complainant also notified authorities that, during one of these instances, TATE struck her in the face, causing a black eye.  She further stated that she sustained marks on her skin from being slapped by TATE on other occasions.

Complainant further alleged that, during this same time period, TATE hit her with a belt on multiple occasions, which caused serious bruising and welts on her buttocks and legs. Complainant told authorities that, when TATE hit her with a belt, she would scream for him to stop, but he often would not stop.  She recalled a specific occasion in September 2012 where T. TATE told her he wanted to film her.  She agreed, and, after pressing play, threw her face down, and tied her arms with cable ties.  He made her choose a number between 1 and 10 and began to hit her with the folded section of a belt on her buttocks and the back of her legs.  She screamed for him to stop, but he carried on. Complainant described the pain as excruciating and led to serious bruising.

Complainant reported an additional incident of nonconsensual sexual intercourse with TATE that she said took place on or about December 24, 2012.

On that date, TATE picked Complainant up from the train station and drove her to his mother's house in Luton, England.  After arriving at the home, TATE pushed Complainant onto a mattress, pinned her down, and penetrated her vagina with his penis without her consent.  TATE simultaneously used his hand to hit and grab onto Complainant's buttocks approximately five (5) or six (6) times, causing bruising.  According to UK authorities, Complainant reported that T. TATE was very angry and that she was scared.  She felt that she did not have the choice to consent, and she reported that TATE did not check whether she consented.

The UK authorities have obtained messaging evidence between Complainant and T. TATE where they discuss having violent sex and Complainant makes clear that she does not consent to forcible anal penetration.  On October 12, 2012, Complainant states "only thing I don't want is you raping my arse.  Anal yes, but I don't want you to force it upon me."  Complainant also provided contemporaneous photographs of injuries and bruising that she alleges were caused by T. TATE.

Complainant identified TATE as the person who committed these offenses based on her longstanding relationship with him.  She also told authorities that she could identify TATE from television and social media.

In response to a request from the United Kingdom, the United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181, *et seq.*, filed a complaint in this District seeking a warrant for T. TATE's provisional arrest pending extradition.  This Court issued an arrest warrant, and T. TATE was provisionally arrested for the purposes of initiating extradition proceedings on July 18. 2026., until September 16, 2026, to submit their full extradition request, with supporting documents as required by Article 8 of the Treaty.  The Government of the

4

United Kingdom has represented that it will submit a formal request for extradition, supported by the documents the Treaty specifies within the time the Treaty requires. See Complaint at Para. 10.

## ARGUMENT

### I.     LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

#### A.     The limited role of the Court in extradition proceedings

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see Kastnerova v. United States*, 365 F.3d 980, 984 n.5 & 986 (11th Cir. 2004). The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828-29 (11th Cir. 1993). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Martin*, 993 F.2d at 828-29. If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and it must commit the fugitive to the custody of the U.S. Marshal pending the Secretary's final determination regarding surrender. 18 U.S.C.

5

§ 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828.

### B.    The requirements for certification

The Court must certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See, e.g., See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *See In re Extradition of Martinelli Berrocal*, No. 17-22197-Civ-TORRES, 2017 WL 3776953, at *10 (S.D. Fla. Aug. 31, 2017). The following sections briefly discuss each of those requirements.

### 1.    Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993). This District's local rules expressly authorize magistrate judges to "[c]onduct extradition

proceedings, in accordance with 18 U.S.C. § 3184." *See* Rule 1(a)(3), Magistrate Judge Rules for the U.S. District Court for the Southern District of Florida.

### 2.   Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as T. TATE, who is found within its jurisdictional boundaries.  18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

### 3.   Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also Arias v. Warden*, 928 F.3d 1281, 1285 (11th Cir. 2019); *Kastnerova*, 365 F.3d at 987.  The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and the United Kingdom.  The Court must defer to the Department of State's determination in that regard. *E.g.*, *Arias*, 928 F.3d at 1288 (where "[Department of State] declaration set forth the United States Executive Branch's position—that the Treaty remains in full force," courts "have no answer but this: the Treaty remains in effect").

### 4.   Crime covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty.  Article I of the Treaty provides for the return of "persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses." Article II of the Treaty defines an offense as extraditable if it is punishable under the laws of both

7

the United States and the United Kingdom by deprivation of liberty for a period of one year or more or by a more severe penalty.

