# DOSAR NR. 1305/D/P/2022

*Ordinance of 25.02.2025 – English translation*

*English text of this document, extracted from its Romanian–English parallel translation. Unofficial, for information only; not a certified or sworn translation.*

| ENGLISH TRANSLATION |
|---|
| **R O M A N I A** |
| **PUBLIC MINISTRY** |
| **PROSECUTOR'S OFFICE ATTACHED TO THE HIGH COURT OF CASSATION AND JUSTICE** |
| **DIRECTORATE FOR INVESTIGATING ORGANIZED CRIME AND TERRORISM** |
| **CENTRAL STRUCTURE** |
| **SECTION FOR COMBATING ORGANIZED CRIME** |
| 33 Sf. Vineri St., Bucharest, contact@diicot ro, operator code 16051 |
| Telephone: 021.412.34.04, Fax: 021 319.38.58 |
| **File no. 1305/D/P/2022** |
| **ORDINANCE** |
| *amending the obligations imposed under the preventive measure of judicial control* |
| **25.02.2025** |
| PROFIRA CEZAR – chief prosecutor of service within the Prosecutor's Office attached to the High Court of Cassation and Justice – DIRECTORATE FOR INVESTIGATING ORGANIZED CRIME AND TERRORISM – Central Structure, Section for Combating Organized Crime; |
| Having examined the criminal prosecution documents drawn up in the file bearing the above number, |
| **FINDS:** |
| **I.** On 25.02.2025 there was registered with DIICOT the request of the defendants **Tate Emory Andrew**, identified ███████████████████████████████████████████████, through their chosen defence counsel, attorney VIDINEAC EUGEN CONSTANTIN, with domicile elected for the service of procedural documents at the secondary office of the Civil Law Partnership of Attorneys "Vidineac and Associates", located in Bucharest, 23 Regina Maria Blvd., floor 1, apt. 3, District 4, who, pursuant to the provisions of **art. 215 para. 8 of the Code of Criminal Procedure**, requested the **revocation of the preventive measure of judicial control ordered by Interlocutory Judgment no. 428/CP of the Bucharest Court of Appeal, delivered on 04.08.2023 in file no. 18906/3/2023/al.2, and extended by the Ordinance extending the preventive measure of judicial control issued on 31.01.2025 in file no. 1305/D/P/2022,** having regard to the following considerations: |
| By Interlocutory Judgment no. 428/CP of the Bucharest Court of Appeal, delivered on *04.08.2023* in criminal file no. 18906/3/2023/al.2, the appeal lodged by the defendants Tate Andrew and Tate Tristan was admitted, with the |

consequence of replacing the measure of house arrest with the preventive measure of judicial control for a period of 60 days, from 04.08.2023 until 02.11.2023 inclusive.

Subsequently, this measure was successively maintained by the courts, so that on 31.01.2025, following the return of the case to the prosecutor's office on 19.12.2024, the Ordinance extending the preventive measure of judicial control was issued for a period of 60 days (from 03.02.2025 until 03.04.2025 inclusive).

It is submitted that, from the moment the measure was instituted until the present, the circumstances underlying its imposition have changed significantly, so that maintaining judicial control is no longer justified, the legal requirements laid down by art. 202 para. (1) of the Code of Criminal Procedure not being met — namely the existence of well-founded reasons justifying the need to prevent the defendant from evading criminal prosecution or trial, from influencing witnesses, or from committing other offences.

In support of this point, they mention that they appeared at all the terms set by the judicial body or by the court, complying in full with all the obligations imposed at the time the judicial control measure was taken.

Moreover, they emphasize that, throughout the preventive measure, they displayed irreproachable conduct, committing no offence and rigorously complying with the measures to which they were subject.

In this respect, given that the measure of judicial control imposes evident restrictions on freedom of movement and on professional activity, also affecting the personal and family life of the undersigned, we consider that the maintenance of such a restriction appears manifestly unjustified for as long as there can be no question of any attempt to hamper the criminal prosecution or of any wish to evade criminal prosecution.

Furthermore, it is requested that it be noted that, in this case, there can likewise be no question of the persistence or continued existence of a social danger, given that the echo of the acts whose commission is charged against them has diminished considerably or has even become non-existent with the passage of a long period of time — a circumstance that outlines the merits of the undersigned's request.

