# DOSAR NR. 2557/D/P/2023

*Ordinance of 25.02.2025 – English translation*

*English text of this document, extracted from its Romanian–English parallel translation. Unofficial, for information only; not a certified or sworn translation.*

| **ENGLISH TRANSLATION** |
|---|
| **R O M A N I A** |
| **PUBLIC MINISTRY** |
| **PROSECUTOR'S OFFICE ATTACHED TO** |
| **THE HIGH COURT OF CASSATION AND JUSTICE** |
| **DIRECTORATE FOR INVESTIGATING ORGANIZED CRIME AND TERRORISM** |
| **CENTRAL STRUCTURE** |
| **SECTION FOR COMBATING ORGANIZED CRIME** |
| 33 Sf. Vineri St., Bucharest, contact@diicot ro, operator code 16051 |
| Telephone: 021.412.34.04, Fax: 021 319.38.58 |
| **File no. 2557/D/P/2023** |
| **ORDINANCE** |
| *amending the obligations imposed under the preventive measure of judicial control* |
| **25.02.2025** |
| PROFIRA CEZAR – chief prosecutor of service within the Prosecutor's Office attached to the High Court of Cassation and Justice – DIRECTORATE FOR INVESTIGATING ORGANIZED CRIME AND TERRORISM – Central Structure, Section for Combating Organized Crime; |
| Having examined the criminal prosecution documents drawn up in the file bearing the above number, |
| **FINDS:** |
| **I.** On 25.02.2025 there was registered with D.I.I.C.O.T. the request of the defendant **Tate Emory Andrew**, identified by residence permit no. 000010383, personal identification number (PIN): 7861201080029, through his chosen defence counsel, attorney VIDINEAC EUGEN CONSTANTIN, with domicile elected for the service of procedural documents at the secondary office of the Civil Law Partnership of Attorneys "Vidineac and Associates", located in Bucharest, 23 Regina Maria Blvd., floor 1, apt. 3, District 4, who, pursuant to the provisions of **art. 215 para. 8 of the Code of Criminal Procedure**, requested the **revocation of the judicial control measure** ordered by Interlocutory Judgment no. 67/DL delivered by the Bucharest Court of Appeal in file no. 3844/3/2025, in view of the following reasons: |

By Interlocutory Judgment no. 67/DL delivered by the Bucharest Court of Appeal in file no. 3844/3/2025, the preventive measure of house arrest was replaced with the preventive measure of judicial control for a period of 60 days (from 14.02.2025 until 14.04.2025), with certain obligations also being imposed on me.

It is submitted that, from the moment the measure was instituted until the present, the circumstances underlying the ordering of the measure have changed significantly, so that maintaining the judicial control is no longer justified, the legal requirements provided by art. 202 para. (1) of the Code of Criminal Procedure not being met, namely the existence of well-founded reasons justifying the need to prevent the defendant from evading the criminal prosecution or the trial, from influencing witnesses, or from committing other offences.

In support of this matter, it is noted that the defendant appeared at all the terms set by the judicial body or the trial court, complying in full with all the obligations imposed at the time the judicial control measure was taken.

Moreover, he emphasizes that throughout the duration of the preventive measure he displayed irreproachable conduct, committing no offence and rigorously complying with the measures to which he was subject.

In this sense, given that the judicial control measure imposes evident restrictions on the right to movement and on professional activity, while at the same time affecting the personal and family life of the defendant, he considers that maintaining such a restriction is manifestly unjustified so long as there can be no question of an attempt to hamper the criminal prosecution activity or of a desire to evade the criminal prosecution.

Furthermore, it is requested to note that, in the case, there can be no question either of the subsistence or continued existence of a social danger, given that the echo of the acts whose commission is imputed to him has diminished considerably or has even become non-existent with the passage of a long period of time — an aspect that outlines the merits of the undersigned's request.

