# DOSAR NR. 2557/D/P/2023

*Ordinance extending judicial control of 03.07.2026 – English translation*

*English text of this document, extracted from its Romanian–English parallel translation. Unofficial, for information only; not a certified or sworn translation.*

| ENGLISH TRANSLATION |
|---|
| **R O M A N I A** |
| **PUBLIC MINISTRY** |
| **PROSECUTOR'S OFFICE ATTACHED TO THE HIGH COURT OF CASSATION AND JUSTICE** |
| **DIRECTORATE FOR INVESTIGATING ORGANIZED CRIME AND TERRORISM** |
| **CENTRAL STRUCTURE** |
| **SECTION FOR COMBATING ORGANIZED CRIME** |
| 33 Sf. Vineri St., Bucharest, contact@diicot.ro, operator code 16051 |
| Telephone: 021.412.34.04, Fax: 021 319.38.58 |
| **File no. 2557/D/P/2023** |
| **ORDINANCE** |
| *extending the preventive measure of judicial control* |
| **03.07.2026** |
| PROFIRA CEZAR – chief prosecutor of service within the Prosecutor's Office attached to the High Court of Cassation and Justice – DIRECTORATE FOR INVESTIGATING ORGANIZED CRIME AND TERRORISM – Central Structure, Section for Combating Organized Crime; |
| Having examined the criminal prosecution documents drawn up in the file bearing the above number, |
| **FINDS:** |
| **I. History of file 3062/D/P/2023** *(commencements in rem, extensions in rem, severances, etc.)* |
| By the indictment **no. 1305/D/P/2022 of 15 June 2023** the following was ordered: |
| 1. **Committal for trial**, under house arrest, of the defendant TATE III Emory Andrew, for the commission of the offences of: **setting up an organized criminal group**, provided for by art. 367 para. 1, 3 and 6 of the Criminal Code, **human trafficking**, in continued form, provided for by art. 210 para. 1 lit. a of the Criminal Code with reference to art. 182 lit. a and c of the Criminal Code, applying art. 35 para. 1 of the Criminal Code (four material acts concerning the injured persons [redacted], over the period end of 2016 - April 2018, [redacted] over the period January 2022 - 11 April 2022, and the victims [redacted], over the period May 2021 - December 2022, and [redacted] – [redacted], over the period February 2021 - December 2022) and **rape**, in continued form – two material acts, provided for by art. 218 para. 1 of the Criminal Code, applying art. 35 para. 1 |

| |
|---|
| of the Criminal Code (injured person [redacted] acts of 20.03.2022 and 27.03.2022), *all applying art. 38 para. 1 of the Criminal Code* |
| 2. **Committal for trial**, under house arrest, of the defendant TATE Tristan, for the commission of the offences of: **setting up an organized criminal group**, provided for by art. 367 para. 1, 3 and 6 of the Criminal Code, **human trafficking**, in continued form, provided for by art. 210 para. 1 lit. a of the Criminal Code with reference to art. 182 lit. a and c of the Criminal Code, applying art. 35 para. 1 of the Criminal Code (three material acts in relation to the victims: [redacted], over the period July 2021 - 27 February 2022; [redacted], over the period August 2021 – 28 October 2021; [redacted], over the period November 2021 – 11 April 2022), **incitement to hitting or other violence**, provided for by art. 47 of the Criminal Code with reference to art. 193 para. 1 of the Criminal Code (injured person [redacted], act of 28 October 2021), *all applying art. 38 para. 1 of the Criminal Code.* |
| 3. **Committal for trial**, under house arrest, of the defendant Naghel Georgiana-Manuela, for the commission of the offences of: **setting up an organized criminal group**, provided for by art. 367 para. 1, 3 and 6 of the Criminal Code, **human trafficking**, in continued form, provided for by art. 210 para. 1 lit. a of the Criminal Code with reference to art. 182 lit. a and c of the Criminal Code, applying art. 35 para. 1 of the Criminal Code (six material acts, the victims: [redacted], over the period 05 April 2022 - 11 April 2022, [redacted], over the period 01 March 2022 - 11 April 2022, [redacted], over the period 28 October 2021 - 27 February 2022, [redacted], over the period August 2021 – 28 October 2021, [redacted] over the period May 2021 – December 2022, and [redacted], over the period April 2021 – December 2022), **illegal access to a computer system**, provided for by art. 360 para. 1 and 3 of the Criminal Code (injured person [redacted], act of 29 October 2021), **impairment of the integrity of computer data**, provided for by art. 362 of the Criminal Code (injured person [redacted], act of 29 October 2021), **hitting or other violence**, provided for by art. 193 para. 1 of the Criminal Code (injured person [redacted] act of 28 October 2021), *all applying art. 38 para. 1 of the Criminal Code.* |
| 4. **Committal for trial**, under house arrest, of the defendant Radu Alexandra-Luana, for the commission of the offences of: **setting up an organized criminal group**, provided for by art. 367 para. 1, 3 and 6 of the Criminal Code, and **human trafficking**, in continued form – provided for by art. 210 para. 1 lit. a of the Criminal Code with reference to art. 182 lit. a and c of the Criminal Code, applying art. 35 para. 1 of the Criminal Code (five material acts in relation to the victims: [redacted], over the period 05 April 2022 - 11 April 2022, [redacted], over the period 28 October 2021 - 27 February 2022, [redacted], over the period August 2021 – 28 October 2021, [redacted], over the period May 2021 – December 2022, and [redacted], over the period April 2021 – December 2022), *both applying art. 38 para. 1 of the Criminal Code.* |
| 5. **Closure of the case** in respect of the commission of the offence of unlawful deprivation of liberty, provided for by art. 205 of the Criminal Code, because the act is not provided for by criminal law. |
| 6. **Severance of the case with respect to the commission of the offences of:** |
| 6.1. **money laundering**, provided for by art. 49 para. 1 lit. a and b of Law no. 129/2019 on preventing and combating money laundering and the financing of terrorism, for which the **extension of the criminal prosecution** was ordered by ordinance no. 1305/D/P/2022 of **11 January 2023** of the Prosecutor's Office attached to the High Court of Cassation and Justice – Directorate for Investigating Organized Crime and Terrorism – Central Structure, consisting in the following: *beginning with 2021, on the territory of Romania, the defendants TATE III EMORY ANDREW, TATE Tristan and Naghel Georgiana, assisted by other persons, obtained sums of money from criminal activities, which they transferred through bank accounts and cryptocurrency trading platforms, and invested them in commercial companies, movable and immovable property in Romania and abroad, subsequently assigning the shares by means of which they had purchased the assets, in the name of interposed persons, with a view to concealing and disguising the illicit origin of these assets, as well as for the purpose of helping the defendants Andrew Tate and Tate Tristan to evade prosecution, trial and the execution of the sentence;* |

6.2. **aiding an offender**, provided for by art. 269 para. 1 of the Criminal Code, for which the **extension of the criminal prosecution** was ordered by ordinance no. 1305/D/P/2022 of **11 January 2023** of the Prosecutor's Office attached to the High Court of Cassation and Justice – Directorate for Investigating Organized Crime and Terrorism – Central Structure, consisting in the following: *the named Bogdan Stancu and the named Vali Coman, after the arrest of the defendants, namely at the beginning of 2023, took steps consisting in the drawing up of notarized statements in favour of the defendants TATE III EMORY ANDREW, TATE Tristan and Naghel Georgiana, with the aim of using these statements at the hearing of the appeal against the pre-trial detention interlocutory judgment issued by the Bucharest Tribunal on 30 December 2022, providing assistance to the defendants for the purpose of hindering and impeding the investigations in the present case, the holding of the defendants criminally liable, and the execution of the custodial measures;*

6.3. **influencing statements**, provided for by art. 272 para. 1 of the Criminal Code, for which the **extension of the criminal prosecution** was ordered by ordinance of **22 February 2023**, consisting in the following: *during the period of incarceration, namely 29 December 2022 – February 2023, the defendant Andrew Tate, assisted by the witness* [redacted]*, through other persons including a person known by the name LUKE, attempted to induce the injured persons* [redacted]*, through coercion and other acts of a manifestly intimidating nature (notifications through commercial companies in the USA) committed against them and against members of their families, to withdraw the statements given in the present case and to give false statements in the present case, with the aim of avoiding the holding of the defendants criminally liable;*

6.4. **trafficking in minors**, provided for by art. 211 para. 1 and 2 lit. a of the Criminal Code, with reference to art. 210 para. 1 lit. b of the Criminal Code, for which the **commencement of the criminal prosecution "in rem"** was ordered by the ordinance of the prosecutor within DIICOT – Galați Territorial Service of **07 April 2021**, consisting in the following: *on 30.03.2021, the police bodies within the B.C.C.O. (Organized Crime Combating Brigade) Galați took up the matter ex officio in respect of the fact that, during November 2020, the minor* [redacted] *was recruited by the "loverboy" method by the defendant Tate Tristan for the purpose of exploitation by inducing her to engage in prostitution;*

6.5. **human trafficking**, provided for by art. 210 para. 1 lit. a of the Criminal Code, for which the extension of the criminal prosecution, in rem, was ordered by ordinance no. 1305/D/P/2022 of **11 April 2022**, in respect of other exploited persons and other perpetrators.

