**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. <u>1:26-MJ-03259-LOUIS</u>**
**CASE NO. <u>1:26-MJ-03260-LOUIS</u>**

**IN THE MATTER OF THE EXTRADITION OF TRISTAN TATE,**
______________________________________/

**IN THE MATTER OF THE EXTRADITION OF EMORY ANDREW TATE,**
______________________________________/

## ORDER

**THIS CAUSE** is before the Court on Respondent[1] Emory Andrew Tate's Motion for Release Pending Extradition Proceedings, (ECF No. 23) in Case No. 1:26-MJ-03260-LOUIS, and Respondent Tristan Tate's Motion for Release Pending Extradition Proceedings, (ECF No. 24) in Case No. 1:26-MJ-03259-LOUIS (together, the "Motion").[2] The Government filed a Response to the Motion, (ECF No. 37), to which Respondents replied, (ECF No. 44). The Court convened a hearing on the Motion on August 27, 2026. Respondents sought leave to supplement the record to address the status of pending foreign proceedings. The request was granted; the supplementation was filed and the Government has responded thereto. Upon review of the record, consideration of the Parties' briefing and the Parties' arguments in open court, being well advised in the premises,

[1] When referring to a person subject to an international extradition request, courts use the varied terms Relator, Extraditee, Accused, Defendant, or Respondent. For convenience and consistency purposes, this Court will refer to Emory and Tristan Tate as Respondents. The Court also identifies each Respondent by his first name, to distinguish between them. Emory Andrew Tate III stated his preference to be identified as "Emory," and I will do the same here.

[2] Respondent Tristan Tate stands as the respondent in related (though not consolidated) extradition proceedings pending before the undersigned. *See In the Matter of the Extradition of Tristan Tate*, Case No. 1:26-mj-03259-Louis, at [ECF No. 3] (filed July 18, 2026). Respondents have elected to "consolidate[] their arguments" and have thus filed identical briefing on the instant Motion. *See id.* at [ECF No. 24] (filed Aug. 7, 2026).

and as set forth below, Respondents' Motion for Release is **DENIED**.

## I. BACKGROUND AND PROCEDURAL HISTORY

On July 18, 2026, warrants issued for the provisional arrests of brothers Emory Andrew Tate III ("Emory") and Tristan Tate ("Tristan"). Respondents were arrested on the same day, outside of a Miami venue at which they were co-hosting a boxing event. Respondents were taken into custody pursuant to a provisional arrest complaint based on charges against them in the United Kingdom (alternatively, "U.K."). The United Kingdom seeks Respondents' extradition pursuant to Article 12 of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "Extradition Treaty").[3]

The warrant and Complaint in Case No. 1:26-mj-03260 set forth allegations that Respondent Emory choked and raped two women in their homes in England at various times between 2015 and 2025. (ECF No. 3 at 3–5). The warrant and Complaint in Case No. 1:26-mj-03259 set forth allegations that Respondent Tristan choked, raped, and otherwise physically assaulted a woman with whom he was in a long-term romantic relationship on multiple occasions. (ECF No. 3 at 3–5).

Since their arrest, Respondents have been housed at the Federal Detention Center in Miami ("FDC-Miami"). On July 20, 2026, Respondents made their initial appearances before the undersigned with Defense counsel present. On July 27, the Court approved a briefing schedule on Respondents' Motion in accordance with Respondents' counsel's stated preference, (ECF No. 19),

---

[3] Extradition Treaty Between the Government United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. Treaty Doc. No. 108-23 (2004) as amended by the Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006).

which schedule has since been modified with leave of the Court. *See* (ECF Nos. 22, 33, 35, 40, 43). Respondents timely filed their Motion on August 7, 2026. The Government filed a Response on August 10, (ECF No. 37), to which Respondents replied on August 21, (ECF No. 44).

The instant Motion does not concern the U.K.'s request for extradition or the defenses Respondents may raise thereto. These proceedings are at an early stage. Article 12(4) of the Extradition Treaty provides the United Kingdom sixty days from the date of provisional arrest to issue a formal request for extradition and supporting documents. It is upon such submission that the Parties will dispute whether the Court should or should not certify extradition.

In the interim and by the instant Motion, Respondents seek release from detention on conditions of bond pending the resolution of these extradition proceedings.

Several witnesses gave sworn testimony at the hearing on August 27 in support of Respondents' request for release. Mr. Andrew Ford, Respondents' retained solicitor in England and Wales, explained some of the foreign proceedings; Ms. Natasha Sesai described her relationship with Emory and observations of Tristan over the course of her relationship with Emory; and, finally, both Respondents testified.

U.K. Attorney Ford gave background testimony as to the United Kingdom's efforts to investigate, arrest, charge, and extradite Respondents.[4] Ms. Sesai testified as to Respondents' character, specifically, that Respondent Emory's public-facing alter ego, "Top G" differs materially from the individual behind the persona. She further gave general testimony as to Respondent Tristan's character and demeanor. Respondent Tristan testified about the conditions of his and Respondent Emory's confinement at the Federal Detention Center in Miami ("FDC-

[4] Attorney Ford sought to address the Court as counsel of record, however, the Government objected on the grounds that Ford has neither been authorized to practice law in this District or the United States nor admitted *pro hac vice*. Ford's statements were accordingly presented as a witness, under oath.

Miami"), the state of his financial wealth, and his belief that the charges against him have been fabricated. Respondent Emory similarly testified about the conditions of confinement, his adamant denial of any wrongdoing relating to the foreign charges, and his social media presence.

## II. LEGAL STANDARD

Foreign extradition proceedings in federal court constitute one element of a diplomatic process governed by the applicable extradition treaty and the federal extradition statute, 18 U.S.C. §§ 3181-3196. They are neither civil nor criminal in nature. *Matter of Extradition of Bell*, 2021 WL 1616127, at *2 (S.D. Fla. Apr. 26, 2021) (citations omitted); *Martin v. Warden, Atl., Pen.*, 993 F.2d 824, 829 (11th Cir. 1993). Accordingly, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply thereto. *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164–65 (11th Cir. 2005); *Matter of Extradition of Benjamin*, 566 F. Supp. 3d 1324, 1328 (S.D. Fla. 2021). Foreign extraditions are "*sui generis* in nature . . . and set forth their own law." *Bell*, 2021 WL 1616127, at *2. (quoting *In re Extradition of Mohammad Safdar Gohir*, No. 14-mj-00314, 2014 WL 2123402, at *6 (D. Nev. May 21, 2014).