Consequently, in assessing whether the crime for which T. TATE's extradition is requested is covered by the Treaty, the Court should examine the description of criminal conduct provided by the United Kingdom in support of its charge and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Arias*, 928 F.3d at 1292-93 (noting that "courts ask whether the conduct that the government describes would violate our laws if it occurred in this country"); *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000); *United States v. Cardoso*, No. 04-mc-128, 2005 WL 1228826, at *3 (M.D. Fla. May 10, 2005) ("Acts are considered criminal in the United States if they would be unlawful under federal statutes, the law of the state where the accused is found, or by a preponderance of the states.") (citation omitted). A requesting country need not establish that its crime is identical to ours. Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 301 (1933); *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just

8

obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

### 5. Probable cause that the fugitive has committed the offense

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that each crime sought for extradition was committed by the person before the Court. *E.g.*, *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1432 (S.D. Fla. 1993). The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted.) The extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quotations omitted); *see Martinelli Berrocal*, 2017 WL 3776953, at *21 (same).

### C.   An extradition hearing follows unique procedures

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901.) Accordingly, an extradition hearing is not a criminal proceeding. *See, e.g.*, *Martin*, 993 F.2d at 828. Rather, it is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *see*

*In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017), and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

Accordingly, the Federal Rules of Evidence do not apply to extradition proceedings. *See, e.g., Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005); *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."). Indeed, hearsay evidence is admissible at an extradition hearing, and, moreover, "[a] certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government." *Matter of Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *4 (S.D. Fla. May 28, 2015); *see also, e.g., Afanasjev*, 418 F.3d at 1165 (unsworn statements may be sufficient to justify extradition) (citing *Collins*, 259 U.S. at 317). Nothing more is required, and typically nothing more is provided. *See, e.g., In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1287 (S.D. Fla. 2011) ("It is exceedingly rare for the Government to submit anything other than documents in support of an extradition request."); *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993) (police detective's statement summarizing results of investigation established probable cause); *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence.) Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and

rendition of a fugitive."); *Afanasjev*, 418 F.3d at 1164-65.  A fugitive has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005).  Furthermore, many constitutional protections applicable in criminal cases do not apply.  For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *Nunez-Garrido*, 829 F. Supp. 2d at 1282-83 (collecting cases); there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *Martin* 993 F.2d at 829; the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, e.g.*, *In re Extradition of Batchedler*, 494 F. Supp. 2d 1302, 1309 (N.D. Fla. 2007) ("Double jeopardy has no role at all in an extradition proceeding.") (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained.  *See, e.g*, *Nunez-Garrido*, 829 F. Supp. 2d at 1281.  A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather, he may only introduce evidence explaining the submitted evidence.  *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913).  A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *Shaw*, 2015 WL 3442022, at *8 ("Defendant has consistently attempted to contradict the case brought against him in [the requesting country]. . . . This the Defendant cannot do.")  "The extent to which a fugitive may offer explanatory proof is largely within the discretion of the court." *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999).

11

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g., Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"); *Martinelli Berrocal*, 2017 WL 3776953, at *27 (citing cases); *Fernandez-Morris*, 99 F. Supp. 2d at 1373 n.5. These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### D. Rule of non-inquiry: All matters other than certification are reserved for the Secretary of State

All matters raised by the fugitive as a defense to extradition, other than those related to the legal requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Arias*, 928 F.3d at 1295 ("We have neither the power nor competence to consider a foreign fugitive's concern about the fairness of his country's criminal justice system, let alone halt his extradition on that basis— that kind of consideration is properly addressed to the Executive Branch."); *Martin*, 993 F.2d at 830 n.10 ("We [have] explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate. Rather, humanitarian considerations are matters properly reviewed by the Department of State.") (citation omitted); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch); *Quinn*, 783 F.2d at 789-90 (noting that "the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge

made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive") (citation omitted.)  This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## II.     TRISTAN TATE SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*.  The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail.  Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[3]  *See In re Extradition of Shaw*, No. 14-MC-81475-WM, 2015 WL 521183, at *5 (S.D. Fla. Feb. 6, 2015).  Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory."  *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A.     Applicable law

1.     A strong presumption against bail governs in an international extradition proceeding

Unlike in domestic criminal cases, "there is a presumption against bond." *Martin*, 993 F.2d at 827; *see also Martinelli Berrocal*, 263 F. Supp. 3d at 1294 ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process.")  The Supreme Court established this

---

[3]     The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2).  Here, T. TATE is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses in violation of the laws of the United Kingdom.

presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. 40, 62 (1903).