In support of this, they point out to the criminal prosecution bodies that the practice of the European Court of Human Rights has established through its decisions that: *"in [assessing the persistence of the danger to public order of releasing the defendant, one must start from the rules of principle established in this respect by the ECtHR case-law which, in several cases against France (for example, the Lelellier case, Judgment of 26 June 2001), held that, in so far as national law recognizes, by reason of the particular gravity and the particular reaction of public opinion, that certain offences may give rise to a « a disturbance of society » of a nature to justify a preventive measure, but only for a limited term and in any event, it should be demonstrated that release would genuinely disturb public order, and the maintenance of the measure is legitimate only for as long as public order is effectively threatened.*

*Consequently, according to the ECtHR case-law, the liberty of the person is the rule, the exception to this rule being deprivation of liberty by means of any preventive measure (Wemhoff v. Germany), which represents a serious derogation from the principles of individual liberty and from the presumption of innocence, the national authorities having the obligation to ensure that, in each case, the preventive measure to which an [accused is subject does not exceed a reasonable duration"* (Bistrița-Năsăud Tribunal, by interlocutory judgment of 28 May 2007).

Thus, starting from the considerations of the European Court of Human Rights, the criminal prosecution bodies must prove both the practical necessity of maintaining, in the present case, judicial control, and the negative consequences that would result from the revocation of this measure and from the release of the person.

Further, from the perspective of the ***social resonance of the charged act,*** they request the court to apply the settled ECtHR case-law in the matter, according to which the concrete danger to public order may be taken into account in the initial phase of the criminal proceedings, but this factor is relevant and sufficient only if it is based on facts of a nature *to demonstrate that the full release of the defendant would genuinely disturb public order (ECtHR,*

*Degeratu v. Romania, of 6 July 2010, Scundeanu v. Romania, of 2 February 2010; I.A. v. France, of 23 September 1998).*

*Therefore, when assessing the necessity of maintaining the preventive measure of judicial control, the criminal prosecution bodies must not confine themselves to referring in an abstract manner to the gravity of the acts and the disturbance of public order, without giving reasons for the certain and current character of the interference with public order and without specifying exactly how the release of the applicant would have such an effect (see ECtHR, Prencipe v. Monaco of 16 July 2009).*

In relation to these considerations, they request the criminal prosecution bodies also to bear in mind the necessity of taking into account a reasonable term for ordering preventive measures against persons suspected of committing acts of a criminal nature, by analysing not only the complexity of the case but also the period of time elapsed since the preventive measures were taken.

Therefore, as a matter of principle, the European Court held that *a person accused of an offence must always be released during the proceedings if the authorities cannot prove that there are sufficient reasons justifying the continued maintenance of a preventive measure* (Mahmut Öz v. Turkey, of 03 July 2012, Moldova, of 4 October 2005, §95; Yağcı and Sargın v. Turkey, of 8 June 1995, §52).

The Court emphasized that *the invocation of a disturbance of public order cannot be done in an abstract, general manner, but rather presupposes the existence of concrete and effective reasons that must make the maintenance of the preventive measure necessary, with the aim of removing the state of danger, as a measure of protection of public order (see ECtHR, Jiga v. Romania — Judgment of 16 March 2010, Scundeanu v. Romania — Judgment of 2 February 2010),* case-law fully applicable to the present case.

Not least, in order to prove the merits of the present request, it is requested that it be borne in mind that they fully complied with the obligations and measures to which they were subject, appearing whenever summoned before the competent bodies — aspects that attest to the impossibility that the revocation of the judicial control measure would lead to the disturbance or hampering of the criminal prosecution.

**II.** On 25.02.2025 there was registered with D.I.I.C.O.T. the request of the defendant **Tate Emory Andrew**, ██████████████████████████████████████████████████, and **Tate Tristan**, ██████████████████████████████████, through their chosen defence counsel, attorney Alexandru Rîșniță, with domicile elected for the service of procedural documents at the seat of the law office of attorney Alexandru Rîșniță, located in Cluj-Napoca, 44 Axente Sever St., who, pursuant to the provisions of **art. 215 para. 8 of the Code of Criminal Procedure**, as well as the request of the chosen defence counsel attorney Vidineac Eugen Constantin, with domicile elected for the service of procedural documents at the secondary office of the Civil Law Partnership of Attorneys "Vidineac and Associates", located in Bucharest, 23 Regina Maria Blvd., floor 1, apt. 3, District 4, whereby they requested the **cessation of the obligation not to leave the territory of Romania, attached to the judicial control,** having regard to the following reasons:

By way of introduction, a brief chronology of the preventive measures ordered in the present file is recalled: Messrs. Tate were taken into police custody on 29.12.2022 and then placed in pre-trial detention starting on 30.12.2022 and until 31.03.2023, at which point the measure was replaced with house arrest. Subsequently, house arrest was replaced with the measure of judicial control on 04.08.2023, a measure under which the two remain at present.