In support of this, he brings to the attention of the criminal prosecution bodies the fact that the practice of the European Court of Human Rights has established through its decisions that: *"In assessing the persistence of the danger to public order posed by releasing the defendant, one must start from the matters of principle established in this respect by the ECtHR case-law which, in several cases against France (for example, the Letellier case, Judgment of 26 June 2001), held that, in so far as national law recognizes it through the particular seriousness and the particular reaction of public opinion, that certain offences may give rise to a « disturbance of society » of such a nature as to justify a preventive measure, **but only for a limited period and, in any event, it would have to be demonstrated that release would genuinely disturb public order, and maintaining the measure is legitimate only for so long as public order is actually threatened.***

Consequently, according to the ECtHR case-law, the liberty of the person is the rule, the exception to this rule being deprivation of liberty by means of any preventive measure (the Wemhoff v. Germany case), which represents **a serious derogation from the principles of individual liberty and from the presumption of innocence,** the national authorities being under an obligation to ensure that, in each case, the preventive measure to which an accused is subject does not exceed a reasonable duration" *(Bistriţa-Năsăud Tribunal, by interlocutory judgment of 28 May 2007).*

Thus, starting from the considerations of the European Court of Human Rights, the criminal prosecution bodies must prove both the practical necessity of maintaining, in the present case, the judicial control, and the negative consequences that would result from the revocation of this measure and from releasing the person.

Further, from the perspective of the _**social resonance of the imputed act,**_ he requests the court to apply the ECtHR's settled case-law in the matter, according to which the concrete danger to public order may be taken into account at the initial stage of the criminal process, but this factor is not relevant and sufficient unless it is based on facts of such a nature _**as to demonstrate that the full release of the defendant would genuinely disturb public order**_ (see ECtHR, Degeratu v. Romania, of 6 July 2010, Scundeanu v. Romania, of 2 February 2010; I.A. v. France, of 23 September 1998).

Therefore, _**at the moment of assessing the necessity of maintaining the preventive measure of judicial control, the criminal prosecution bodies must not confine themselves merely to making abstract reference to the gravity of the acts and to the disturbance of public order, without motivating the certain and current character of the harm to public order and without specifying how exactly the release of the claimant would have such an effect_** (see ECtHR, the Prencipe v. Monaco case of 16 July 2009).

In relation to these considerations, he requests the criminal prosecution bodies to also take into account the necessity of considering a reasonable time-frame for the ordering of preventive measures against persons suspected of committing criminal acts, by analysing not only the complexity of the case, but also the period of time elapsed since the preventive measures were taken.

Thus, as a matter of principle, the European Court held that *a person accused of an offence must always be released during the proceedings, if the authorities cannot prove that there are sufficient reasons to justify the continued maintenance of a preventive measure. (Mahmut Öz v. Turkey, of 03 July 2012, Şarban v. Moldova, of 4 October 2005, §95; Yağcı and Sargın v. Turkey, of 8 June 1995, §52).*

The Court emphasized that *invoking the disturbance of public order cannot be done in an abstract, general manner, but rather it presupposes the existence of concrete and effective reasons that must make it necessary to maintain the preventive measure, with the aim of removing the state of danger, as a measure to protect public order (see ECtHR Jiga v. Romania – Judgment of 16 March 2010, Scundeanu v. Romania – Judgment of 2 February 2010),* case-law fully applicable to the present case.

Consequently, he considers that, in order to prove the merits of the present request, he asks that it be taken into account that he fully complied with the obligations and measures under which he found himself, appearing whenever he was summoned before the competent bodies — aspects that attest to the impossibility that revoking the judicial control measure would lead to the disturbance or hampering of the criminal prosecution activity.

**II.** On 25.02.2025 there was registered with D.I.I.C.O.T. the request of the defendant **Tate Emory Andrew**, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, through his chosen defence counsel, attorney Alexandru Rîșniță, with domicile elected for the service of procedural documents at the office of the law practice of attorney Alexandru Rîșniță, located in Cluj-Napoca, 44 Axente Sever St., who, pursuant to the provisions of **art. 215 para. 8 of the Code of Criminal Procedure**, as well as the request of the chosen defence counsel, attorney VIDINEAC EUGEN CONSTANTIN, with domicile elected for the service of procedural documents at the secondary office of the Civil Law Partnership of Attorneys "Vidineac and Associates", located in Bucharest, 23 Regina Maria Blvd., floor 1, apt. 3, District 4, through which they requested the **cessation of the obligation not to leave the territory of Romania, attached to the judicial control,** in view of the following reasons:

It is recalled at the outset that Mr. Andrew Tate was taken into police custody on 21.08.2024 and made subject to the preventive measure of house arrest starting from 22.08.2024, subsequently replaced with the judicial control measure on 14.02.2025. The obligations attached to both preventive measures were fully complied with, evidence of which is also the gradual decrease in the intensity of the preventive measures.