Following the severance of the case, **file no. 3062/D/P/2023** was registered.

**II. History of file 2557/D/P/2023** *(commencements in rem, extensions in rem, joinders, etc.)*

**1. File 2557/D/P/2023:**

On 19.05.2023, the police officers within the Ilfov Organized Crime Combating Service took up the matter ex officio in respect of the commission of the offence of **"human trafficking"**, an act provided for by art. 210 para. 1 of the Criminal Code, consisting in the following: *beginning with January 2020, the named Tate Tristan –* [redacted]*, by deceiving her as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, approached the named* [redacted] *subsequently proposing that she perform video-chat activities within a studio that had this purpose and was owned and operated by him.*

In fact, during January 2020, the named [redacted] was approached on the social network Instagram and subsequently on the written-messaging application "WhatsApp" by the named Tate Tristan, a moment which also coincides with the beginning of the relationship between the two.

In the context of the relationship between the two, the named [redacted] domiciled in the municipality of Cluj, visited on repeated occasions the residence of the named Tate Tristan in Voluntari, on which occasion she

observed that this residence was frequented by numerous female persons about whom the named Tristan Tate told her that they worked for him, at which point she learned of the video-chat business of the named Tate Tristan.

Subsequently, following the insistence of the named Tristan Tate, beginning with June 2020, the named [redacted] began to carry out activities specific to video-chat under the coordination of the named Tristan Tate, as well as of his assistant, Naghel Georgiana.

Initially, the named [redacted] carried out activities on the MyFreeCams platform, subsequently also on the "OnlyFans" platform, the accounts on this platform being created and managed by Naghel Georgiana. The sums of money obtained on the video-chat platforms were collected by the named Tristan Tate, who subsequently gave a small percentage of these sums to the named [redacted]

Given that the aspects described above yielded data and indications regarding the commission of the offence of **"human trafficking"**, an act provided for and punished by **art. 210 of the Criminal Code**, the criminal investigation bodies within the BCCOB – Ilfov Organized Crime Combating Service proceeded to forward the ex officio notification report to DIICOT – Central Structure.

In view of these considerations, the existence was retained of the factual elements that fall within the constituent content of the offence of **"human trafficking"**, an act provided for by art. 210 para. 1 lit. a of the Criminal Code, consisting in the following:

- over the period January 2020 – June 2020, the named Tate Tristan recruited the injured person [redacted] by deception, and over the period June 2020 – November 2021 he housed her in buildings within Ilfov County, coercing her, through acts of psychological violence, to perform various activities on the online video-chat platforms, namely the recording, distribution and live-streaming of adult-oriented video content, on the MyFreeCams platform, subsequently also on the "OnlyFans" platform, exploiting her for the purpose of obtaining sums of money.

In this context, by ordinance **no. 2557/D/P/2023** of **21 June 2023**, the **commencement of the criminal prosecution in rem** was ordered, in respect of the commission of the offence of **"human trafficking"**, an act provided for by **art. 210 para. 1 lit. a of the Criminal Code.**

**2. File 2558/D/P/2023:**

On 19.05.2023, the police officers within the Ilfov Organized Crime Combating Service took up the matter ex officio in respect of the commission of the offence of **"human trafficking"**, an act provided for by art. 210 para. 1 of the Criminal Code, consisting in the following: *beginning with February 2020, the named Tate Tristan – PIN 7880715470021, by deceiving her as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, approached the named* [redacted] *subsequently proposing that she perform video-chat activities within a studio that had this purpose and was owned and operated by him.*

In fact, during February 2020, the named [redacted] was approached on the social network Instagram and subsequently on the written-messaging application "WhatsApp" by the named Tate Tristan, a moment which also coincides with the beginning of the relationship between the two. At that time, the named [redacted] did not have stable employment.

At the beginning of the relationship, the named Tristan Tate did not disclose to his girlfriend [redacted] the fact that his financial income came from managing the video-chat businesses.

In the context of the relationship between the two, the named [redacted] visited on repeated occasions the residence of the named Tristan Tate in Voluntari, on which occasion she observed that this residence was

| |
|---|
| frequented by numerous female persons about whom the named Tristan Tate told her that they worked for him, at which point she learned of the video-chat business of the named Tristan Tate. |
| Subsequently, after the named Tristan Tate learned of the fact that the named [redacted] had in the past carried out activities specific to video-chat, by exercising acts of psychological coercion and under the pretext that she could earn significant sums of money, he induced [redacted] to resume this activity, this time for his benefit. |
| In this respect, following the insistence of the named Tristan Tate, beginning with June 2020, the named [redacted] began to carry out activities specific to video-chat under the coordination of the named Tristan Tate, as well as of his assistant, Naghel Georgiana. |
| Initially, she carried out activities on the MyFreeCams platform, the account on this platform being created and managed by Naghel Georgiana. The activities were carried out in a residence within the town of Voluntari, a residence rented for this purpose by the named Tristan Tate; subsequently, the named [redacted] against the background of some disputes with the named Tristan Tate, wished to continue the activity in a residence within the municipality of Brașov, a residence likewise provided by the named Tristan Tate. The sums of money obtained on the video-chat platforms were collected by the named Tristan Tate, who subsequently gave a small percentage of these sums to the named [redacted] |
| Given that the aspects described above yielded data and indications regarding the commission of the offence of **"human trafficking"**, an act provided for by **art. 210 of the Criminal Code**, the criminal investigation bodies within the BCCOB – Ilfov Organized Crime Combating Service proceeded to forward the ex officio notification report to DIICOT – Central Structure. |
| In view of these considerations, the existence was retained of the factual elements that fall within the constituent content of the offence of **"human trafficking"**, an act provided for by art. 210 para. 1 lit. a of the Criminal Code, consisting in the following: |
| - over the period February 2020 – June 2020, the named Tate Tristan recruited the injured person [redacted] by deception, and beginning with June 2020 until November 2021 he transported and housed her in buildings within Ilfov County, as well as Brașov County, coercing her, through acts of psychological violence, to perform various activities of a pornographic nature on the online video-chat platforms, namely the recording, distribution and live-streaming of adult-oriented video content, on the MyFreeCams platform, exploiting her for the purpose of obtaining sums of money. |
| In this context, by ordinance **no. 2558/D/P/2023** of **21 June 2023**, the **commencement of the criminal prosecution in rem** was ordered, in respect of the commission of the offence of **"human trafficking"**, an act provided for by **art. 210 para. 1 lit. a of the Criminal Code.** |
| **3. File 3053/D/P/2023:** |
| On 08.06.2023, the police officers within the Ilfov Organized Crime Combating Service took up the matter ex officio in respect of the commission of the offence of **"human trafficking"**, an act provided for by **art. 210 para. 1 of the Criminal Code**, consisting in the following: *beginning with August 2019, the named Tate Tristan, by deceiving her as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, approached the named* [redacted] – [redacted] *subsequently proposing that she perform video-chat activities within a studio that had this purpose and was owned and operated by him.* |
| In fact, during August 2019, the named [redacted] was approached on the social network Facebook and subsequently on the written-messaging application "WhatsApp" by the named Tate Tristan, a moment which also coincides with the beginning of the relationship between the two. |