As such, "[f]ederal district courts have almost exclusively, and by necessity, developed a federal common law to fill in the gaps left by current legislation for bail determinations in foreign extradition cases." *Matter of Extradition of Bell*, 2021 WL 1616127, at *2 (quoting *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 470 (S.D. Tex. 2010)). From this iterative establishment of federal common law, several settled rules have arisen.

There is a well-established presumption against bond in extradition proceedings, reflecting among other interests the value the United States places on fulfilling its obligations under international law to a country requesting extradition. *In re Extradition of Pelletier*, No. 09–22416–MC, 2009 WL 3837660, at *3 (S.D. Fla. Nov. 16, 2009) (citing *Wright v. Henkel*, 190 U.S. 40

(1903)); *Martin v. Warden*, 993 F.2d 824, 827 (11th Cir. 1993)). This presumption flows from the federal extradition statute's lack of any provision authorizing district courts to grant bail to potential extraditees. *See Matter of Extradition of Ricardo Alberto Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1292 (S.D. Fla. 2017); *Wright*, 190 U.S. at 62 (recognizing for the first time in 1903 that "while bail should not ordinarily be granted in cases of foreign extradition," courts may, upon a showing of "special circumstances, extend such relief").

Owing to *Wright*, circuit and district courts apply the "special circumstances" test in determining whether to grant requests for release in extradition cases. *Matter of Extradition of Berrocal*, 263 F. Supp. 3d at 1292–93 (collecting cases). "[C]ourts consistently agree that special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable" to all potential extraditees. *In re Extradition of Shaw*, No. 14-MC-81475, 2015 WL 521183, at *5 (S.D. Fla. Feb. 6, 2015) (quoting *In re Extradition of Garcia*, 761 F. Supp. 2d at 473–74).

Thus, unlike in a domestic criminal case, where the Government bears the burden of establishing that the accused is a risk of flight or danger to the community, a respondent in foreign extradition proceedings bears the burden of showing that he is neither a risk of flight nor a danger to the community, and must further show that special circumstances warrant his release. *Matter of Extradition of Yungman*, No. 24-MC-61373, 2024 WL 4581265, at *2 (S.D. Fla. Oct. 25, 2024); *In re Extradition of Rollo*, No. 20-80746-MC, 2020 WL 13379288, at *1 (S.D. Fla. May 28, 2020). There is a lack of consensus as to whether the respondent must meet that proof by clear and convincing evidence, or by a preponderance of the evidence. *See Matter of Extradition of Headley*, No. 18-mc-81148, 2018 WL 4938553, at *7 (collecting cases). As set forth below, the Court concludes that Respondents have failed to meet their burdens to demonstrate entitlement to release

under either standard.

## III. DISCUSSION

### A. The Court Will Follow Eleventh Circuit Law.

The Parties agree that Respondents bear the burden of demonstrating his entitlement to release during the pendency of these extradition proceedings.

Respondents urge the Court to determine their entitlement to release based on risk of flight and danger to the community only, without additionally showing the existence of special circumstances that here warrant release.

Respondents contend that the requirement to show "special circumstances" to obtain release on bond is unconstitutional. (Motion at 15 n.3). The argument strikes at the Supreme Court's holding in *Wright v. Henkel*, 190 U.S. 40 (1903). There, the Supreme Court departed from lower court precedent that, in the absence of any provision permitting individuals detained in the course of extradition proceedings to seek bond pending the outcome of same—in the United States Constitution, in bilateral extradition treaty, or in legislatively enacted statute—bond was categorically unavailable to such detainees. *Id.* at 62–63 (rejecting such reasoning by the district court in *In re Carrier*, 57 F. 578 (D. Colo. 1893)). Instead, the Court left the door open to "special circumstances" that might justify an extraditee's release on bond in the proper case and on the proper showing. *Id.* at 63 (recognizing that "bail should not ordinarily be granted in cases of foreign extradition," but declining to hold that courts "may not in any case, and whatever the special circumstances, extend that relief").

As Respondents acknowledge, the requirement that the "special circumstances" test be satisfied is supported by binding Eleventh Circuit precedent. *Martin v. Warden, Atl. Pen*, 993 F.2d 824, 827 (11th Cir. 1993) ("In extradition cases there is a presumption against bond" and "a

defendant in an extradition case will be released on bail only if he can prove 'special circumstances.'").

Notwithstanding, Respondents argue for release under standards applicable to the Bail Reform Act, 18 U.S.C. § 3142. The Act provides a "procedural scheme for making bail determinations in *domestic criminal* cases," and omits "any reference" to extradition proceedings. *Matter of Extradition of Berrocal*, 263 F. Supp. 3d at 1292 (emphasis added); *Matter of Extradition of Rangel Prentt*, No. 24-cv-80209, 2024 WL 2219823, at *11 (S.D. Fla. May 7, 2024) ("The Bail Reform Act does not apply to extradition proceedings.") (citations omitted); *see also* 18 U.S.C. § 3156(a)(2). An extradition proceeding is not a criminal prosecution. *In re Extradition of Rollo*, 2020 WL 13379286, at *1 (quoting *Martin v. Warden, Atl. Pen*, 993 F.2d at 828–29). The provisions of the Bail Reform Act are thus inapplicable to these *sui generis* proceedings.

This Court will follow the Eleventh Circuit's established standard, applicable here, in determining whether Respondents have met their burden on all three factors to be considered: risk of flight, danger to the community, *and* the existence of special circumstances warranting release.