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive.[4] *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

---

[4] Indeed, the Treaty contemplates detention during the provisional arrest stage. Article 12(4) provides that, if the United States has not received the formal extradition request and supporting documents from the United Kingdom within sixty (60) days of arrest, T. TATE may request to be released from custody.

2.      Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g., In re Extradition of Kirby*, 106 F.3d 855, 862-63 (9th Cir. 1996); *Leitner*, 784 F.2d at 160-61; *Shaw*, 2015 WL 521183, at *5; *Martinelli Berrocal*, 263 F. Supp. 3d at 1292 (for over a hundred years, the "special circumstances" test has been applied by circuit and district courts for bail determinations in extradition cases). "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties to foreign countries, age, and incentive to flee based on the severity of the offense. *See, e.g., Martinelli Berrocal*, 263 F. Supp. 3d at 1304-06; *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-MJ-430-HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering the fact that a fugitive, a physician, had "more than sufficient assets available with which to flee"). Crucially, the special circumstances inquiry is separate from, and additional to, considerations of danger to the community or risk of flight.[5] *See, e.g., Shaw*, 2015 WL 521183, at *6; *In re*

_____

[5]      "The case law . . . reflects an inconsistency among courts in their analysis of flight risk in relation to the 'special circumstances' inquiry. Most courts treat flight risk as a separate, independent factor from the special circumstances analysis. The courts that examine risk of flight

15

*Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016) (special circumstances must exist in addition to absence of risk of flight). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Martin*, 993 F.2d at 827 (stating that "a defendant in an extradition case will be released on bail only if he can prove 'special circumstances'" and declining to consider the fugitive's argument that the district court erred in determining that he was a flight risk); *Salerno v. United States*, 878 F.2d 317, 317-18 (9th Cir. 1989) (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *In re Extradition of Maniero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996) (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *Kin-Hong*, 83 F.3d at 525; *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271-72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36; *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *United States v. Risner*, No. 3:18-mj-765, 2018 WL 6809796, at *22 (N.D. Tex. Dec. 27, 2018); *Beresford-Redman*, 753 F. Supp. 2d at 1089;

---

and special circumstances separately thus require the potential extraditee to establish the following two factors before [they] can grant bail in a foreign extradition case: (1) 'special circumstances' exist in their particular case; and (2) they are not a flight risk or a danger to the community. The majority of cases that have examined this question, especially those in our Circuit, have concluded that the risk of flight analysis is a separate inquiry." *Martinelli Berrocal*, 263 F. Supp. 3d at 1303 (citations and quotation marks omitted).

16

- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at \*1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 602 (W.D. Va. 2013); *In re Extradition of Huerta*, No. H-08-342M, 2008 WL 2557514, at \*2 (S.D. Tex. June 23, 2008); *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at \*5 (C.D. Cal. July 1, 2004); *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 173-74 (S.D.N.Y. 2009); *In re Extradition of Rouvier*, 839 F. Supp. 537, 541-42 (N.D. Ill. 1993);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Antonowicz*, 17-cv-00861, 2017 WL 1197855, at \*3 (C.D. Cal. Mar. 27, 2017); *In re Extradition of Knotek*, No. 13-9204 BRO, 2016 WL 4726537, at \*7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. July 3, 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at \*3-4 (allegedly well-respected businessman); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 131 (E.D.N.Y. Mar. 21, 2001); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581–82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569;

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno*, 878 F.2d at 318; *Martinelli Berrocal*, 263 F. Supp. 3d at 1297-98; *Antonowicz*, 2017 WL 1197855, at \*3; and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Antonowicz*, 2017 WL 1197855, at \*3; *Garcia*, 615 F. Supp. 2d at 172; *Kyung Joon Kim*, 2004 WL 5782517, at \*2; *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1386–87 (D. Nev. May 24, 1995).

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

B.      **Analysis**

The Court should detain T. TATE without bond because he is a danger to the community and a flight risk. *First*, the serious nature of the offenses with which T. TATE is charged- including repeated violent rape and physical assault- renders him a danger to the community both here in the United States and abroad if he were released from custody. *See, e.g., Perez-Cueva*, 2016 WL 884877, at *3 (seriousness of allegations against fugitive "militates against release on bail"). In addition to the charges the United Kingdom previously brought against T. TATE in January 2024, the United Kingdom recently announced that it has brought new charges against T. TATE, including two additional counts of rape, 1 count of sexual assault, and three additional counts of facilitating travel for exploitation.[6] The United Kingdom has represented that they intend to pursue extradition on all outstanding charges and will provide the requisite supporting documentation in the timescales required by the Treaty. T. TATE and his brother also face a number of other serious criminal charges in Romania, including charges of rape, human trafficking and forming an organized crime group.