The obligations attached to each of the preventive measures were fully complied with, as evidenced also by the gradual decrease in the intensity of the preventive measures. And with regard to the obligations attached to judicial control, the correct procedural attitude of Messrs. Tate justified the extension of the territorial limits from Bucharest Municipality and Ilfov County to the territory of Romania.

Although it is considered that, at this point, one could even discuss the appropriateness of investigating the two while at full liberty, for the moment the removal from the content of judicial control of the obligation not to leave the territory of Romania is requested.

On a first level, it is recalled that **Messrs. Tate are American and British citizens,** and that during the period of nearly 2 years and 2 months in which they were subject to preventive measures, they interrupted all ties with their states of citizenship. Implicitly, the two suffered a **significant restriction in the exercise of the right to private and family life.** At present, it is considered that such a restriction no longer finds an objective justification, in which context one may even discuss a disregard of art. 2 of Protocol no. 4 to the European Convention on Human Rights, according to which *everyone is free to leave any country, including his own.*

Of course, it is not in itself unacceptable for States to apply various preventive measures that restrict a defendant's liberty in order to ensure the efficient conduct of the criminal proceedings and to ensure the person's presence throughout the proceedings. Even so, in order to assess whether a given restriction is justified on the basis of the aforementioned aim, the Court has had regard, in its practice, to a series of criteria for analysing the fairness of such a measure, such as the conduct of the applicant and, in particular, the risk of evading criminal prosecution or trial (Pop Blaga v. Romania, Bulea v. Romania), the evolution of the criminal investigation and the diligence of the authorities in carrying it out throughout the duration of the imposed restriction (Prescher v. Bulgaria, Pfeifer v. Bulgaria), or the possibility of conducting the procedure efficiently without imposing the restriction at issue (Hajibeyli v. Azerbaijan, Pokhalchuk v. Ukraine).

Moreover, it is submitted that **there are no plausible reasons to consider that Messrs. Tate would have any intention of absconding,** on the contrary constantly demonstrating interest in the correct establishment of the facts and the resolution of the present file. Equally, having regard also to the notoriety of the two, it is considered that the thesis of absconding is, from a pragmatic point of view, entirely implausible.

At the same time, it is considered that **the admission of the present request would not affect the proper conduct of the criminal proceedings.** It is recalled that Messrs. Tate would remain subject to the other obligations attached to the preventive measure. Thus, their appearance at the summonses of the judicial bodies and at the police body designated for supervision would ensure their participation in the proceedings, while the prohibition on contacting the alleged injured persons and the witnesses would continue to be effective in ensuring the establishment of the truth in the case.

With regard to the **stage of the investigation,** it is recalled that, in the preliminary chamber procedure, the present file was returned to the Prosecutor's Office, so that the inevitable prolongation of the procedure is not imputable to the defendants. Further, in order to decide whether a fair balance was struck between the general interests and the personal interests at stake in a given case, the Court must verify whether the applicant had a **genuine interest in exercising the right** affected by the restriction at issue. The **prolonged inability to return to the place or country of habitual residence and the separation from family** resulting therefrom, as is the case of Messrs. Tate, denotes such a genuine interest in exercising freedom of movement (Munteanu v. Romania, Miazdzyk v. Poland).

Furthermore, the **conduct of the applicants,** who repeatedly seek to obtain the revocation of the restriction, also denotes such an interest and carries significant weight in the Court's analysis regarding the fair balance between the public interest and the individual interests in issue (Hristov v. Bulgaria). On this level, it is observed that Messrs. Tate have repeatedly requested both the revocation of the measure and the extension of the imposed territorial limit.