Although it is believed that, at this moment, one may even discuss the appropriateness of investigating Mr. Andrew Tate in a state of full liberty, they choose to request for the moment the removal, from the content of the judicial control, of the obligation not to leave the territory of Romania.

On a first level, he recalls that **Mr. Tate is an American and British citizen,** and that during the period of over 6 months in which he was subject to preventive measures he severed all ties with the states of his citizenship. Implicitly, he suffered a **significant restriction in the exercise of the right to private and family life.** At present, it is believed that such a restriction no longer finds an objective justification, a context in which one may even discuss a breach of art. 2 of Protocol No. 4 to the European Convention on Human Rights, according to which *everyone is free to leave any country, including his own.*

Of course, it is not in itself unacceptable for States to apply various preventive measures that restrict the liberty of a defendant in order to ensure the efficient conduct of the criminal proceedings and to ensure the presence of the person throughout the proceedings. Even so, in order to assess whether a particular restriction is justified on the basis of the aforementioned purpose, the Court has taken into account, in its practice, a series of criteria for analysing the fairness of such a measure, such as the conduct of the claimant and, in particular, the risk of evading criminal prosecution or trial (Pop Blaga v. Romania, Bulea v. Romania), or the possibility of efficiently conducting the procedure without imposing the disputed restriction (Hajibeyli v. Azerbaijan, Pokhalchuk v. Ukraine).

It is submitted that, concretely, **there are no plausible reasons to consider that Mr. Tate would have the intention to evade,** on the contrary constantly demonstrating an interest in the correct establishment of the facts and the resolution of the present file. Equally, having regard also to his notoriety, it is believed that the thesis of evasion is, from a pragmatic point of view, completely implausible.

At the same time, we consider that **admitting the present request would not affect the proper course of the criminal proceedings.** It is recalled that Mr. Tate would remain subject to the other obligations attached to the preventive measure. Thus, his appearance at the summonses of the judicial bodies and at the police body designated for supervision would ensure his participation in the proceedings, while the prohibition on contacting the alleged injured persons and the witnesses would continue to be effective for ensuring the ascertainment of the truth in the case.

Further, in order to decide whether a fair balance has been struck between the general and the personal interests at stake in a particular case, the Court must verify whether the claimant had **a real interest in exercising the right** affected by the disputed restriction. **The prolonged inability to return to the place or country of one's habitual residence and the separation from family** resulting therefrom, as is the case of Mr. Tate, denote such a real interest in exercising the freedom of movement (Munteanu v. Romania, Miazdiyk v. Poland).

Last but not least, it is submitted that even when a restriction on a person's freedom of movement was initially justified, maintaining it automatically over a long period of time may become a disproportionate measure that infringes the person's rights (Rrener v. Bulgaria).

*******

**Art. 242 para. 1 of the Code of Criminal Procedure provides:**

*"The preventive measure **shall be revoked,** ex officio or upon request, **where the grounds that determined it have ceased or new circumstances have arisen from which the unlawfulness of the measure results,** ordering, in the case of police custody and pre-trial detention, the release of the suspect or of the defendant, if he is not detained in another case."*

**Art. 215 para. 8 and para. 8¹ of the Code of Criminal Procedure provides:**

*"During the criminal prosecution, the prosecutor may order, ex officio or at the reasoned request of the defendant, by ordinance, the imposition of new obligations on the defendant, **or the replacement or cessation of those initially ordered,** if well-founded reasons arise justifying this, after hearing the defendant. Against the prosecutor's ordinance, the defendant may lodge a complaint with the judge of rights and liberties at the court that would have jurisdiction to try the case on the merits, the provisions of art. 213 applying accordingly.*

*The provisions of para. (8) shall also apply where the measure was taken by the judge of rights and liberties."*