| |
|---|
| At the beginning of the relationship, the named Tristan Tate did not disclose to his girlfriend [redacted] the fact that his financial income came from managing the video-chat businesses. |
| In the continuation of the relationship, as a result of the insistence of the named Tristan Tate, beginning with September 2019, the named [redacted] began to carry out activities specific to video-chat under the coordination of the named Tristan Tate, as well as of his assistant, Naghel Georgiana. |
| The named [redacted] carried out activities specific to video-chat on the MyFreeCams platform, the account on this platform being created and managed by Naghel Georgiana. The activities were carried out in a residence within the town of Voluntari, a residence rented for this purpose by Tristan Tate through the named Naghel Georgiana. |
| The sums of money obtained on the video-chat platforms were collected by the named Tristan Tate, who subsequently gave a small percentage of these sums to the named [redacted]. |
| Given that the aspects described above yielded data and indications regarding the commission of the offence of **"human trafficking"**, an act provided for by **art. 210 of the Criminal Code**, the criminal investigation bodies within the BCCOB – Ilfov Organized Crime Combating Service proceeded to forward the ex officio notification report to DIICOT – Central Structure. |
| In view of these considerations, the existence was retained of the factual elements that fall within the constituent content of the offence of **"human trafficking"**, an act provided for by art. 210 para. 1 lit. a of the Criminal Code, consisting in the following: |
| - over the period August - September 2019, the named Tate Tristan recruited the injured person [redacted], by deception, and over the period September 2019 - December 2021 he housed her in buildings within Ilfov County, coercing her, through acts of psychological violence, to perform various activities of a pornographic nature, on the online video-chat platforms, namely the recording, distribution and live-streaming of adult-oriented video content of a pornographic nature, exploiting her for the purpose of obtaining sums of money. |
| In this context, by ordinance **no. 3053/D/P/2023** of **21 June 2023**, the **commencement of the criminal prosecution in rem** was ordered, in respect of the commission of the offence of **"human trafficking"**, an act provided for by **art. 210 para. 1 lit. a of the Criminal Code.** |
| By ordinance **no. 2557/D/P/2023** of **01 August 2023**, the **joinder** of files nos. **2557/D/P/2023, 2558/D/P/2023 and 3053/D/P/2023** was ordered, **the investigations to be continued under no. 2557/D/P/2023.** |
| * |
| By ordinance **no. 2557/D/P/2023** of **10 October 2023**, the **extension of the criminal prosecution IN REM** was ordered in respect of the commission of the offence of "influencing statements", an act provided for and punished by **art. 272 para. 1 of the Criminal Code**, consisting in the following: *the named ANDREW and TRISTAN TATE attempt to induce the injured persons/victims and witnesses in the present file, through bribery or through other acts of a manifestly intimidating effect, not to give statements or to give false statements.* |
| By ordinance **no. 2557/D/P/2023** of **31 October 2023**, the **extension of the criminal prosecution IN REM** was ordered in respect of the commission of the offence of "human trafficking", an act provided for and punished by **art. 210 para. 1 lit. a and b with reference to art. 182 lit. c of the Criminal Code**, consisting in the following: *beginning with 2017 - present, the named ANDREW and TRISTAN TATE, taking advantage both of the state of manifest vulnerability of the victims and by deceiving them as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, recruited the named* [redacted] *as well as other female* |

| |
|---|
| *persons, whom, after gaining their trust, they induced to perform video-chat activities on several specialized platforms for their material benefit.* |
| By ordinance **no. 2557/D/P/2023** of **26 January 2024**, the **extension of the criminal prosecution IN REM** was ordered in respect of the commission of the offence of "sexual act with a minor in continued form", an act provided for and punished by **art. 220 para. 1 and 4 lit. e of the Criminal Code applying art. 5 of the Criminal Code and art. 35 of the Criminal Code**, consisting in the following: *the named ANDREW TATE, beginning with 04.12.2020, repeatedly had sexual intercourse and anal and oral sexual acts with the named* [redacted] – [redacted]*, knowing that she was 15 years old.* |
| By ordinance **no. 2557/D/P/2023** of **29 January 2024**, the **extension of the criminal prosecution IN REM** was ordered in respect of the commission of the offence of "human trafficking", an act provided for and punished by **art. 210 para. 1 lit. a and b with reference to art. 182 lit. c of the Criminal Code**, consisting in the following: *beginning with 2017 - present, the named ANDREW and TRISTAN TATE, taking advantage both of the state of manifest vulnerability of the victims and by deceiving them as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, recruited the named* [redacted]*, as well as other female persons, whom, after gaining their trust, they induced to perform video-chat activities on several specialized platforms for their material benefit or to create content on the TikTok platform.* |
| By ordinance **no. 2557/D/P/2023** of **17 April 2024**, the **extension of the criminal prosecution IN REM** was ordered in respect of the commission of the offence of: |
| - "money laundering in continued form" – in the concealment modality*, an act provided for and punished by* ***art. 49 para. (1) lit. "b" of Law no. 129/2019 applying art. 35 para. (1) of the Criminal Code****, consisting in the following:* over the period December 2023 – February 2024, the named Andrew TATE and Tristan TATE, for the purpose of concealing or disguising the illicit origin of the money obtained from the commission of the offence of human trafficking, purchased several luxury cars which they registered and recorded with the tax authorities in the name of other persons; |
| - "complicity in money laundering" – in the concealment modality*, an act provided for and punished by* ***art. 48 of the Criminal Code with reference to art. 49 para. (1) lit. "b" of Law no. 129/2019****, consisting in the following:* over the period December 2023 – February 2024, for the purpose of concealing or disguising the illicit origin of the money obtained from the commission of the offence of human trafficking by the named Andrew and Tristan TATE, the named [redacted], being aware of the origin of the money with which the cars of the make LAMBORGHINI HURACAN 724 F1, FERRARI 488 SPIDER F142 BD and AUDI RS7 were purchased, accepted the registration and recording with the tax authorities of these cars in their name. |
| By ordinance **no. 2557/D/P/2023** of **15 July 2024**, the **joinder** of files nos. **3062/D/P/2023 and 2557/D/P/2023** was ordered, **the investigations to be continued under no. 2557/D/P/2023.** |
| * |
| By ordinance **no. 2557/D/P/2023** of **12 August 2024**, the **extension of the criminal prosecution IN REM** was ordered in respect of the commission of the offences of: |
| - ***"human trafficking"****, an act provided for and punished by* ***art. 210 para. 1 lit. a and b with reference to art. 182 lit. c of the Criminal Code applying art. 5 of the Criminal Code*** (prior to the amendment made by Law no. 202/2024 of 01.07.2024)*, consisting in the following:* beginning with 2014 - present, the named ANDREW and TRISTAN TATE, taking advantage both of the state of manifest vulnerability of the victims and by deceiving them as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, or by the promise of earning significant sums of money from video-chat activities, recruited the |

| |
|---|
| named [redacted] whom, after gaining their trust, through coercion (emotional blackmail or acts of physical violence), they induced to perform video-chat activities on the specialized platforms MyFreeCams and OnlyFans for their material benefit. |
| - ***"false testimony"**, an act provided for and punished by **art. 273 para. 1 of the Criminal Code**, consisting in the following:* over the period 2023 – 2024, being influenced by the named ANDREW and TRISTAN TATE, some of the witnesses heard in the present case ([redacted] and other witnesses) gave false statements or did not tell all that they knew in connection with the essential facts or circumstances about which they were questioned in the present case. |
| - ***"incitement to hatred or discrimination"**, an act provided for by **art. 369 of the Criminal Code**, consisting in the following:* through the speeches promoted on social media (YouTube, the X platform, TikTok, Telegram, etc.) the named ANDREW and TRISTAN TATE incited the public to hatred and discrimination against women. |
| - ***"setting up an organized criminal group"**, an act provided for by **art. 367 para. 1 of the Criminal Code**, consisting in the following:* during 2015, on the territory of Romania, the named TATE Andrew, TATE Tristan and NAGHEL Georgiana-Manuela set up an organized criminal group, a group to which the named [redacted] subsequently adhered and which they supported, with a view to committing, on the territory of Romania and on the territory of other states such as the U.K., mainly the offences of human trafficking, through actions of recruiting the victims, carried out by the defendants TATE III Emory Andrew and TATE Tristan, and subsequently, under their coordination, through actions of housing, transporting, monitoring and coordinating the victims, carried out through the involvement in the criminal activity of the named NAGHEL Georgiana-Manuela, [redacted] all for the purpose of obtaining significant sums of money by compelling the victims to engage in pornographic performances with a view to producing and distributing pornographic materials, using for this purpose the platforms MeFreeCams and OnlyFans. |
| **************** |
| By ordinance **no. 2557/D/P/2023** of **19 August 2024**, the **continuation of the criminal prosecution against the named persons** was ordered: |
| 1. **TATE III Emory Andrew**, [redacted], for the commission of the offences of: |
| *1.1. **"setting up an organized criminal group" – in the setting-up modality**, an act provided for by **art. 367 para. 1, 3 and 6 of the Criminal Code**, consisting in the following:* during 2015, on the territory of Romania, together with the named TATE Tristan and Naghel Georgiana-Manuela, he set up an organized criminal group, a group to which, during 2016, the named [redacted] adhered, and during September 2021 the named [redacted] adhered, a group that was dismantled on 29.12.2022 (the date of the action in file 1305/D/P/2022), for the purpose of committing, on the territory of Romania and on the territory of other states such as the UK, the offence of human trafficking, through actions of recruiting the victims, carried out by the named Tate III Emory Andrew and TATE Tristan, and subsequently, under their coordination, through actions of transporting, housing, monitoring and coordinating the victims, carried out through the involvement in the criminal activity of the named [redacted] for the purpose of obtaining significant sums |