**B. Risk of Flight**

The arguments presented by Respondents have been dynamic, evolving from Motion to Reply. Based on the arguments and evidence presented at the hearing, Respondents' primary argument for release posits that they have demonstrated a perfect track record of compliance with conditions of release imposed by the Romanian court system, contrary to the Government's argument that Respondence have the incentive and financial means to flee.[5] At the hearing,

[5] Respondents advance this track record of compliance on release from Romanian custody as a "special circumstance" warranting release here. Acknowledging that the case law "reflects an inconsistency among courts in their analysis of flight risk in relation to the 'special circumstances' inquiry," the majority of courts "treat flight risk as a separate, independent factor from the special circumstances analysis." *In re Extradition of Shaw*, 2015 WL 521183, at *6; *see In re Extradition of Pelletier*, 2009 WL 3837660, at *2. Acknowledging that some courts have indeed concluded that the lack of flight risk alone may rise to the level of a special circumstance, *e.g.*, *In the Matter of the Extradition of Jeremy Barock Hulsh*, Case No. 1:23-cr-00074, at [ECF No. 26] (N. D. Ill. Mar. 9, 2023), this Court need not decide

Respondents advanced evidence, including their own testimony, that what wealth they had has been seized by the Romanian government; and that to the extent the Government's evidence draws on their statements on social media regarding their extreme wealth, those statements are attributable to the characters they play online but are vastly exaggerated (or outright false). Emory Tate additionally advanced evidence that social media posts boasting about his willingness and ability to evade law enforcement are just the "hyperbole" that Respondents disseminate in their capacity as public-facing figures selling an image. (ECF Nos. 23, 44).

The Government has advanced substantial evidence contracting Respondents' evidence. As to wealth, the Government highlights Respondents' public-facing message that they "are self-proclaimed *billionaires* who say that they own high-end vehicles, private jets, and a custom $50-million-dollar superyacht and have unrestricted access to traditional funds, crypto currency, and bitcoin." (ECF No. 37 at 12). The Government admitted evidence of Respondents holding themselves out as owning a "superyacht." *See* (ECF Nos. 37-5, 37-6). The Government further adduced Respondents' history of depicting themselves to the public as individuals who live lives of fabulous wealth. (ECF No. 37 at 19–20). In an audio recording promoting "The War Room," Respondent Emory explains how crucial it is for one to hide one's wealth. Gov't Ex. No. 16.

On Reply, Respondents explain that their online statements are not to be taken for their truth. (ECF No. 44 at 13–14) ("Andrew and Tristan are social media personalities. Their business model depends on online attention . . . . The more hyperbolic and outlandish the post, the more likely it will generate views and likes, which in turn generates income. In short, *they are playing a role*.") (emphasis in original). Emory testified and denounced his statements of exorbitant wealth, explaining the statements are "hyperbolic exaggeration[s] for comedic effect" that are the

---

the issue because, as explained below, Respondents have not credibly shown the record of compliance they claim.

hallmark of Top G, a brash alter-ego he assumes in order to generate income. Respondent Tristan testified to the same effect. In any event, per Respondents' argument and testimony, they have been rendered bereft of assets by Romanian authorities who they claim have seized all assets down to their children's toys.

In the extradition context, courts' risk-of-flight inquiry is primarily capacity and incentives-based. *See Matter of Extradition of Rangel Prentt*, No. 24-cv-80209, 2024 WL 2219823, at *13 (S.D. Fla. May 7, 2024) ("In evaluating risk of flight in the extradition context, courts have considered a defendant's financial means, foreign connections, age, and the seriousness of the offenses.") (quoting *Matter of Extradition of Berrocal*, 263 F. Supp. 3d at 1304). Courts have further considered an extraditee's ties to the district in which they are being held, propensity to undertake extensive international travel, and the use of aliases. *See, e.g.*, *In re Extradition of Shaw*, 2015 WL 521183, at *9.

Crediting Respondents' argument that they are not billionaires does little to dispel the concerns, presumptively in place, that they constitute quintessential flight risks with the capacity to flee. While Respondents may not in fact possess what extravagant holdings they portray themselves as possessing online, the record reflects that they possess an exceptional capacity to flee the jurisdiction.

Respondents advanced the testimony of Ms. Sesai, who testified that Emory and Tristan have generously funded their children's upbringing—Emory has three children and is expecting a fourth; Tristan has eight children—even after the time Romania seized or otherwise froze their assets. The Government elicited testimony on cross-examination that Emory has purchased luxury accessories for her during this same period. Her testimony, in sum, belied the intimation that Respondents' lack of billionaire status renders them incapable of procuring the means by which to

undertake flight; it further belied Respondents' insistence—including when testifying at the August 27 hearing—that Romania had foreclosed their access to wealth.

Respondents are U.S. citizens but reside abroad and undertake international travel with frequency as part of their business model. In conjunction with their Motion for Release, Respondents submit a "Travel Timeline" capturing international flights they took while on judicial supervision in the Romanian proceedings between February 2025 and July 2026. (ECF No. 30-7). The travel log reflects 43 flights taken in that span, to and from numerous countries. (*Id.*). As the Government contended at the hearing, the log appears to be incomplete on its face; the precise frequency with which Respondents fly, together or separately, and where, remains elusive. Defense counsel argued that if there were in fact even more flights than their records revealed, this would only support their argument that their history of extensive travel shows a reliable track record of rigorous compliance with the conditions of their release. Whether this is a fair inference is discussed more below; the fact remains, the history of international travel is extensive but only partially known. The lack of transparency here is significant. In the audio recording described above, Emory Tate exhorted that one must amass multiple passports, explaining that it is no longer possible to live "off the grid" but rather, that one should seek to live on as many grids as possible; he very specifically describes how he has passed himself off to various law enforcement agencies using identification documents issued by different countries as a method of evading law enforcement. Gov't Ex. No. 16.

Adding to their extensive international travel, Respondents have significant ties abroad. All of the families—Emory's three and Tristen's eight—reside abroad, largely in Dubai and Romania. Ms. Sesai described both Respondents as loving and present parents who are very attached to their children. None of these children reside in the United States. In fact, Respondents

have offered no evidence of their ties to this jurisdiction and the record shows only one connection: their arrest here in Miami at a sporting event. Their lack of ties to this jurisdiction, and strong foreign ties, demonstrate a risk of flight that has not been overcome.

The Parties' competing evidence of Respondents' incentives to flee revolves in significant part around Respondents' statements on social media platforms. For example, the Government advances evidence of statements attributed to Emory Tate as the user of a Twitter account @OfWudan. From the account have come tweets excoriating foreign law enforcement authorities, celebrating efforts to obstruct criminal process, bragging of missing court dates, and making claims that the poster possesses aliases and both the means and motive to effectuate flight with considerable speed. (ECF No. 37-1 at 13–31).

Respondents challenge the reliability of this evidence to show their true motives. Respondents argue that, to the extent the statements are even fairly attributable to an account controlled by one of them, the hyperbolic messages are not reflective of their genuine beliefs or actions but are instead part of the character they play online. Respondents explain that the messages are, in this context, intended only to "shake up" the internet and motivate followers to work out and live healthy lives.