*Second*, T.TATE has strong incentives to flee, given the possibility of a long prison sentence in the United Kingdom and the low burden of proof in extradition proceedings. *See, e.g., In re Extradition of Adame*, 2013 WL 1222115, at *3 (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low

---

[6]     The United Kingdom's announcement about these new charges can be found here: https://www.cps.gov.uk/national-news/news/cps-decides-prosecute-tate-brothers-additional-sexual-offences. As reflected in the government's complaint, it sought T. TATE's provisional arrest only on charges of rape and assault occasioning bodily harm set forth in the January 2024 warrant, subject to proceeding on additional charges for purposes of extradition certification when the United Kingdom's formal extradition request is submitted to and reviewed by the United States.

18

burden of proof, there is a significant risk that he will be formally extradited to Mexico"); *see also*, *e.g.*, *Shaw*, 2015 WL 521183, at *9 ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee.").

The fact that T. TATE has demonstrated a defiant unwillingness to participate in judicial proceedings in the United Kingdom is another factor establishing risk of flight. According to the UK, T. TATE has been aware of the charges against him for some time and has refused to voluntarily return to face his accusers. *cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976)).

Instead, while actively avoiding prosecution, T. TATE and his brother Andrew Tate have simultaneously fought hard to obtain the identity of the complainants against him. The UK's Crown Prosecution Service (CPS) reports that, since March 2024, T. TATE's lawyers have repeatedly requested the identities of the complainants and even sought judicial review in the Hight Court of England and Wales of the CPS's decision not to disclose the victim names.[7] The judge rejected the arguments and upheld the decision of UK authorities to protect the victims under the circumstances.

---

[7] T. TATE's brother, Andrew Tate, has a substantial social media following which, according to the United Kingdom, he has leveraged in the past to try to identify individuals of interest. According to the United Kingdom, on September 16, 2025, Andrew Tate posted images of a man on his X account, with 10 million followers, stating "10k reward for this man's identity and workplace." In less than 10 hours, the post had 2.8 million views.

19

T. TATE and his brother appear to have the financial means- and the will- to continue evading justice. They travel frequently to countries that do not have extradition treaties with the United Kingdom, seemingly to avoid or frustrate attempts to extradite them. For example, in a recent article in The New Yorker magazine titled "Andrew Tate's Empire of Abuse," Andrew Tate was attributed as saying, "I'll just run around the world, and I'll be above the jurisdiction of any one place." In the same article, T. TATE was reported as saying "New charging decision = new warrant… means we're not protected by Romania at all and he can be picked up at anytime from anyplace," followed by a voice note saying "We're just gonna have to fucking stay in Dubai and the United States and stop traveling and fucking get some extradition lawyers." Andrew Tate also posted on X in March 2026 that "The British Government is internationally mocked. No matter where I go, everybody laughs at what a joke the once great Britain has become. Total Clowns."[8]

Despite having nearly £2 million forfeited in the UK from accounts related to Andrew Tate, as well as seizures of a number of prestige supercars, T. TATE and his brother appear to still have access to considerable financial resources. In addition to their well-documented world travels, in July 2026, Andrew Tate posted a video tour on social media of a $50 million, 41 metre super-yacht, "Obsidian Blade," which he is reported be having built in Bodrum, Turkey, and which is reported to be due for completion in 2027.

Based on these facts, the Court should find that T. TATE is both a danger to the community and a flight risk, either one of which renders him ineligible for bail in this extradition proceeding. Moreover, these reasons are sufficient for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that T. TATE is not either a flight risk or a danger to the

---

[8]     https://x.com/cobratate/status/2035759165382246547?s=48

community, the government is unaware of any "special circumstances" that would justify bail in this case. *Cf. In re Drumm*, 150 F. Supp. 3d 92, 97-100 (D. Mass. 2015) (denying bail because of a failure to show a special circumstance, even though the court found that defendant posed no danger to the community and defendant's risk of flight could be adequately mitigated).

Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the United Kingdom, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

## CONCLUSION

For the foregoing reasons, the United States requests that T. TATE be detained pending resolution of this extradition proceeding.

Dated: July 19, 2026

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: /s/ Abbie D. Waxman
Abbie D. Waxman
Assistant United States Attorney
Florida Bar No.: 109315
99 Northeast Fourth Street
Miami, Florida 33132
Tel: (305) 961-9240
Abbie.Waxman@usdoj.gov

21