Not least, even where a restriction on the person's freedom of movement was initially justified, its automatic maintenance over a long period of time may become a disproportionate measure that infringes the person's rights (Riener v. Bulgaria).

For these considerations, we consider that the period of over 2 years during which Messrs. Tate were unable to return, even temporarily, to their states of citizenship and to maintain contact with their family environment was sufficient, and that, having regard to their procedural conduct, the present file can follow its natural course even in the absence of this prohibition.

In view of these considerations, it is respectfully requested that the present request be admitted as formulated.

*******

**Art. 242 para. 1 of the Code of Criminal Procedure provides:**

"The preventive measure **is revoked**, ex officio or upon request, where **the grounds that determined it have ceased or new circumstances have arisen from which the unlawfulness of the measure results**, ordering, in the case of police custody and pre-trial detention, the release of the suspect or of the defendant, if he is not detained in another case."

**Art. 215 para. 8 and para. 8¹ of the Code of Criminal Procedure provides:**

"During the criminal prosecution, the prosecutor may order, ex officio or at the reasoned request of the defendant, by ordinance, the imposition of new obligations on the defendant **or the replacement or cessation of those initially ordered**, if well-founded reasons arise justifying this, after hearing the defendant. Against the prosecutor's ordinance, the defendant may lodge a complaint with the judge of rights and liberties at the court that would have jurisdiction to try the case on the merits, the provisions of art. 213 applying accordingly.

The provisions of para. (8) shall also apply where the measure was taken by the judge of rights and liberties."

***

By Ordinance no. **1305/D/P/2022** of **31.01.2025** concerning the defendants **TATE Tristan**, known as *"Talisman Tate"*, ████████████████████████████████████████ , and **TATE III Emory Andrew**, ████████████████████████████████████████ the **preventive measure of judicial control was extended for a period of 60 days, from 03.02.2025 until 03.04.2025 inclusive;**

*Throughout the time they are under judicial control, the defendants TATE Emory III Andrew and TATE Tristan must comply with the following obligations:*

*a) to appear before the criminal prosecution body, the preliminary chamber judge, or the trial court whenever summoned;*

*b) to immediately inform the judicial body that ordered the measure or before which the case is pending of any change of residence;*

*c) to appear at the police station in whose jurisdiction the defendant actually resides, in accordance with the supervision schedule drawn up by the police body, or whenever summoned;*

*d) **not to leave the territorial limit of Romania except with the prior authorization of the judicial body before which the case is pending;***

*e) the defendants Radu Laura Alexandra and Naghel Georgiana-Manuela shall not approach one another, nor the defendants Tate III Emory Andrew and Tate Tristan; the latter two defendants may approach each other, but may not approach the co-defendants* ███████████████████████████████████████████████████████████████████████ *; shall not approach the injured persons/civil parties:* ████████████████████████████████████████████████████████████████████

*f) to periodically provide relevant information about their means of subsistence;*

*g) not to possess, use, or carry weapons.*

\*\*\*

**Having been heard on 25.02.2025 regarding the request made, the defendant TATE III Emory Andrew stated the following:**

"I was informed that I am to be heard regarding the revocation/amendment of the content of the preventive measure of judicial control, namely the removal of the obligation to leave the territory of Romania.

Given that I am an American citizen, I have the possibility to develop a business in the online field, to be near my family in America, having regard to the losses suffered in the family — namely my grandmother and my aunt have passed away — as well as to the fact that the other family members, including my sister, need me and we must reunite as a family. In this sense, I will be able to come at any summons of the judicial bodies in order to uphold my procedural position in the files in which I am involved, and I will also come to the signings before the duty officer, as required of me.

I specify that, should you grant me this request, I will communicate to you the address where I will actually reside, as well as all the data necessary for contacting me by email and telephone in order to respond promptly and efficiently to any request you may have.

Likewise, I appoint Mr. attorney Constantin Eugen Vidineac to continue to represent my legal interests, and he also assumes the obligation to notify me of any request of the criminal prosecution bodies.

I was informed that, should I fail to appear at the summonses of the judicial bodies or fail to comply with the other obligations of judicial control, the preventive measure of judicial control may be replaced with a custodial preventive measure."

**Having been heard on 25.02.2025 regarding the request made, the defendant TATE Tristan stated the following:**

"I was informed that I am to be heard regarding the revocation/amendment of the content of the preventive measure of judicial control, namely the removal of the obligation to leave the territory of Romania.