By interlocutory judgment **no. 67/DL of 14 February 2025** concerning the defendant **TATE III EMORY ANDREW,** ███████████████████████████████████████████████████████████

███████████████████████████████████████████, under house arrest, it was ordered:

*"Takes note of the withdrawal of the appeal lodged by the appellant defendant TATE 111 EMORY ANDREW against the interlocutory judgment delivered by the judge of rights and liberties of the Bucharest Tribunal, Criminal Section I, on 12.02.2025, in file no. 3844/3/2025*

*pursuant to art. 425¹ para. 7 pt. 2 let. a of the Code of Criminal Procedure, allows the appeal lodged by the Prosecutor's Office attached to the High Court of Cassation and Justice – Directorate for Investigating Organized Crime and Terrorism – Central Structure against the interlocutory judgment delivered by the judge of rights and liberties of the Bucharest Tribunal, Criminal Section I, on 12.02.2025, in file no. 3844/3/2025, partially sets aside the contested interlocutory judgment and, retrying on the merits:*

Pursuant to art. 242 para. 2 of the Code of Criminal Procedure, replaces the measure of house arrest, ordered against the defendant TATE III EMORY ANDREW', by the interlocutory judgment of 22.08.2024 delivered by the judge of rights and liberties of the Bucharest Tribunal, in file no. 28369/3/2024, with the measure of judicial control for a period of 60 days, from 14.02.2025 until 14.04.2025.

Pursuant to art. 215 para. 1 of the Code of Criminal Procedure, imposes on the defendant TATE III EMORY ANDREW that, throughout the time he is under judicial control, he comply with the following obligations:

a) to appear before the criminal prosecution bodies, the preliminary chamber judge, or the trial court whenever summoned;

b) to immediately inform the criminal prosecution bodies, the preliminary chamber judge, or the court of any change of residence;

c) to appear before the police bodies designated for supervision, in accordance with the supervision schedule drawn up, or whenever summoned.

d) [pursuant to] art. 215 para. 2 of the Code of Criminal Procedure, imposes on the defendant TATE III EMORY ANDREW that, during the judicial control, he comply with the following obligations:

a) **not to leave the territorial limit of Romania except with the prior authorization of the criminal prosecution bodies, the preliminary chamber judge, or the trial court;**

b) not to communicate, directly or indirectly, by any means, with the other co-defendants, Naghel Georgiana-Manuela, Radu Alexandra-Luana, Donea Alexandru, Stanciu Alexandru-Cristian, Stancu Bogdan-Adrian and John Naomi Amba, nor with the injured persons/victims/witnesses ███████████████████████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; and not to approach them at a distance of less than 50 metres.

c) to periodically provide relevant information about his means of subsistence.

d) not to possess, use, or carry weapons.

pursuant to art. 215 para. 3 of the Code of Criminal Procedure, warns the defendant that, in the event of a bad-faith breach of the obligations incumbent upon him or in the event of the intentional commission of another offence during the judicial control, the preventive measure may be replaced with the measure of house arrest or with the measure of pre-trial detention.

Orders the immediate release of the defendant TATE III EMORY ANDREW from under the power of the house arrest measure ordered by the interlocutory judgment of 22.08.2024 delivered by the judge of rights and liberties of the Bucharest Tribunal, in file no. 28369/3/2024."

**Having been heard on 25.02.2025 regarding the request made, the defendant TATE III Emory Andrew stated the following:**

"I was informed that I am to be heard regarding the revocation/amendment of the content of the preventive measure of judicial control, namely the removal of the obligation to leave the territory of Romania.

As I also stated within file 1305/D/P/2022, I mention the same aspects, namely:

Given that I am an American citizen, I have the possibility to develop an online business, to be alongside my family in America, having regard to the losses suffered in the family, namely my grandmother and my aunt have passed away, as well as the fact that the other members of the family, including my sister, need me and we must reunite as a family. In this sense, I will be able to come at any summons of the judicial bodies to support my procedural position in the files in which I am concerned, and I will also come to the signings before the duty officer, as will be imposed on me.