| |
|---|
| of money by compelling the victims to engage in pornographic performances with a view to producing and distributing pornographic materials, using for this purpose the platforms MeeFree Cams and OnlyFans; |
| *1.2.* ***"trafficking in minors"****, an act provided for and punished by* ***art. 211 para. 1 and 2 lit. a with reference to art. 210 para. 1 lit. a and b of the Criminal Code with reference to art. 182 lit. c of the Criminal Code applying art. 5 of the Criminal Code*** (the form prior to the amendments made by Law no. 202/2024 of 01.07.2024) – ***in relation to the victim*** [redacted]*, consisting in the following:* beginning with 2014 and until December 2021, the named ANDREW TATE, taking advantage both of the state of manifest vulnerability of the victim (minor – 17 years old, lack of life experience, lack of family support) and by deceiving her as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, the falseness of the feelings of love resulting from the fact that the named Andrew TATE, in the same time interval, was recruiting several victims by the same method – "loverboy", recruited the named [redacted], whom, after gaining her trust and inducing her to fall in love with him, through coercion (emotional blackmail), he sexually exploited by inducing her to engage in pornographic performances with a view to producing and distributing pornographic materials, namely to perform video-chat activities on the video-chat platforms MyFreeCams and OnlyFans for his material benefit, obtaining pecuniary benefits in a total value of USD 1,529,305.12. Likewise, during the period of sexual exploitation, the named Tristan TATE repeatedly transported the victim [redacted] from the territory of Great Britain to Romania and provided her with accommodation in several locations situated both on the territory of Great Britain and on the territory of Romania (at his domicile in Voluntari, in a house in Tunari and in an apartment in the Pipera area), as well as all the logistics necessary for carrying out the video-chat activity; |
| *1.3.* ***"human trafficking in continued form"*** – 6 material acts *in relation to the victims* [redacted]*, an act provided for by* ***art. 210 para. 1 lit. a and b of the Criminal Code with reference to art. 182 lit. c of the Criminal Code applying art. 35 para. 1 of the Criminal Code and art. 5 of the Criminal Code*** (the form prior to the amendments made by Law no. 202/2024 of 01.07.2024)*, consisting in the following:* over the period July 2015 – September 2021, the named ANDREW TATE, taking advantage both of the state of manifest vulnerability of the victims [redacted], and by deceiving them as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, the falseness of the feelings of love resulting from the fact that the named Andrew TATE, in the same time interval, was attempting in parallel to recruit several victims by the same "loverboy" method, recruited the aforementioned victims, whom, after gaining their trust and inducing them to fall in love with him, through psychological coercion, he sexually exploited by inducing them to engage in pornographic performances with a view to producing and distributing pornographic materials, namely to perform video-chat activities on the specialized platforms MyFreeCams and OnlyFans for his material benefit, thereby obtaining from the exploitation of the victims pecuniary benefits in a total value of USD 1,545,893 and 886,257 tokens (the currency with which the victim was paid on the video-chat platform). Likewise, during the period of sexual exploitation, the named ANDREW TATE provided his victims both with accommodation in various locations in the town of Voluntari and with all the logistics necessary for carrying out the video-chat activity, as follows: |
| *1.3.1.* over the period July 2015 – September 2021, the named ANDREW TATE, taking advantage both of the state of manifest vulnerability of the victim (young age – 18 years old, lack of life experience, lack of material resources) and by deceiving her as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, the falseness of the feelings of love resulting from the fact that the named Andrew TATE, in the same time interval, was attempting in parallel to recruit several victims by the same "loverboy" method, recruited the named [redacted], whom, after gaining her trust and inducing her to fall in love with him, through moral coercion (emotional blackmail), he sexually exploited by inducing her to engage in pornographic performances with a view to producing and distributing pornographic materials, namely to perform video-chat activities on the specialized platforms MyFreeCams and OnlyFans for his material benefit, thereby obtaining from the exploitation of the victim pecuniary benefits in a total value of USD 1,524,056.25. Likewise, during the period of sexual exploitation, the named ANDREW TATE provided the victim [redacted] |

[redacted] with transport from the territory of Great Britain to Romania, accommodation in various locations in the town of Voluntari, as well as all the logistics necessary for carrying out the video-chat activity,

*1.3.2.* over the period April – December 2016, the named ANDREW TATE, taking advantage both of the state of manifest vulnerability of the victim (young age – 23 years old and lack of material resources) and by deceiving her as to the possibility of obtaining significant sums of money, recruited the named [redacted] whom, after gaining her trust, through moral coercion (emotional blackmail), he sexually exploited by inducing her to engage in pornographic performances with a view to producing and distributing pornographic materials, namely to perform video-chat activities on the specialized platform MyFreeCams for his material benefit. Likewise, in the process of sexual exploitation of the victim, the named Andrew TATE repeatedly provided her with transport from the territory of Great Britain to Slovakia and Romania (purchasing round-trip plane tickets) and provided her with accommodation both on the territory of Slovakia, Romania, and on the territory of Great Britain, in the locations where the victim performed the video-chat activities in the aforementioned period. Therefore, during the reference period, all the logistics necessary for carrying out this activity by the victim were provided by the named Andrew TATE, and as a result of the video-chat activity carried out by the victim [redacted] the named Andrew TATE obtained pecuniary benefits in a total value of 886,257 tokens (the currency with which the victim was paid on the video-chat platform);

*1.3.3.* over the period summer 2017 – February 2018, the named ANDREW TATE, taking advantage both of the state of manifest vulnerability of the victim (young age – 18 years old, lack of life experience, lack of material resources) and by deceiving her as to the existence of genuine feelings of love, the falseness of the feelings of love resulting from the fact that the named Andrew TATE, in the same time interval, was attempting in parallel to recruit several victims by the same "loverboy" method, recruited the named [redacted], whom, after gaining her trust and inducing her to fall in love with him, he sexually exploited by inducing her to engage in pornographic performances with a view to producing and distributing pornographic materials, namely to perform video-chat activities on the specialized platform MyFreeCams for his material benefit, obtaining pecuniary benefits in a total value of USD 2,247.75. Likewise, during the period of sexual exploitation, the named ANDREW TATE provided the victim [redacted] both with accommodation in an apartment near his domicile (town of Voluntari) and with all the logistics necessary for carrying out the video-chat activity;

*1.3.4.* over the period June - July 2018, the named Andrew TATE, taking advantage both of the state of manifest vulnerability of the victim (lack of employment and lack of income) and by deceiving her as to the existence of genuine feelings of love – the "loverboy" method, recruited the named [redacted] with the aim of sexually exploiting her by inducing her to engage in pornographic performances with a view to producing and distributing pornographic materials, namely to perform video-chat activities on the MyFreeCams platform for his material benefit;

*1.3.5.* over the period June 2018 - November 2018, the named ANDREW TATE, taking advantage both of the state of manifest vulnerability of the victim (young age – 18 years old, lack of life experience, lack of material resources) and by deceiving her as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, the falseness of the feelings of love resulting from the fact that the named ANDREW TATE, in the same time interval, was attempting in parallel to recruit several victims by the same "loverboy" method, recruited the named [redacted], whom, after gaining her trust and inducing her to fall in love with him, he sexually exploited by inducing her to engage in pornographic performances with a view to producing and distributing pornographic materials, namely to perform video-chat activities on the specialized platform MyFreeCams for his material benefit, thereby obtaining from the exploitation of the victim pecuniary benefits in a total value of USD 16,765. Likewise, during the period of sexual exploitation, the named ANDREW TATE provided the victim [redacted] both with accommodation at his domicile in Voluntari, [redacted]., and with all the logistics necessary for carrying out the video-chat activity;