Moreover, Respondent Emory vehemently testified that the @OfWudan account was one of so many "copycats" of his online profile, run by "some kid." A video introduced by the Government directly impeached this claim: in an undated video interview, Emory Tate told followers that the Twitter handle @OfWudan was the best way to stay connected with him. *See* Gov't Ex. No. 13**.**

Whether Emory Tate in fact controlled the @OfWudan account or caused the contested messages to be posted is not determinative here. The significance of the competing evidence of his

control over the account is the impact to the credibility of his testimony, as his adamant denial of ever having controlled the account is squarely contradicted by his own contemporaneous identification of the account as the best way for followers to connect with him. "When a defendant chooses to testify, he runs the risk that," if disbelieved, the trier of fact "might conclude the opposite of his testimony is true." *United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008) (quoting *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (quotations omitted))*; see also United States v. Williams*, 390 F.3d 1319, 1325 (11th Cir. 2004) ("[A] defendant who chooses to present a defense runs a substantial risk of bolstering the Government's case.") (quotations omitted).

Relatedly, the Parties offered competing proof to show whether Respondent Tristan possessed a fake Mexican passport bearing an image of his face, his date of birth, the fictitious name "Vladimir Scorpius," and a "CURP" number. *See* (ECF No. 37-1 at 32). The Government proffers that the CURP number serves an identificatory function and can only be obtained by request to the Mexican Government. On cross-examination, Respondent Tristan denied he himself ever made a request to the Mexican Government for the issuance of such a number.

That Respondent Tristan possessed such a document was effectively uncontested at the hearing; in Reply, Respondents attempt to explain that Respondent Tristan, "[a] die-hard 007 fanatic," used the document as "a cardboard prop . . . for a Halloween costume" wherein he portrayed the Vladimir Scorpius, a character in a 1988 James Bond novel. At the August 27 hearing, Respondent Tristan gave a different narrative: he explained that the passport was "printed" by an assistant of his around 2021. He denied ever using it. It is without dispute that the CURP number in fact issued as it appears on the fake passport image.

Respondents bear the burden of demonstrating that they do not pose a risk of flight. The

assertions of fact they make and rely upon to meet that burden have been contradicted or otherwise lessened in probative value by the Government's rebuttal in briefing on the instant Motion and, further, in open court at the hearing.

Accepting as true that Respondents' family-facing personae differ from their social media personalities, there is nonetheless a dearth of competent, credible evidence of Respondents' ties to the relevant jurisdiction, stability, and absence of incentive to flee. On this record, I do not find that Respondents Emory or Tristan have met their burden to show, whether by clear and convincing evidence or by a preponderance of the evidence, that they do not pose a risk of flight.

**C. Risk of Danger to the Community**

Respondents attempt to meet their burden to demonstrate that they do not pose a risk of danger to the community. To this end, they rely on Ms. Sesai's testimony that Emory has not treated her abusively, and that both Emory and Tristan are loving caregivers to their families. Further, Respondents again rely on their purportedly unblemished track record of compliance with the conditions of supervised release imposed upon them by Romanian courts.

The Court does not find Ms. Sesai's testimony that Respondent Emory has not abused her or their child particularly probative of whether Respondent Emory poses a danger to the community. Respondents are alleged to have committed forcible rape against struggling victims. Here, as in *Matter of Extradition of Bell*, the nature of the offenses alleged indicate that Respondents do indeed pose dangers to the community. 2021 WL 1616127, at *7.

Moreover, the Government has rebutted Respondents' argument that their track record of compliance with the conditions of their supervised release from Romanian custody lacks any tarnish. In conjunction with their Response brief, the Government submits a Letter from the Romanian Ministry of Justice indicating that Respondent Emory faces 7 counts of "influencing

witness testimony on a continuing basis," and that Respondent Tate faces 12 counts for the same alleged criminal offense. *See* (ECF No. 37-2 at 7). Respondents concede that certain of the alleged conduct occurred while they were under judicial supervision. (ECF No. 44 at 2).

At the hearing, Respondents and their counsel explained that Respondents had merely offered to pay for the travel and visiting expenses of women identified as victims of the alleged acts in Romania. Respondents further argue, in Reply, that the fact that the Romanian authorities did not elect to detain them upon discovering these alleged facts undermines the Government's characterization of these allegations as serious.

Whether the contact with alleged victims or witnesses amounts to witness tampering or not, the prohibited contact admittedly occurred, in violation of the Romanian court's commands. Respondents' explanation may provide an excuse for the conduct, but that is for the Romanian court to decide at another juncture.

**D. Respondents Have Failed to Show that Special Circumstances Warrant Release**

Respondents have shown neither that they do not pose a risk of flight nor that they do not pose a danger to the community. This result obtains whether the Court applies a clear and convincing evidence or a preponderance of the evidence standard. Notwithstanding, consistent with *Wright v. Henkel*, the Court addresses Respondents' arguments that "special circumstances" favor their release from detention pending the extradition proceedings.

**i. Probable Cause**

Respondents argue that the U.K. warrant and complaint are unsupported by probable cause because the charges against him are supported by anonymous witness statements, and therefore constitute hearsay. The Government argues that Respondents are improperly attempting to accelerate a probable cause determination in advance of September 16, 2026, the Treaty-imposed

deadline the U.K. faces to issue its formal request for extradition and disclose information supportive of same. The Government further notes that, in extradition proceedings, a charging document may be supported by hearsay.

Courts have held that probable cause challenges "hardly constitute the type of special circumstances that warrant bail." *Matter of Extradition of Berrocal*, 263 F. Supp. 3d at 1295 (explaining that, "[r]ather than being 'special,' [the court's] review of hundreds of extradition cases has shown that probable cause challenges are quite commonplace"); *see also Matter of Extradition of Rangel Prentt*, 2024 WL 2219823, at *18 ("[T]he Court finds matters pertaining to the high probability or substantial likelihood of success at the extradition hearing (and to probable cause) to be matters more pertinent to the extradition hearing itself"). The Court follows the other courts of this district and concludes that a probable cause challenge is best resolved at the extradition proceeding itself, and after the United Kingdom has submitted its formal request for extradition and accompanying materials in compliance with the Extradition Treaty.