Given that I am an American citizen, I have the possibility to develop a business in the online field, to be near my family in America, having regard to the losses suffered in the family — namely my grandmother and my aunt have passed away — as well as to the fact that the other family members, including my sister, need me and we must

reunite as a family. In this sense, I will be able to come at any summons of the judicial bodies in order to uphold my procedural position in the files in which I am involved, and I will also come to the signings before the duty officer, as required of me.

I specify that, should you grant me this request, I will communicate to you the address where I will actually reside, as well as all the data necessary for contacting me by email and telephone in order to respond promptly and efficiently to any request you may have.

Likewise, I appoint Mr. attorney Constantin Eugen Vidineac to continue to represent my legal interests, and he also assumes the obligation to notify me of any request of the criminal prosecution bodies.

I was informed that, should I fail to appear at the summonses of the judicial bodies or fail to comply with the other obligations of judicial control, the preventive measure of judicial control may be replaced with a custodial preventive measure."

************

**I.** As regards the request for revocation of the preventive measure of judicial control, this **shall be rejected as unfounded** for the following considerations:

Pursuant to art. 242 para. 1 of the Code of Criminal Procedure, the preventive measure is revoked ex officio or upon request, where the grounds that determined it have ceased or new circumstances have arisen from which the unlawfulness of the measure results.

Analysed through the prism of the appropriateness of the preventive measures under which the defendants were placed, it is held that their legal situation and the procedural stage of the file require that the liberty of those concerned be subordinated to procedural guarantees, it being necessary to maintain permanent and supervised contact between them and the judicial body, as well as a prompt response to any summons of the judicial authority, so that it is considered that there exists a fair balance between the interference with the defendants' rights, legal and constitutional, and the aim pursued, namely to ensure that the criminal proceedings initiated against them unfold at an undisturbed pace.

The defendants were placed under a preventive measure restrictive of liberty not only in order to be at the disposal of the judicial bodies, but also examined from the perspective of the imperative need to protect the process of administering the evidence, in which sense it is necessary for them to be under the regime of subordinating liberty to procedural guarantees, having to bear certain restrictions not only with regard to freedom of movement and social life, and to have their manner of complying with the imposed obligations verified, in particular through the monitored observation of the persons with whom they come into contact and of their forms of manifestation, thus also avoiding the risk of committing new offences of the same kind.

Likewise, it is considered that the measure of judicial control is necessary in order to ensure the proper conduct of the criminal proceedings, but also to prevent the commission by the defendants of other offences, having regard to the nature of the acts for which they are being investigated and the context in which these were committed. Consequently, owing to the specific nature of the offences for which the defendants Andrew and Tristan TATE are being investigated, the preventive measure is necessary at this procedural moment.

From this perspective, not even the personal circumstances of the defendants can counterbalance the gravity of the acts committed, and they are wholly insufficient to substantiate the revocation of the preventive measure ordered in the case.

At the same time, it is found that the preventive measure of judicial control is also proportionate to the gravity of the charges brought against the defendants, given that, as has been shown, they are charged with committing acts

of a high degree of gravity, in respect of which there exist, up to this moment, well-founded indications giving rise to the reasonable suspicion that they were committed in the manner retained by the judicial body.

Therefore, for the reasons retained and in relation to the gravity of the acts allegedly committed, as well as the procedural imperatives, such as those of ensuring the proper conduct of the criminal proceedings and of continuing to keep the defendants at the disposal of the judicial bodies, which could require their presence at any moment for the purpose of carrying out the criminal prosecution, I consider that the absence of *any* form of control over the defendants TATE Andrew and Tristan *would not be appropriate.*

With the factual and legal reasoning set out in the foregoing, it is considered that this measure, merely restrictive of rights, satisfies the requirements of appropriateness and proportionality in full accordance with domestic provisions and consistent with ECtHR practice, responds to the imperative of ensuring the proper conduct of the criminal proceedings, by obtaining lawful evidence, for the timely and complete establishment of the acts constituting offences, so that any person who has committed an offence be punished according to his guilt and no innocent person be held criminally liable.