I state that, in the event that you allow me this request, I will communicate to you the address where I will actually reside, as well as all the data necessary for contacting me by email and telephone, in order to respond promptly and efficiently to any request you may have.

Likewise, I appoint Mr. attorney Constantin Eugen Vidineac to continue to represent my legal interests, and he also undertakes the obligation to inform me of any request of the criminal prosecution bodies.

I was informed that, in the event that I do not appear at the summonses of the judicial bodies or do not comply with the other obligations of the judicial control, the preventive measure of judicial control may be replaced for me with a custodial preventive measure."

********

**I.** As regards the request for the revocation of the preventive measure of judicial control, this **shall be dismissed as unfounded** for the following considerations:

Pursuant to art. 242 para. 1 of the Code of Criminal Procedure, the preventive measure is revoked ex officio or upon request, where the grounds that determined it have ceased or new circumstances have arisen from which the unlawfulness of the measure results.

Thus, as can be observed, the preventive measure of judicial control was ordered by interlocutory judgment 67/DL delivered by the Bucharest Court of Appeal in file no. 3844/3/2025 of 14.02.2025, and in the 11 days that have elapsed since the ordering of the preventive measure no new circumstances have arisen from which its unlawfulness would result, nor have the grounds that determined it ceased.

Moreover, the purpose of the preventive measure of judicial control is to ensure the proper conduct of the criminal proceedings, to prevent the defendant from evading the criminal prosecution or the trial, or to prevent the commission of other offences.

As regards the maintenance of the preventive measure of judicial control, this is conditioned, on the one hand, by the existence of evidence or well-founded indications from which the reasonable suspicion results that a person has committed an offence, and, on the other hand, by the necessity of ensuring the proper conduct of the criminal proceedings, it also being possible to find that the social danger which the defendant represents has not substantially diminished compared to the moment the preventive measure was ordered by the trial court.

Likewise, the gravity of the accusation brought against the defendant must be observed, an accusation that justifies the maintenance of the preventive measure of judicial control, there being, in the body of evidence administered in the present case, proof that there is a possibility that the defendant might thwart the proper conduct of the criminal proceedings by influencing the statements of the witnesses or of the injured persons.

Likewise, the condition of proportionality, provided by art. 202 para. 3 of the Code of Criminal Procedure, is met, the judicial control measure — the most lenient of the preventive measures — being proportionate to the gravity of the accusation brought against the defendant.

Analysed from the perspective of the appropriateness of the preventive measures under which the defendant was placed, it is held that his legal situation and the procedural stage of the file require that the liberty of the person concerned be subordinated to procedural guarantees, it being necessary to maintain permanent and supervised contact between him and the judicial body, as well as a prompt response to any summons of the judicial authority, so that it is considered that there is a fair balance between the interference with the defendant's rights, both legal and constitutional, and the aim pursued, namely that of ensuring the conduct of the criminal proceedings initiated against him at an undisturbed pace.

The defendant was placed under a preventive measure restrictive of liberty not only in order to be at the disposal of the judicial bodies, but also examining it from the perspective of the imperative need to protect the process of administering evidence, in which sense it is necessary for him to be under the regime of subordinating liberty to procedural guarantees, having to bear certain constraints not only with regard to freedom of movement and social life, and to have verified the manner of his compliance with the imposed obligations, in particular with the monitored observation of the persons with whom he comes into contact and of their forms of manifestation, thus also avoiding the risk of the commission of new offences of the same kind.

Likewise, it is considered that the judicial control measure is necessary for ensuring the proper conduct of the criminal proceedings, but also for preventing the commission by the defendant of other offences, having regard to the nature of the acts for which he is being investigated and the context in which they were committed. Consequently, due to the specific nature of the offences for which the defendant is being investigated, the preventive measure is necessary at this procedural moment.

From this perspective, neither can the personal circumstances of the defendant counterbalance the gravity of the acts committed, and they are wholly insufficient to found the revocation of the preventive measure ordered in the case.

At the same time, it is found that the preventive measure of judicial control is also proportionate to the gravity of the accusations brought against the defendant, given that, as has been shown, he is charged with the commission of acts of a high gravity, in respect of which there exist, up to this moment, well-founded indications from which the reasonable suspicion results that they were committed in the manner held by the judicial body.