*1.3.6.* over the period July 2018 - January 2019, the named ANDREW TATE, taking advantage both of the state of manifest vulnerability of the victim (young age – 18 years old, lack of life experience, the trauma of a failed relationship) and by deceiving her as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, the falseness of the feelings of love resulting from the fact that the named

| |
|---|
| Andrew TATE, in the same time interval, was attempting in parallel to recruit several victims by the same "loverboy" method, recruited the named [redacted], whom, after gaining her trust and inducing her to fall in love with him, through acts of psychological coercion (threatening the victim that he would disclose to her parents that she had done video-chat), he sexually exploited by inducing her to engage in pornographic performances with a view to producing and distributing pornographic materials, namely to perform video-chat activities on the specialized platform MyFreeCams for his material benefit, thereby obtaining from the exploitation of the victim pecuniary benefits in a total value of USD 2,824. Likewise, during the period of sexual exploitation, the named ANDREW TATE provided the victim [redacted] both with accommodation at his domicile in Voluntari, 50 Drumul Bisericii St., and with all the logistics necessary for carrying out the video-chat activity; |
| *1.4.* ***"sexual act with a minor in continued form"*** – without being able to establish the number of material acts, *an act provided for and punished by* ***art. 220 para. 1 and 4 lit. e of the Criminal Code applying art. 35 of the Criminal Code****, consisting in the following:* the named ANDREW TATE, beginning with 04.12.2020, being at the domicile address in Drumul Bisericii, Ilfov County, or in the complex in Pipera, called Cloud 9 – where he had rented an apartment for the victim, repeatedly had sexual intercourse and anal and oral sexual acts with the named [redacted] knowing that she was 15 years old; |
| 1.5. **"influencing statements in continued form"** – *3 material acts* in relation to the named [redacted], an act provided for and punished by **art. 272 para. 1 of the Criminal Code applying art. 35 para. 1 of the Criminal Code**, consisting in the following: |
| *1.5.1* on 28.09.2023 and 29.09.2023, the named ANDREW TATE attempted to induce the named [redacted] through acts of a manifestly intimidating effect (by posting, on 28.09.2023, on the social network X (formerly Twitter) a false conversation by which he denigrates the injured person [redacted], and on 29.09.2023 he falsely warned the witness [redacted] that DIICOT was conducting a criminal investigation against him), not to give statements or to give false statements in the present file; |
| *1.5.2* over the period December 2023 – January 2024, the named ANDREW TATE attempted to induce the injured person [redacted] through acts of bribery (offering her the sum of EUR 5,000, of which he actually handed over the sum of EUR 2,500), not to give statements or to give false statements in the present file; |
| *1.6.* ***"money laundering in continued form"*** – in the concealment modality – 4 material acts*, an act provided for and punished by* ***art. 49 para. (1) lit. "b" of Law no. 129/2019 applying art. 35 para. (1) of the Criminal Code****, consisting in the following:* over the period December 2023 – July 2024, the named Andrew TATE and Tristan TATE, for the purpose of concealing or disguising the illicit origin of the money obtained from the commission of the offence of human trafficking, purchased the luxury cars LAMBORGHINI HURACAN 724 F1, FERRARI 488 SPIDER F142 BD, AUDI RS7 and FERRARI 488 GTB, cars which they purchased, registered and recorded with the tax authorities in the name of the named [redacted], namely the cars: |
| - **LAMBORGHINI Huracan 724 F1**, year of manufacture 2020, blue colour, chassis series ZHWEF5ZF9LLA14811, registration number B-119-NLA, registration history - registered in the name of the legal person G&C AUTODEALER SRL - unique registration code (CUI) 36798257 on 05.01.2024 and deregistered on 07.02.2024 with a view to transcription; current registration – registered in the name of the named [redacted] as of 07.02.2024, with registration number B-610-AXD; |
| - **FERRARI 488 SPIDER F142 BD**, year of manufacture 2018, black colour, chassis series ZFF80AMB000233057, registration number B-119-NKU, registration history - registered in the name of the legal person G&C AUTODEALER SRL - CUI 36798257 as of 05.01.2024 and deregistered on 22.02.2024, with a view to transcription; current registration – registered in the name of the named [redacted] as of 22.02.2024, with registration number B-488-SPY; |
| - **AUDI RS 7 SPORTBACK F2 SDJPBQ2**, grey colour, year of manufacture 2020, chassis series WUAZZZF20LN900627, registration history – registered on 14.01.2022 in the name of the named [redacted] |

| |
|---|
| [redacted] with registration number B993VVV and deregistered on 07.02.2024 with a view to transcription; current registration – registered on 07.02.2024 in the name of the named [redacted] with registration number B-399-SPY. |
| - **FERRARI 488 GTB**, year of manufacture 2020, red colour, chassis series ZFF79AMB000234408, provisional registration number B086374, purchased – in the name of the named [redacted] |
| ***all applying art. 38 para. 1 of the Criminal Code*** |
| By the ordinance of the prosecutor within the Prosecutor's Office attached to the High Court of Cassation and Justice – Directorate for Investigating Organized Crime and Terrorism of 21.08.2024, the **setting in motion of the criminal action** against the defendant Andrew Tate was ordered, for the offences in respect of which the continuation of the criminal prosecution had previously been ordered. |
| **************** |
| By interlocutory judgment **no. 67/DL of 14 February 2025** concerning the defendant **TATE III EMORY ANDREW**, [redacted] under house arrest, the following was ordered: |
| "Takes note of the withdrawal of the appeal lodged by the appellant defendant TATE III EMORY ANDREW against the interlocutory judgment delivered by the judge of rights and liberties within the Bucharest Tribunal, Criminal Section I on 12.02.2025, in file no. 3844/3/2025 |
| pursuant to art. 425[1] para. 7 point 2 lit. a of the Code of Criminal Procedure allows the appeal lodged by the Prosecutor's Office attached to the High Court of Cassation and Justice - Directorate for Investigating Organized Crime and Terrorism - Central Structure against the interlocutory judgment delivered by the judge of rights and liberties within the Bucharest Tribunal, Criminal Section I on 12.02.2025, in file no. 3844/3/2025, sets aside in part the contested interlocutory judgment and, retrying the merits: |
| **Pursuant to art. 242 para. 2 of the Code of Criminal Procedure replaces the measure of house arrest, ordered against the defendant TATE III EMORY ANDREW by the interlocutory judgment of 22.08.2024 delivered by the judge of rights and liberties at the Bucharest Tribunal, in file no. 28369/3/2024, with the measure of judicial control for a duration of 60 days, from 14.02.2025 until 14.04.2025.** |
| pursuant to art. 215 para. 1 of the Code of Criminal Procedure imposes on the defendant TATE III EMORY ANDREW that, while under judicial control, he comply with the following obligations: |
| a) to appear before the criminal prosecution bodies, the preliminary chamber judge, or the trial court whenever summoned; |
| b) to immediately inform the criminal prosecution bodies, the preliminary chamber judge, or the court of any change of residence; |
| c) to appear before the police bodies designated with supervision, in accordance with the supervision schedule drawn up, or whenever summoned. |
| d) pursuant to art. 215 para. 2 of the Code of Criminal Procedure imposes on the defendant TATE III EMORY ANDREW that, during the judicial control, he comply with the following obligations: |

| |
|---|
| a) not to leave the territorial limit of Romania except with the prior authorization of the criminal prosecution bodies, the preliminary chamber judge, or the trial court; |
| b) not to communicate, directly or indirectly, by any means, with the other co-defendants, [redacted] nor with the injured persons/victims/witnesses [redacted] not to approach them at a distance of less than 50 metres. |
| c) to periodically provide relevant information about his means of subsistence. |
| d) not to possess, use, or carry weapons. |
| pursuant to art. 215 para. 3 of the Code of Criminal Procedure, draws the defendant's attention to the fact that, in the event of a bad-faith breach of the obligations incumbent on him or in the event of the commission of another offence, intentionally, during the judicial control, the preventive measure may be replaced with the measure of house arrest or with the measure of pre-trial detention. |
| Orders the immediate release of the defendant TATE III EMORY ANDREW from the measure of house arrest ordered by the interlocutory judgment of 22.08.2024 delivered by the judge of rights and liberties at the Bucharest Tribunal, in file no. 28369/3/2024." |
| Subsequently, by DIICOT ordinances of 24.02.2025 and 25.02.2025, **the prohibitions were removed** on the defendant Andrew TATE against leaving the territorial limit of Romania other than with the prior authorization of the criminal prosecution bodies, the preliminary chamber judge, or the trial court, as well as the prohibition on approaching and contacting the [redacted] |
| By the ordinances of the prosecutor within the Prosecutor's Office attached to the High Court of Cassation and Justice – Directorate for Investigating Organized Crime and Terrorism of **01.04.2025, 22.05.2024, 25.07.2025, 29.09.2025, 27.11.2025, 23.01.2026, 27.03.2026 and 26.05.2026**, the **extension of the judicial control measure taken against the defendant: TATE III Emory Andrew** was successively ordered, [redacted] without military obligations, against whom the commission is retained of the offences of **"setting up an organized criminal group"** – in the setting-up modality, an act provided for by art. 367 para. 1, 3 and 6 of the Criminal Code, **"trafficking in minors"**, an act provided for and punished by art. 211 para. 1 and 2 lit. a with reference to art. 210 para. 1 lit. a and b of the Criminal Code with reference to art. 182 lit. c of the Criminal Code applying art. 5 of the Criminal Code, **"human trafficking in continued form"** – 6 material acts in relation to the victims [redacted], an act provided for by art. 210 para. 1 lit. a and b of the Criminal Code with reference to art. 182 lit. c of the Criminal Code applying art. 35 para. 1 of the Criminal Code and art. 5 of the Criminal Code, **"sexual act with a minor in continued form"** – without being able to establish the number of |