**ii. Romanian Surrender Orders**

Respondents argue that the United Kingdom has contravened Romanian court orders in seeking their extradition from the United States, and that the instant attempt to secure Respondents' extradition constitutes a special circumstance warranting release. Respondents were arrested on Romanian criminal charges on December 30, 2022. They remained in Romanian custody until late March 2023, on which date they were placed under conditions of house arrest. In early August 2023, Respondents were placed under judicial supervision subject to certain conditions. *See* (ECF Nos. 30-3, 30-4).

On January 19, 2024, the United Kingdom's Crown Prosecution Service obtained arrest warrants under the EU-UK Trade and Cooperation Agreement ("TACA") based upon allegations

of rape. Respondents were arrested on March 12, 2024, while on supervised release in Romania. (ECF Nos. 30-1 (Emory), 30-2 (Tristan)). Applying Romanian law and TACA provisions, the Romanian court "order[ed] the execution" of the TACA warrants, (ECF Nos. 30-1 at 8, 30-2 at 9). The Court provided, however, that Respondents' "surrender is postponed until the final resolution" of their case. (ECF Nos. 30-1 at 8, 30-2 at 9).

Respondents' argument is that the United Kingdom is impermissibly attempting to "jump the line" by seeking to effectuate their extradition despite the Romanian court's "surrender" orders. (Motion at 16). In their Motion, Respondents posit that the Romanian surrender orders militate against a finding that the U.K.'s extradition request constitutes a "diplomatic necessity." (*Id.*). In Reply, Respondents argue that "the existence of Romania's standing surrender order" carries independent weight. Then, at the hearing on August 27, Respondents' counsel indeed argued that this Court was in effect sitting as an appellate court in review of foreign court orders.

Respondents thus appear to be requesting that the Court defer to, and adopt, select facets of the Romanian surrender orders (and defer also to ordinances issued by the Romanian prosecutor on the case, (ECF Nos. 30-5, 30-6)). Indeed, they ask the Court to go further, and settle what they characterize as a political dispute between the United Kingdom and Romania as to who gets priority in pursuing criminal proceedings against Respondents. "It is well-established that United States courts are not *obligated* to recognize judgments rendered by a foreign state, but may *choose* to give res judicata effect to foreign judgments on the basis of comity." *Belize Telecom Ltd. v. Govt. of Belize*, No. 05-20470-CIV, 2005 WL 4868966, at *12 (S.D. Fla. June 6, 2005) (citations omitted); *see also Gamble v. United States*, 587 U.S. 678, 701 n.12 (2019) (collecting circuit court cases supportive of same).

Respondents' argument implicates eminently political issues, asking the Court to resolve a

purported dispute between two foreign nations, that neither nation has actually asserted, concerning the proper application of foreign law and the provisions of a multi-national treaty to which the United States is not a party. The Court further notes that while the Romanian government has issued letters filed by the Government in support of the Government's opposition since these proceedings commenced, *see* (ECF Nos. 37-2, 37-3), it has not sought to intervene in the proceedings to assert any interest contrary to the United Kingdom's.

**iii. Diplomatic Necessity**

Respondents argue that several considerations flowing from the United Kingdom's 2024 request for their extradition from Romania, where criminal proceedings were then pending, lessens the diplomatic necessity of their request so as to support their showing of special circumstances. The Court analyzes these considerations in turn.

**a. Absence of Urgency**

Respondents contend that "[n]either the government's sworn complaint[s] nor its detention memorand[a] identif[y] any facts constituting an 'urgent situation'" justifying Respondents' provisional arrests pursuant to Article 12(1) of the Extradition Treaty. The Government counters that the issue of the U.K.'s "perceived lack of urgency . . . is not justiciable." (ECF No. 37 at 33) (citing *Matter of Extradition of Correa*, No. 17-mc-14059, 2017 WL 8780154, at *2 (S.D. Fla. May 8, 2017). The Government explains its position that "'urgency' merely serves as the treaty's Contracting Parties' guidance to one-another on when one state may request that their treaty partner take the necessary steps to secure a provisional warrant before receiving an extradition request." (*Id.* at 34).

The Government cites inadequate authority for the proposition that issues of urgency are non-justiciable. Certainly, federal courts have heard and ruled upon arguments like that

Respondents now advance. *See, e.g.*, *United States v. Messina*, 566 F. Supp. 740, 744 (E.D.N.Y. 1983); *see id.* at 745 (declining to address whether the question of urgency is justiciable). Notwithstanding, the Court does not conclude that a lack of urgency here constitutes a special circumstance.

The Government alternatively argues that the Court should defer to the United Kingdom's decision to seek Respondents' provisional arrest when it did. (ECF No. 37 at 36). "In determining whether urgency warrants a prospective extradite[e]'s provisional arrest and detention, courts afford considerable deference to determinations of urgency expressed by the requesting authority 'as a matter of comity.'" *Matter of Extradition of Tautvydas*, No. 22 CR 615, 2023 WL 1069853, at *4 (N.D. Ill. Jan. 27, 2023) (quoting *Messina*, 566 F. Supp. at 745).

In *Messina*, the Court deferred to the Italian government's communication of its determination to proceed via provisional arrest warrant rather than through a formal extradition request. The United States concurred in the Italian government's exercise of its discretion, and the provisional arrest warrant accordingly issued. The Court agreed with the Government's contention "that the Italian determination, while not binding on the United States, is due deference as a matter of comity." *Messina*, 566 F. Supp. at 745. In addition, the Court "accord[ed] considerable weight to the judgment of the United States, given its foreign affairs interest in the matter." *Id.*

In *Messina*, as here, the district court conformed its analysis to the unique posture in which the Court now sits. *See Arias Leiva v. Wilson*, No. 17-23938-CIV, 2018 WL 9662548, at *5 (S.D. Fla. Aug. 27, 2018) (noting that "an extradition proceeding is not an ordinary Article III case or controversy"). Deference to the United Kingdom's policy determination as to when to seek a provisional arrest, and on what grounds, is warranted. Respondents have not shown that what they view as a lack of urgency in effectuating such arrest constitutes a special circumstance warranting

their release.