**II.** As regards the request of the defendants TATE Andrew and Tristan for the amendment of the content of the preventive measure of judicial control, in the sense of **removing the obligation not to leave the territory of Romania, attached to the judicial control**, this shall be admitted for the following considerations:

By **interlocutory judgment of the Bucharest Tribunal – Criminal Division I** delivered on **18.07.2023** in **file no. 18906/3/2023/a1.2**, the **lawfulness and merits of the house-arrest measure taken with respect to the defendants, TATE III EMORY ANDREW,** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ , **TATE TRISTAN**, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ , by interlocutory judgment no. 120/CO-DL/31.03.2023 of the Bucharest Court of Appeal – Criminal Division II delivered in file no. 8921/3/2023;, by interlocutory judgment no. **120/CO-DL/31.03.2023 of the Bucharest Court of Appeal – Criminal Division II** delivered in file no. **8921/3/2023**, were found.

By **interlocutory judgment no. 428/CP of the Bucharest Court of Appeal – Criminal Division I** delivered on 04.08.2023, **the appeals were admitted** which were lodged by the defendants Tate III Emory Andrew, Tate Tristan against the interlocutory judgment of 18.07.2023 of the preliminary chamber judge within the Bucharest Tribunal, Criminal Division I, delivered in file no. 18906/3/2023/a1.2, the contested interlocutory judgment being set aside, and, upon re-trial:

Pursuant to art. 242 para. 2 of the Code of Criminal Procedure with reference to art. 211 et seq. of the Code of Criminal Procedure, it **replaces the measure of house arrest** of the defendants Tate III Emory Andrew and Tate Tristan **with the preventive measure of judicial control**, for a period of 60 days, from 04 August 2023 until 02 October 2023 inclusive.

As can be observed, the defendants TATE Andrew and Tristan have been under the preventive measure of judicial control since 04.08.2023. The obligations attached to both preventive measures were fully complied with, the defendants demonstrating respect for all the obligations imposed during the nearly 1 year and 6 months of preventive measures restrictive of liberty and rights.

Likewise, the defendants TATE Andrew and Tristan are American and British citizens, and during the period of over 1 year and 6 months in which they were subject to preventive measures, they interrupted all ties with their states of citizenship and with the family members located in those states. Therefore, they suffered a significant restriction in the exercise of the right to private and family life, which is why it is considered that such a restriction

no longer finds an objective justification, given that the defendants, for over 2 years, rigorously complied with all the obligations imposed.

At the same time, having regard to the conduct of the defendants TATE Andrew and Tristan in the two files in which they are being investigated, in concrete terms, it is considered that there are no plausible reasons to consider that they would have any intention of evading criminal prosecution and trial; on the contrary, they have constantly demonstrated interest in the correct establishment of the facts and the resolution of the present file.

Therefore, I consider that the admission of the present request would not affect the proper conduct of the criminal proceedings, given that the defendants TATE Andrew and Tristan remain subject to the other obligations attached to the preventive measure. Thus, their appearance at the summonses of the judicial bodies and at the police body designated for their supervision would ensure their participation in the proceedings, while the prohibition on contacting the alleged injured persons and the witnesses would continue to be effective in ensuring the establishment of the truth in the case.

In view of the foregoing considerations, pursuant to art. 242 of the Code of Criminal Procedure and art. 215 para. 8 of the Code of Criminal Procedure,

### I ORDER:

**1. Rejection of the request made by the defendants TATE III Emory Andrew,** *9* and **TATE Tristan,** through their chosen defence counsel attorney Vidineac Eugen Constantin, **for the revocation of the preventive measure of judicial control.**

**2. Admission of the request made by the defendants TATE III Emory Andrew,** and **TATE Tristan,** through their chosen defence counsel attorney Vidineac Eugen Constantin and chosen defence counsel attorney Alexandru Rîșniță, **for the amendment of the judicial control measure taken with respect to them.**

**The amendment of the judicial control measure taken with respect to the defendants:**

**TATE III Emory Andrew,** and **TATE Tristan,**

*The obligation not to leave the territorial limit of Romania except with the prior authorization of the criminal prosecution body, the preliminary chamber judge, or the trial court is removed;*

The present ordinance shall be communicated to the defendants **TATE III Emory Andrew** and **TATE Tristan**, as well as to IPJ Ilfov – Voluntari Town Police.

**CHIEF PROSECUTOR OF SERVICE,**

**CEZAR PROFIRA**

*[signature and round DIICOT stamp]*