Therefore, for the reasons held and by reference to the gravity of the acts presumed to have been committed, as well as the procedural imperatives, such as those of ensuring the proper conduct of the criminal proceedings and of continuing to keep the defendant at the disposal of the judicial bodies, which might require his presence at any

moment for the purpose of carrying out the criminal prosecution, I consider that the absence of *any* form of control over the defendant TATE Andrew *would not be appropriate.*

With the factual and legal argumentation set out in the foregoing, it is considered that this measure, merely restrictive of rights, satisfies the requirements of appropriateness and proportionality in full accordance with the internal provisions and consistent with the ECtHR case-law, responds to the imperative of ensuring the proper conduct of the criminal proceedings, by obtaining lawful evidence, for the timely and complete ascertainment of the acts constituting offences, so that any person who has committed an offence be punished according to his guilt and no innocent person be held criminally liable.

**II.** As regards the request of the defendant Tate Andrew for the amendment of the content of the preventive measure of judicial control, in the sense of **removing for him the obligation not to leave the territory of Romania, attached to the judicial control,** this shall be admitted for the following considerations:

The defendant Andrew Tate was taken into police custody on 21.08.2024 and made subject to the preventive measure of house arrest starting from 22.08.2024, subsequently replaced with the judicial control measure on 14.02.2025. The obligations attached to both preventive measures were fully complied with, the defendant demonstrating respect towards all the obligations imposed during the more than 6 months of preventive measures restrictive of liberty and rights.

Moreover, it is to be observed that he is being investigated in a parallel file, namely in file 1305/D/P/2022, a file in which the defendant Andrew Tate has been under preventive measures since 29.12.2022, a period of time during which there was no breach by the defendant of the measures ordered.

Likewise, the defendant Andrew Tate is an American and British citizen, and during the period of over 6 months in which he was subject to preventive measures he severed all ties with the states of his citizenship and with the family members located in those states. Therefore, he suffered a significant restriction in the exercise of the right to private and family life, which is why it is believed that such a restriction no longer finds an objective justification, given that for over 2 years the defendant has rigorously complied with all the imposed obligations.

At the same time, having regard to the conduct of the defendant Andrew TATE within the two files in which he is being investigated, concretely, it is considered that there are no plausible reasons to consider that he would have the intention to evade the criminal prosecution and the trial; on the contrary, he has constantly demonstrated an interest in the correct establishment of the facts and the resolution of the present file.

Therefore, I consider that admitting the present request would not affect the proper course of the criminal proceedings, given that the defendant Andrew Tate remains subject to the other obligations attached to the preventive measure. Thus, his appearance at the summonses of the judicial bodies and at the police body designated for supervision would ensure his participation in the proceedings, while the prohibition on contacting the alleged injured persons and the witnesses would continue to be effective for ensuring the ascertainment of the truth in the case.

In view of the foregoing considerations,

**ORDERS:**

**1. The dismissal of the request made by the defendant TATE III EMORY ANDREW,** ███████████████████████████████████████████████████████████████ by the United States – Department of State, through his chosen defence counsel, attorney Vidineac Eugen Constantin, **for the revocation of the preventive measure of judicial control.**

**2. The admission of the request made by the defendant TATE III EMORY ANDREW,** son of ███████████████████████████████████ , through his chosen defence counsel, attorney Vidineac Eugen Constantin, and his chosen defence counsel, attorney Alexandru Rîșniță, **for the amendment of the judicial control measure taken with respect to the defendant.**

The amendment of the judicial control measure taken with respect to the defendant:

**TATE III EMORY ANDREW,** son of ███████████████████████████████████ , by interlocutory judgment no. 67/DL delivered by the Bucharest Court of Appeal in file no. 3844/3/2025 on 14.02.2025.

*The obligation not to leave the territorial limit of Romania, except with the prior authorization of the criminal prosecution bodies, the preliminary chamber judge, or the trial court, is removed;*

The present ordinance shall be communicated to the defendant **Tate Andrew** and to IPJ Ilfov – the Voluntari Town Police.

**CHIEF PROSECUTOR OF SERVICE,**

**CEZAR PROFIRA**