| |
|---|
| material acts, an act provided for and punished by art. 220 para. 1 and 4 lit. e of the Criminal Code applying art. 35 of the Criminal Code, **"influencing statements in continued form"** – 3 material acts in relation to the named [redacted], an act provided for and punished by art. 272 para. 1 of the Criminal Code applying art. 35 para. 1 of the Criminal Code, and **"money laundering in continued form"** – in the concealment modality – 4 material acts, an act provided for and punished by art. 49 para. (1) lit. "b" of Law no. 129/2019 applying art. 35 para. (1) of the Criminal Code, **all applying art. 38 para. 1 of the Criminal Code**, for a period of **60 days, from 30.03.2026 until 28.05.2026, inclusive;** |
| By interlocutory judgment no. **25644/3/2025** of **08.08.2025**, the **Bucharest Tribunal – Criminal Section I** dismissed as unfounded the complaint of the defendant TATE III Emory Andrew lodged against the prosecutor's ordinance of 25.07.2025 by which the extension of the judicial control measure was ordered for a period of 60 days, from 02.08.2025 until 30.09.2025, inclusive. |
| By interlocutory judgment no. **33806/3/2025** of **07.10.2025**, the **Bucharest Tribunal – Criminal Section I** dismissed as unfounded the complaint of the defendant TATE III Emory Andrew lodged against the prosecutor's ordinance of 29.09.2025 by which the extension of the judicial control measure was ordered for a period of 60 days, from 01.10.2025 until 29.11.2025, inclusive. |
| By interlocutory judgment no. **11852/3/2026** of **07.04.2026**, the **Bucharest Tribunal – Criminal Section I** dismissed as unfounded the complaint of the defendant TATE III Emory Andrew lodged against the prosecutor's ordinance of 27.03.2026 by which the extension of the judicial control measure was ordered for a period of 60 days, from 30.03.2026 until 28.05.2026, inclusive. |
| By interlocutory judgment no. **21399/3/2026** of **09.06.2026**, the **Bucharest Tribunal – Criminal Section I** dismissed as unfounded the complaint of the defendant TATE III Emory Andrew lodged against the prosecutor's ordinance of 28.05.2026 by which the extension of the judicial control measure was ordered for a period of 60 days, from 29.05.2026 until 27.07.2026, inclusive. |
| *********** |
| **Analysing** the criminal prosecution documents, it is found that in the case the conditions provided for by **art. 202 of the Code of Criminal Procedure** are met. |
| **Thus, there exist evidence and well-founded indications** *(statements of injured persons and witnesses; investigation reports, reports analysing the data resulting from the carrying out of computer searches, reports analysing the information obtained on the basis of international cooperation, reports rendering interceptions, the domicile-search reports and the other evidence set out)*, from which it results that the defendant **TATE Emory III Andrew** committed the offences in respect of which the continuation of the criminal prosecution against him and the setting in motion of the criminal action were ordered, and the **extension of the preventive measure of judicial control** is necessary for the purpose of ensuring the proper conduct of the criminal proceedings, of preventing the defendant from evading criminal prosecution, of preventing the defendant from contacting the persons heard in the present case and influencing them, of removing the state of danger to public order, taking into account the gravity of the acts, the manner and circumstances in which they were committed, as well as for the purpose of preventing the commission of another offence. |
| As regards the maintenance of the preventive measure of judicial control, this is conditional, on the one hand, on the existence of evidence or well-founded indications from which the reasonable suspicion results that a person has committed an offence, and, on the other hand, on the necessity of ensuring the proper conduct of the criminal proceedings, it also being possible to find that the social danger represented by the defendant has not substantially diminished compared to the time when the preventive measure was ordered by the court. |
| Likewise, the gravity of the accusation brought against the defendant must be noted, an accusation that justifies the maintenance of the preventive measure of judicial control, since from the body of evidence administered in the |

present case there is proof that there is a possibility that the defendants may frustrate the proper conduct of the criminal proceedings by influencing the statements of the witnesses or injured persons.

Likewise, the condition of proportionality, provided for by art. 202 para. 3 of the Code of Criminal Procedure, is met, the measure of judicial control, the mildest of the preventive measures, being proportionate to the gravity of the accusation brought against the defendant. Moreover, **the defendant's request to have removed the prohibition on leaving the territory of Romania was allowed, he currently having complete freedom of movement, the defendant TATE Emory III Andrew having left the territory of Romania for approximately one month.**

Analysed from the perspective of the appropriateness of the preventive measures to which the defendant was subject, it is retained that his legal situation and the procedural stage of the file require that the liberty of the person concerned be subordinated to procedural guarantees, it being necessary to maintain permanent and supervised contact between him and the judicial body, as well as a prompt response to any summons of the judicial authority, so that it is considered that there is a fair balance between the interference with the defendant's rights, both legal and constitutional, and the aim pursued, namely to ensure that the criminal proceedings initiated against them proceed at an undisturbed pace.

The defendant was placed under a preventive measure restrictive of liberty not only to be at the disposal of the judicial bodies, but also examining from the perspective of the imperative need to protect the process of administering the evidence, in which sense it is necessary for him to be under the regime of subordinating liberty to procedural guarantees, being required to bear certain restrictions not only as regards freedom of movement, social life, and to have verified the manner of compliance with the imposed obligations, in particular with the monitored observation also of the persons with whom he comes into contact, of their forms of manifestation, thus also avoiding the risk of committing new offences of the same kind.

Likewise, it is considered that the measure of judicial control is necessary to ensure the proper conduct of the criminal proceedings, but also to prevent the defendant from committing other offences, given the nature of the acts for which he is under investigation and the context in which they were committed. Consequently, due to the specific nature of the offences for which the defendant is under investigation, the preventive measure is necessary at this procedural moment.

From this perspective, not even the defendant's personal circumstances can counterbalance the gravity of the acts committed, and they are wholly insufficient to justify the revocation of the preventive measure ordered in the case.

At the same time, it is found that the preventive measure of judicial control is also proportionate to the gravity of the accusations brought against the defendant, given that, as has been shown, he is charged with the commission of acts of a high gravity, in respect of which there exist, up to this moment, well-founded indications from which the reasonable suspicion results that they were committed in the manner retained by the judicial body.

Therefore, for the reasons retained and in relation to the gravity of the acts allegedly committed, as well as the imperatives of a procedural nature, such as those of ensuring the proper conduct of the criminal proceedings and of continuing to keep the defendant at the disposal of the judicial bodies, which might require his presence at any time in order to carry out the criminal prosecution, I consider that the absence of *any* form of control over the defendant **TATE Emory III Andrew** *would not be appropriate.*

With the factual and legal reasoning set out above, it is considered that this measure, only restrictive of rights, satisfies the requirements of appropriateness and proportionality in full accordance with the domestic provisions and consistent with the case-law of the ECtHR, meets the imperative of ensuring the proper conduct of the criminal proceedings, through the obtaining of lawful evidence, for the timely and complete establishment of the acts that constitute offences, so that any person who has committed an offence is punished according to his guilt and no innocent person is held criminally liable.