**b. Delay**

Respondents argue that the United Kingdom "significantly delay[ed]" in seeking their provisional arrest and extradition, and that such delay constitutes a special circumstance warranting release here. "The UK sought the extradition of the Tates [from Romania] in 2024 after obtaining a warrant for their arrest, but the charges stem from conduct that occurred eight to ten years before the warrant was signed. The complainants did not report the allegations to authorities until 2020 and 2022." (Motion at 18–19). Because "the U.K. [] had a surrender order for more than two years" before seeking to effectuate Respondents' arrest and extradition, Respondents claim special circumstances exist.

As Respondents acknowledge, their argument of delay is out of step with precedent in this Circuit. *See* (Motion at 19) (citing *Matter of Extradition of Berrocal*, 263 F. Supp. 3d at 1298–99, as distinct from more favorable Ninth Circuit authority). Further, Respondents' argument of delay is in tension with their factual proffer that the United Kingdom has been diligent, even objectionably so, in pursuing their extradition in a manner Respondents claim contravened the Romanian surrender orders.

A defendant in extradition proceedings "does not have a right to a speedy extradition." *Martin*, 993 F.2d at 829 (citations omitted). Some courts have held that there is no diplomatic necessity to detain an extraditee where the requesting government has "not made prosecution of [their] offense a priority," and that such lack of diplomatic necessity can contribute to a finding of special circumstances. *In the Matter of Extradition of Chapman*, 459 F. Supp. 2d 1024, 1027; *see also United States v. Castaneda-Castillo*, 739 F. Supp. 49, 58 (D. Mass. 2010) (finding twenty-five-year delay by Peruvian government in seeking a defendant's extradition indicated that such

extradition was not a priority). On the other hand, "'[t]he normal passage of time inherent in the litigation process' does not constitute a special circumstance. *Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 98–99 (D. Mass. Dec. 10, 2015) (finding that a seven-year delay in seeking extradition was not a special circumstance warranting bail); *see also Martin*, 993 F.2d at 827, 830 (finding that seventeen-year delay in seeking extradition was not a special circumstance). The Court does not find that Respondents have met their burden to show that the two-year delay between the time the United Kingdom first sought Respondents' extradition from Romania and the time it sought their provisional arrest constitutes a special circumstance here.

**c. Availability of Bond in the United Kingdom**

Respondents argue that release is warranted because the United Kingdom applies a "presumption of bond" in criminal cases and designates rape as a bondable offense. At the hearing, Defense counsel cited this as a special circumstance. The Government responded that the argument is speculative on its face: in view of the charges brought against Respondents, and the sentences that could be imposed in the event they were convicted, there is no way to foretell either (a) whether the United Kingdom will seek to have Respondents detained pending any criminal prosecution or (b) whether a U.K. tribunal will nevertheless order Respondents' release.

As the Government further observes, Respondents' theory of special circumstances has been squarely rejected by a litany of courts as a grounds for release in extradition proceedings. *Matter of Extradition of Berrocal*, 293 F. Supp. 3d at 1298–99; *Matter of Extradition of Bell*, 2021 WL 1616127, at *4 ("Merely because the Defendant Bell may seek bail once he arrives in the UK does not mean that he must or should be given bail in the United States before he ever arrives in the UK. Moreover, such an argument would be applicable to virtually all persons being extradited to the UK and is therefore a 'general circumstance'—not a proper 'special circumstance' in this

case."); *Matter of Extradition of Headley*, 2018 WL 4938553, at *8. It is rejected here as well.

**iv. Public Visibility**

Respondents contend that their "extraordinary public visibility" constitutes a special circumstance warranting release. (ECF No. 44 at 32–34). Their argument is that Respondents are highly active on social media, have in the past published contemporaneous information regarding their location at any given time, and depend on consistent publication of content on social media to earn a living. The argument dovetails in some respects with Respondents' argument that they do not pose a risk of flight, which the Court has already rejected. The argument is, moreover, in tension with their insistence that their statements on social media should *not* be relied upon for the truth of what they post on these platforms because their online presence is performative.

Respondents cite *In re Extradition of Chapman*, 459 F. Supp. 2d 1024 (D. Haw. 2006) as support for their argument that their salience in the public eye constitutes a special circumstance. The Court in *Chapman* reached no such conclusion. Its finding of special circumstances turned primarily on "their complete lack of flight risk," and to a lesser degree on the Mexican government's delay of three years in bringing extradition proceedings against the extraditees. 459 F. Supp. 2d at 1027. The district court in *Chapman* found, based on the evidence before it, that the extraditees "dedicated their lives to pursuing fugitives" as "the core of their public personae," and concluded that the prospect "[t]hat they would themselves become fugitives seem[ed] highly unlikely." *Id.* (reasoning that fugitive status would result in the loss of "enormous future earnings from their television program" and a loss of "their own identities and their popularity").

Even crediting *Chapman*, an out-of-circuit case offered as persuasive authority, stark differences exist in this case. As the Defense acknowledges, Respondents' public-facing personae, from which they derive income, are self-proclaimed law-evaders. Whether certain past statements

constitute jokes, hyperbole, and sarcasm or not, Respondent Emory readily admits that his "Top G" persona purports to flout good behavior. Moreover, unlike in *Chapman*, and as set forth above, the Court here has rejected Respondents' argument that they do not constitute a flight risk.

**v. Anticipated Length of Proceedings**

Respondents argue that under the circumstances present here, "the Tates face months of detention before seeing any evidence to purportedly support their extradition, and then there may be months of proceedings." (ECF No. 44 at 28). They cite case law indicating that courts have found that the anticipated duration of proceedings could contribute to a finding of special circumstances warranting release. *See* (*id.*) (citing *In re the Matter of Extradition of Toledo Manrique*, No. 19-mj-71055, 2019 WL 5168587 (N.D. Cal. Oct. 10, 2019)); *see also* (Motion at 29–30) (collecting cases).

In-District case law observes that the fact that extradition proceedings may be protracted typically does not, standing alone, warrant a finding of special circumstances. *See Matter of Extradition of Berrocal*, 263 F. Supp. 3d at 1298 (declining to find special circumstances on extraditee's proffer that proceedings "will be protracted because he intends to file a petition of habeas corpus and appeal if [the court] orders his extradition") (collecting cases); *In re Extradition of Shaw*, 2015 WL 521183, at *8 (acknowledging that "some courts have observed that a delayed extradition hearing may constitute a special circumstance," but observing that "in those cases the delay was caused by the government"). Here, no contention has been made that the Government will effectuate delay in these proceedings.