| |
|---|
| As regards the condition of proportionality, relating the reasonable term of the judicial control measure to art. 5 para. 3 of the ECHR, it is considered that it is observed, taking into account the procedural phase in which the case currently stands and in relation to which the provisions of art. 215[1] para. (6) of the Code of Criminal Procedure become applicable. |
| Thus, in the sense of this latter legal provision - *"During the criminal prosecution, the duration of the judicial control measure may not exceed one year, if the penalty provided for by law is a fine or imprisonment of at most 5 years, respectively 2 years, if the penalty provided for by law is life imprisonment or imprisonment greater than 5 years."* |
| The time elapsed since the date of taking the judicial control measure *(14.02.2025)* appears to be insufficient to consider that the state of danger has diminished, and given the complexity and the procedural phase in which the case stands, it is considered that the duration of the preventive measure of judicial control has not exceeded a reasonable term. |
| Further, it is retained that since the date of the last verification of the subsistence of the grounds that required the taking of the preventive measures against the defendant, **various procedural and process acts have been carried out** *(mainly, re-hearings of injured persons and witnesses, the drawing up of investigation reports, the issuance of requests for letters rogatory and European investigation orders, etc.)*, so that there were no moments of inactivity in the judicial procedure of a nature to call into question the conditions of necessity and proportionality of the preventive measures. |
| ***** |
| Moreover, **by the ordinance of the prosecutor within the Prosecutor's Office attached to the High Court of Cassation and Justice – Directorate for Investigating Organized Crime and Terrorism of 10.06.2026, the extension of the criminal prosecution IN PERSONAM against the named TATE III Emory Andrew was ordered**, in respect of the commission of the offence of "human trafficking", an act provided for and punished by art. 210 para. 1 lit. a and b with reference to art. 182 lit. c of the Criminal Code applying art. 5 of the Criminal Code *(prior to the amendment made by Law no. 202/2024 of 01.07.2024)* – **in relation to the victim** [redacted], consisting in the following: |
| in the first part of 2017, the defendant ANDREW TATE, taking advantage of the state of manifest vulnerability of the victim (young age - 22-23 years old, lack of life experience, lack of family support, the pre-existence of psychological traumas caused by the absence of the paternal figure from the victim's life, as well as lack of material resources), by deceiving her as to the intention of establishing a love/marriage/cohabitation relationship and the existence of genuine feelings of love, the falseness of the feelings of love resulting from the fact that the named Andrew TATE, in the same time interval, was attempting in parallel to recruit several victims by the same "loverboy" method, as well as as to the obtaining of large sums of money in a relatively short time, recruited the named [redacted], whom, after gaining her trust and inducing her to fall in love with him, through acts of moral coercion (emotional blackmail), over the period May - June 2017, he sexually exploited by inducing her to engage in pornographic performances with a view to producing and distributing pornographic materials, namely to perform video-chat activities on the specialized platform MyFreeCams for his material benefit, thereby obtaining from the exploitation of the victim pecuniary benefits in a total value of USD 2,013.50. Likewise, during the period of sexual exploitation, the named ANDREW TATE provided the victim [redacted] both with accommodation in a villa in the town of Tunari, Ilfov County, and with all the logistics necessary for carrying out the video-chat activity; |
| **By the prosecutor's ordinance no. 2557/D/P/2023 of 16.06.2026, the extension of the criminal prosecution IN PERSONAM against the named TATE III Emory Andrew was ordered,** [redacted] in respect of the commission of the offence of **"money laundering in continued form" – in** |

| |
|---|
| **the concealment modality**, an act provided for and punished by **art. 49 para. (1) lit. "b" of Law no. 129/2019 applying art. 35 para. (1) of the Criminal Code**, consisting in the following: |
| - over the period 07.05.2018 – 06.10.2022, the defendants TATE Tristan and TATE III Emory Andrew, for the purpose of concealing and disguising the illicit origin of the sums of money obtained from the commission of the offence of human trafficking, as well as for the purpose of integrating them into the apparently lawful economic circuit, set up on 09.11.2017 and on 26.03.2021, respectively, the commercial companies TALISMAN ENTERPRISES SRL and GROUND BREAKING DEVELOPMENT SRL (formerly EMORY TATE AND SONS), companies in which they figured as partners and administrators, and subsequently proceeded to introduce into the assets of the commercial companies significant sums of money, in the form of apparent loans granted to the companies, made exclusively through bank transfers, namely by carrying out 38 crediting operations in a total value of RON 3,572,446.53 and EUR 33,857 to TALISMAN ENTERPRISES SRL, as well as 24 crediting operations in a total value of RON 9,516,289.94 and EUR 366,467 to GROUND BREAKING DEVELOPMENT SRL. Subsequently, using these funds, the two defendants carried out, through the bank accounts of the companies or even of the defendants, 6 acquisitions consisting of land, buildings, services and a car, in a total value of RON 3,584,069.12 and EUR 112,205 (through the commercial company TALISMAN ENTERPRISES SRL), as well as 28 acquisitions of services, cars, land and a block-type building with a height regime of P+4, in a total value of RON 9,616,466.18 and EUR 246,550 (through the commercial company GROUND BREAKING DEVELOPMENT SRL), assets which entered the companies' patrimony but were used exclusively in the personal interest of the defendants, namely for the purpose of modernizing and equipping the building in which they reside, as well as for purchasing cars, services and other goods for personal use, without any real connection to the declared object of activity of the commercial companies. |
| By the ordinance of the prosecutor within the Prosecutor's Office attached to the High Court of Cassation and Justice – Directorate for Investigating Organized Crime and Terrorism of **17.06.2026, the extension of the criminal action** was ordered in respect of the named **TATE III Emory Andrew** for the commission of the offences of **"human trafficking"**, an act provided for and punished by art. 210 para. 1 lit. a and b with reference to art. 182 lit. c of the Criminal Code applying art. 5 of the Criminal Code *(prior to the amendment made by Law no. 202/2024 of 01.07.2024)* – in relation to the victim [redacted], and **"money laundering in continued form" – in the concealment modality**, an act provided for and punished by art. 49 para. (1) lit. "b" of Law no. 129/2019 applying art. 35 para. (1) of the Criminal Code. |
| **By the prosecutor's ordinance no. 2557/D/P/2023 of 30.06.2026, the extension of the criminal prosecution IN PERSONAM against the named TATE III Emory Andrew was ordered**, [redacted], under investigation in respect of the commission of the offence of **"influencing statements in continued form" – 4 material acts**, an act provided for and punished by art. 272 para. 1 of the Criminal Code applying art. 35 of the Criminal Code, consisting in the following: |
| Over the period January 2023 – January 2024, the defendant TATE III Emory Andrew attempted to induce or induced the injured persons [redacted], as well as the witnesses [redacted] through acts of a manifestly intimidating effect (by threatening legal action and demanding exorbitant damages, by filing an action on the territory of America seeking damages, as well as by unlawfully disclosing in the public sphere documents pertaining to the victims' personal life that contain personal data - endangering including the safety of the injured persons and members of their families), as well as through acts of bribery (providing transport and accommodation in the municipality of Bucharest, as well as providing legal assistance), to withdraw the statements given in criminal prosecution file no. 1305/D/P/2022 (in the case of the injured persons [redacted]), not to give statements or to give false statements in the present file, with the aim of avoiding the holding of the defendants TATE III Emory Andrew and TATE Tristan liable, namely: |
| - over the period January 2023 – July 2024, the defendant Andrew TATE – through persons from his entourage (Lelias Luke Stephan, Tudor Ana Maria and other unidentified persons), attempted to induce the injured persons |