Respondents reliance on *Toledo* omits crucial facts on which the district court there relied in concluding that the anticipated length of proceedings, in combination with other considerations, supported release. The district court's finding as to the duration of the extradition proceedings was

predicated on the findings that "Peru's extradition request contains thousands of documents that will require translation from several languages." The case "also implicate[d] issues of first impression with respect to [the United States'] extradition treaty with Peru." 2019 WL 5168587, at *1. By contrast to *Toledo*, these proceedings travel on more settled ground: the U.S.-U.K. Extradition Treaty. Moreover, the United Kingdom's formal extradition request and supporting documentation has yet to be filed. Determining that they will necessitate a protracted extradition proceeding would be, at this point, premature.

**vi. Conditions of Confinement**

Respondents contend that the conditions of confinement to which they have been subjected are so dire as to warrant release. Respondents assert that they have been kept in administrative segregation since their arrest; that they are accorded only one hour of time outdoors per weekday; that their beds are shorter than they are tall and they sleep without pillows; and that they have had access to neither radio nor television since they were first detained. (Motion at 31). They further stated that they "have no access to commissary, and [] are losing weight." (*Id.*).

In their Reply, Respondents relay an additional incident in which FDC-Miami officials administered pepper spray to one or more inmates located in a cell within the vicinity of the cell Respondents occupy together.

Respondents argue that these circumstances constitute conditions of confinement so severe as to rise to the level of a special circumstance warranting their release. They contend that, as American citizens, the presumption of innocence enhances their ability to show special circumstances arising from their conditions of confinement.

> [A] pretrial detainee "may not be punished at all," *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), "much less maliciously and sadistically." *Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015); *see also* 4 W. Blackstone, Commentaries *300 ("[I]f the offence be not bailable, or the party cannot find bail, he is to be committed to the

county [jail] . . . [b]ut . . . only for safe custody, and not for punishment[.]"

(ECF No. 44 at 24–25) (brackets added).[6]

In *Bell v. Wolfish*, 441 U.S. 520, 535 (1979), the Court observed that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." In the decision's next paragraph, the Court added as follows:

> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however. Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

*Id.* at 537. The term "punishment" was thus key to the Court's initial statement of the Due Process Clause's demands. The Court proceeded to discuss precedent in which it set forth standards by which to separate "punitive measures that may not constitutionally be imposed prior to a determination of guilt" from "regulatory restraints that may." *Id.* at 537–540. Along the way, it described "legitimate operational concerns [that] may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial," including maintaining security and order at detention facilities. *Id.* at 540. The Court concluded that "[r]estraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting

[6] *But see Bell*, 441 U.S. at 533 (the presumption of innocence, while foundational to our criminal law, "has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun").

trial." *Id.* (rejecting the "compelling-necessity" test applied below).

Respondents' briefing on the instant Motion does not argue that "punishment" within the meaning of *Bell* has in fact occurred, or that what unusual restraints FDC-Miami has imposed on them in detention are "arbitrary or purposeless," *see id.* at 539, under the law. At the hearing, one of Respondents' attorneys intimated that Respondents' conditions of confinement were punitive in nature; but Respondents' own testimony as to the majority of those conditions undermined their attorney's proffer. Respondent Tristan testified as to his understanding that he was not being "punished" by FDC-Miami guards' use of pepper spray to quell what was a loud, violent commotion playing out in a nearby cell. As the Government pointed out, this is not unique to their current confinement to the special housing unit; the possibility of something like that happening in FDC exists in general population as it does in special housing.

The evidence they have advanced—primarily Respondents' testimony as to their experience at FDC-Miami—was thoroughly impeached by the Government at the August 27 hearing. The Government elicited testimony from Respondent Tristan that he is now in possession of a radio.[7] On cross-examination of Respondent Emory, the Government elicited testimony that Tristan, Emory, or both have been working as orderlies in FDC-Miami's SHU and have been allowed additional time outside their cell in that capacity. This directly conflicts with Respondent Tristan's testimony that he has been unable to partake in any activity outside his cell and spends his days staring at the walls of his prison cell.

Respondents also gave testimony that they had lost substantial weight in their time in detention. The Government, during its presentation, proffered that Respondents' weight had been taken and that neither weighed any less than when he was first booked at FDC-Miami; in fact, both

[7] Respondent Tristan testified on direct that he had obtained access to FDC-Miami's commissary since the filing of the instant Motion.

have gained insignificant weight since entering FDC-Miami. Having viewed Respondents shortly after their arrest in the courtroom, *see* (ECF No. 10), neither appeared to have lost any significant, *i.e.*, visible amount of weight since they first appeared before the Court.

Respondents cite one case in which a district court ordered release on bond pending extradition proceedings and in doing so relied on the conditions of confinement imposed upon the extraditee, the former President of Peru. *See Matter of Extradition of Toledo Manrique*, 2019 WL 5168587 (N.D. Cal. Oct. 10, 2019). The extraditee had been placed in solitary confinement for three months; he was confined "to a small cell for all but an hour of every two days," and the detention facility's staff psychiatrist opined that "detention under these conditions ha[d] already initiated a marked decline in [the extraditee's] mental health." *Id.*, at *1.

The psychiatrist began by noting that maximally restrictive environments such as administrative segregation "can have effects that range from anxiety, to cognitive disturbances[,] perceptual distortions, paranoia and psychosis." *In the Matter of the Extradition of Alejandro Toledo Manrique*, No. 19-mj-71055-MAG-1, [ECF No. 41] at *2 (filed Oct. 9, 2019). As the Government noted at the August 27 hearing, the staff psychiatrist opined in his report that the extraditee had suffered a "marked deterioration in his mental health" as a result of his time in solitary confinement.

> Mr. Toledo is showing many signs of those psychiatric afflictions mentioned above. I have seen a basic breakdown in Mr. Toledo's basic interest in maintaining his grooming and hygiene. I've seen a marked demoralization, along with significantly increased anxiety and depression. I have increased Mr. Toledo's medications due to this increasing anxiety and depression, but this is simply like putting a Band-Aid on a gaping wound. I've also seen some physical and mental signs showing Mr. Toledo's deteriorization. Mr. Toledo shows increasing psychomotor retardation – meaning a significant general slowing of patient's movements. Mr. Toledo makes far less eye contact than when I initially began treating him. The cognitive deficits noted above are also becoming more prominent. Mr. Toledo repeats himself far more often than he did when I first met him, showing increasing memory deficits, and he shows marked difficulties in his ability to concentrate.