| |
|---|
| [redacted] through acts of a manifestly intimidating effect (by threatening legal action and demanding exorbitant damages, by filing an action on the territory of America seeking damages of over USD 5,000,000 for defamation, defamation per se, commercial defamation, false imprisonment, tortious interference in a business relationship, civil conspiracy, intentional infliction of emotional distress and negligent infliction of emotional distress, by unlawfully disclosing in the public sphere documents pertaining to the victims' personal life that contain personal data – whereby the proper conduct of the criminal proceedings is impaired and the victims' rights to have their identity, dignity, private life and personal data protected are violated, their safety also being endangered, given the extremely great impact among members of society through the various comments they made on social platforms regarding the injured persons [redacted]), committed against them and against members of their families, to withdraw the statements given in criminal prosecution file no. 1305/D/P/2022 and to give false statements, with the aim of avoiding the holding of the defendants Andrew and Tristan TATE criminally liable; |
| - in January 2024, the defendant ANDREW TATE attempted to induce the witness [redacted] through acts of bribery (both by making available to the witness a luxury car to provide transport from Bacău to the DIICOT headquarters in Bucharest and paying for accommodation at a hotel in the municipality of Bucharest, as well as by providing legal assistance through Ms. attorney Boc Oana Alexandra of the Brașov bar with the legal power of attorney on file, series BV no. 250314 of 08.01.2024), not to give statements or to give false statements in the present file, |
| - in February 2023, the defendant Andrew TATE induced the witness [redacted] through acts of bribery (by providing legal assistance through Ms. attorney Petrescu (formerly Cojan) Larisa Daria of the Sibiu Bar with the legal power of attorney on file, series SB no. 389084 of 05.11.2023), to give false statements in the present file. |
| **By the prosecutor's ordinance no. 2557/D/P/2023 of 01.07.2026, the following was ordered:** |
| **I. Extension of the criminal prosecution IN REM in respect of the commission of the offence of:** |
| - "removal of goods from seizure" - an act provided for by art. 261 para. (1) and (2) of the Criminal Code, consisting in the following: after 31.03.2025, the defendants ANDREW and TRISTAN TATE, after the return and leaving in his custody of the cars on which the precautionary seizure was instituted by the ordinances of 29.12.2022 and 05.01.2023, ordered by the interlocutory judgment of the Bucharest Court of Appeal issued on 31.03.2025, and being aware of the existence of the precautionary measure instituted on them, as well as of the express prohibition on alienating them, proceeded to alienate some of these cars for the purpose of removing them from the effect of the precautionary measure. |
| **II. Extension of the criminal prosecution IN PERSONAM against the named persons:** |
| **1. TATE III Emory Andrew,** [redacted], in respect of the commission of the offence of **"removal of goods from seizure in continued form" – 5 material acts**, an act provided for by art. 261 para. (1) and (2) of the Criminal Code applying art. 35 para. (1) of the Criminal Code, consisting in the following: |
| after the return and leaving in his custody of the cars on which the precautionary seizure was instituted by the ordinances of 29.12.2022 and 05.01.2023 (seizures maintained to date) - measures ordered by interlocutory judgment no. 3224/3/2025 of 31.03.2025 of the Bucharest Court of Appeal, being aware of the existence of the precautionary measure instituted on them, as well as of the express prohibition on alienating them, over the period 16.05.2025 – 09.10.2025, the named TATE III Emory Andrew proceeded to successively alienate five cars, namely the cars Rolls-Royce Wraith V12, chassis series SCAXZ0202LU201680, Ferrari 812 Superfast S-A, chassis series ZFF83CMC000230503, BMW M5 Competition, chassis series WBSJF02090BW64908, Mercedes-Benz S63 AMG, chassis series WDD2173772A005523, Aston Martin DBS Superleggera V12 Auto, chassis series |

| |
|---|
| SCFRLHAV7LGR01693, goods on which the precautionary seizure measure was instituted, to various natural and legal persons on the territory of the United Kingdom of Great Britain and Northern Ireland, in breach of the obligations incumbent on him as custodian and for the purpose of removing them from the effect of the precautionary measure, alienations that were carried out as follows: |
| - The car of the make **Ferrari 812 Superfast S-A**, chassis series ZFF83CMC000230503, was **alienated** by the defendant TATE III Emory Andrew on **16.05.2025** to the named [redacted] |
| - The car of the make **Mercedes-Benz S63 AMG**, chassis series WDD2173772A005523, was **alienated** by the defendant TATE III Emory Andrew on **14.07.2025** to the commercial company **Specialist Performance Cars Ltd**; |
| - The car of the make **BMW M5 Competition**, chassis series WBSJF02090BW64908, was **alienated** by the defendant TATE III Emory Andrew on **31.07.2025** to the named [redacted]; |
| - The car of the make **Aston Martin DBS Superleggera** was **alienated** by the defendant TATE III Emory Andrew on **15.08.2025** to the named [redacted] |
| - The car of the make **Rolls-Royce Wraith V12**, chassis series SCAXZ0202LU201680, was **alienated** by the defendant TATE III Emory Andrew on **09.10.2025** to the named [redacted]. |
| **By the prosecutor's ordinance no. 2557/D/P/2023 of 03.07.2026, the extension of the criminal action against the defendant TATE Andrew was ordered for the commission of the offences of:** |
| - **"influencing statements in continued form"** – 4 material acts, an act provided for and punished by art. 272 para. 1 of the Criminal Code applying art. 35 of the Criminal Code. |
| - **"removal of goods from seizure in continued form"** – 5 material acts, an act provided for by art. 261 para. (1) and (2) of the Criminal Code applying art. 35 para. (1) of the Criminal Code. |
| both applying art. 38 para. 1 of the Criminal Code. |
| In view of the foregoing, considering the fact that the measure of judicial control is proportionate to the gravity of the accusations brought against the defendant and necessary for the achievement of the aim pursued by ordering it, and that there is no cause preventing the setting in motion or exercise of the criminal action, pursuant to the provisions of art. 215[1] with reference to art. 202, art. 203 para. (2) and (4), art. 211 para. (1) and (4) and art. 215 para. (1)-(5) of the Code of Criminal Procedure and art. 82 and 83 of Law no. 253/2013 on the execution of penalties, educational measures and other non-custodial measures ordered by the judicial bodies during the criminal proceedings, |
| **ORDERS:** |
| **I. The extension of the judicial control measure taken against the defendant:** |
| **TATE III Emory Andrew**, [redacted], without military obligations, against whom the commission is retained of the offences of: |
| - **"setting up an organized criminal group"** – in the setting-up modality, an act provided for by art. 367 para. 1, 3 and 6 of the Criminal Code, |

| |
|---|
| - **"trafficking in minors"**, an act provided for and punished by art. 211 para. 1 and 2 lit. a with reference to art. 210 para. 1 lit. a and b of the Criminal Code with reference to art. 182 lit. c of the Criminal Code applying art. 5 of the Criminal Code, |
| - **"human trafficking in continued form"** – *6 material acts in relation to the victims* [redacted], an act provided for by art. 210 para. 1 lit. a and b of the Criminal Code with reference to art. 182 lit. c of the Criminal Code applying art. 35 para. 1 of the Criminal Code and art. 5 of the Criminal Code, |
| - **"human trafficking"**, an act provided for and punished by art. 210 para. 1 lit. a and b with reference to art. 182 lit. c of the Criminal Code applying art. 5 of the Criminal Code *(prior to the amendment made by Law no. 202/2024 of 01.07.2024) – in relation to the victim* [redacted], |
| - **"sexual act with a minor in continued form"** – *without being able to establish the number of material acts*, an act provided for and punished by art. 220 para. 1 and 4 lit. e of the Criminal Code applying art. 35 of the Criminal Code, |
| - **"influencing statements in continued form"** – *3 material acts in relation to the named* [redacted] an act provided for and punished by art. 272 para. 1 of the Criminal Code applying art. 35 para. 1 of the Criminal Code, |
| - **"money laundering in continued form"** – *in the concealment modality – 4 material acts*, an act provided for and punished by art. 49 para. (1) lit. "b" of Law no. 129/2019 applying art. 35 para. (1) of the Criminal Code, |
| - **"removal of goods from seizure in continued form"** – *5 material acts*, an act provided for by art. 261 para. (1) and (2) of the Criminal Code applying art. 35 para. (1) of the Criminal Code. |
| **all applying art. 38 para. 1 of the Criminal Code**, for a period of **60 days, from 28.07.2026 until 25.09.2026, inclusive;** |
| Throughout the time he is under judicial control, the defendant **TATE Emory III Andrew** must comply with the following obligations: |
| a) to appear before the criminal prosecution bodies, the preliminary chamber judge, or the trial court whenever summoned; |
| b) to immediately inform the criminal prosecution bodies, the preliminary chamber judge, or the court of any change of residence; |
| c) to appear before the police bodies designated with supervision, in accordance with the supervision schedule drawn up, or whenever summoned. |
| Pursuant to art. 215 para. 2 of the Code of Criminal Procedure imposes on the defendant TATE III EMORY ANDREW that, during the judicial control, he comply with the following obligations: |
| a) not to communicate, directly or indirectly, with the injured persons/victims/witnesses [redacted] |

| |
|---|
| [redacted] not to approach them at a distance of less than 50 metres. |
| b) to periodically provide relevant information about his means of subsistence. |
| c) not to possess, use, or carry weapons. |
| Pursuant to art. 215 para. 3 of the Code of Criminal Procedure, draws the defendant's attention to the fact that, in the event of a bad-faith breach of the obligations incumbent on him or in the event of the commission of another offence, intentionally, during the judicial control, the preventive measure may be replaced with the measure of house arrest or with the measure of pre-trial detention. |
| The supervision of the compliance by the defendant **TATE Emory III Andrew** with the obligations incumbent on him during the judicial control shall be carried out by **IPJ Ilfov – Voluntari Town Police.** |
| The present ordinance shall be communicated to the defendant **TATE Emory III Andrew** and to **IPJ Ilfov – Voluntari Town Police.** |
| **CHIEF PROSECUTOR OF SERVICE,** |
| **CEZAR PROFIRA** |
| *[signature]* |