(*Id.*). By contrast, Respondents have advanced no evidence akin to the staff psychiatrist's report to substantiate their claim that Respondents' conditions of confinement are "strikingly similar" to those in *Toledo*. Respondents are cellmates, not in solitary confinement; they have time outside their cell, including work as an orderly; and have regular if not daily visits with their attorneys.

On this record and in light of the evidence advanced, I cannot conclude that Respondents have met their burden to demonstrate, by clear and convincing evidence or by a preponderance of the evidence, that their conditions of confinement are so severe as to rise to a special circumstance warranting their release from detention.

**vii. Pending Proceedings**

Finally, Respondents argue that their need to participate in pending and anticipated litigation amounts to a special circumstance warranting release. Their argument relies on *In re Mitchell*, 171 F. 289 (S.D.N.Y. 1909), wherein then-District Judge Learned Hand granted an extradition detainee's request for release where he had been arrested on the eve of a complex civil trial "upon which [the detainee's] whole fortune depend[ed]," *id.* at 290 (granting extraditee bail only for the duration of the trial). Respondents contend in Reply that "an extraditee's participation in a civil proceeding underway at the time of his arrest [is] a special circumstance warranting bail" where their "whole fortune" depends on the litigation. (ECF No. 44 at 26) (quoting *Mithcell*, 171 F. at 290).

**a. Palm Beach County Civil Proceedings**

Respondents note that they are currently plaintiffs in a civil defamation action pending in Palm Beach County Court, wherein they have sued a Florida resident who is a witness in the Romanian criminal proceedings. (ECF No. 44 at 25–26). Respondents proffer that their "reputation depends on this litigation," and that, but for their detention pending these extradition proceedings,

they will prevail over the defendant and thereby weaken the Romanian criminal case against them. (*Id.*).

The current status of the civil proceedings is unclear. Review of the County Court's October 23, 2025 order on Respondents' motion to dismiss the civil defendant's counter-claim, (ECF No. 46-5), however, reveals that the County Court dismissed all but one of the defendant's counter-claims without prejudice and with leave to file an amended counter-claim rectifying the pleading deficiencies identified in the Order. Moreover, Respondents have ready access to their counsel in the civil proceedings, who are representing Respondents in connection with these extradition proceedings. This is not a situation comparable to *In re Mitchell*, where pressing "requirements of justice" were found "absolutely peremptory." *See Matter of Extradition of Russell*, 647 F. Supp. 1044, 1049 (S.D. Tex. 1986) (citing *Messina*, 556 F. Supp. at 743), *aff'd*, 805 F.2d 1215 (5th Cir. 1986); *Koskotas v. Roche*, 740 F. Supp. 904, 918–19 (D. Mass. 1990). And "[t]he need to consult with counsel, gather evidence and confer with witnesses, although important, is not extraordinary; all incarcerated defendants need to do these things." *Matter of Extradition of Smyth*, 976 F.2d 1535, 1535–36 (9th Cir. 1992); *Matter of Extradition of Berrocal*, 293 F. Supp. 3d at 1297 (collecting cases).

**b. Romanian Proceedings**

At the hearing, Respondents raised a new argument not raised in their briefing: that their continued detention would foreclose their ability to participate in the Romanian criminal proceedings and would lead to their criminal default. Respondent Emory testified that he and Respondent Tristan had "already won and will beat" the Romanian charges against them, but that their detention prevents them from communicating with their legal team in Romania.

The Court permitted supplemental filing as to the status of the Romanian proceedings and

as to Respondents' contention that they were unable to communicate with Romanian counsel while housed at FDC-Miami. On September 1, 2026, Respondents filed a declaration authored by their Romanian defense counsel, Mr. Eugen C. Vidineac, that cogently explains the Romanian proceedings' current status and notes the prejudice that Respondents would suffer if not granted release on bond.[8] (the "Vidineac Declaration").

"The June 2023 prosecution of the Tate brothers did not survive preliminary-chamber appellate review." (Vidineac Decl. at 1). Accordingly, "[i]t is now for the prosecutor to redraft the indictment, remedy the deficiencies in the committal document and clarify the relevant issues, amend the legal classification of the alleged offenses, discontinue charges, or take any other appropriate procedural measures." (*Id.*). In their second criminal case, "[t]he case is currently at the criminal investigation stage," "[a]ll evidentiary proceedings have been completed," and defense counsel professes to "know that issuance of the indictment is imminent." (*Id.* at 2). Upon the issuance of any indictment, Respondents will need to prepare a defense thereto. In the course of this interim redrafting phase, Respondents' once-separated criminal proceedings have been rejoined once again.

In response, the Government proffers that FDC-Miami possesses "the technological ability to provide videoconferencing to both the Romanian court(s) and Vidineac," and indeed "ha[s] provided videoconferencing to other incarcerated fugitives with pending foreign court proceedings or U.S. immigration proceedings around the country." (Gov't Resp. to Vidineac Decl. at 2).[9]

Respondents' supplemental filing fails to demonstrate that their continued detention

[8] The Government filed a Response to the Declaration.

[9] The Government notes that, per FDC-Miami, neither Bureau of Prisons attorneys nor the officer at FDC-Miami who handles videoconferencing requests has received such request by Respondents or on their behalf. (Gov't Resp. to Vidineac Decl. at 2 n.4). The prosecutor's proffer is not substantiated by evidence. However, it is not inconsistent with the Declaration, which noticeably makes no representation that any such request has been made on Respondents' behalf. The concern is, on this record, conjectural.

renders it impossible to participate in the Romanian proceedings absent their release. Respondents have failed to demonstrate, by clear and convincing evidence or by a preponderance of the evidence, that their continued detention will so prejudice their Romanian defense as to constitute a special circumstance warranting release on bond.

## IV. CONCLUSION

Based upon the foregoing, I find that Respondents have failed to meet their burden to demonstrate that they do not present a risk of flight or danger to the community, or that special circumstances warrant their release. Respondents have failed to demonstrate that special circumstances here warrant relief, whether their proposed special circumstances are considered singly or together. Having failed to meet these three factors, Respondents' Motion for Release Pending Extradition Proceedings is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on this 9th day of September, 2026.

LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE