**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.** 26-mj-03259-LOUIS

**IN THE MATTER OF THE EXTRADITION**
**OF TRISTAN TATE,**
________________________________________/

**MEMORANDUM IN SUPPORT OF EXTRADITION**

The United Kingdom ("U.K.") requests that the United States extradite dual U.S.-U.K. citizen Tristan TATE ("T. TATE" or "the fugitive") so that he can be prosecuted for more than a dozen offenses stemming from conduct that allegedly occurred in the United Kingdom between 2010 and 2017. An extradition hearing is currently scheduled for Friday, November 20, 2026, at 10:00 a.m.

During the extradition hearing, the Court's limited role under the extradition statute is to determine whether the United Kingdom has presented evidence "sufficient to sustain the charge[s] under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. As discussed below, the five requirements for certification are satisfied. *First*, under 18 U.S.C. § 3184 and this District's local rules, the Court is authorized to conduct the extradition proceeding. *Second*, under 18 U.S.C. § 3184, the Court has jurisdiction over T. TATE because the government found and arrested him within this District. *Third*, the extradition treaty between the United States and the United Kingdom (the "Treaty")[1] is in full force and effect. *Fourth*, the offenses for which

[1] Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, U.S.-U.K., Mar. 31, 2003, S. Treaty Doc No. 108-23 (2004), *as amended by the* Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the

extradition is sought are covered by the Treaty. *Fifth*, there is probable cause to conclude that T. TATE committed the offenses alleged by the United Kingdom. The Court should therefore certify to the Secretary of State that T. TATE can be extradited to the United Kingdom.

## BACKGROUND

### I. THE EXTRADITION PROCEEDINGS IN THE UNITED STATES

The United States—in response to a request from the United Kingdom pursuant to 18 U.S.C. §§ 3181 *et seq.* and the United States' obligations under its extradition treaty with the United Kingdom filed a complaint in this District on July 18, 2026, seeking a warrant for T. TATE's provisional arrest with a view toward extradition. ECF No. 3. This Court issued an arrest warrant that same day, and T. TATE was provisionally arrested in Miami on July 18, 2026, for the purpose of initiating extradition proceedings.[2]

On July 20, 2026, the Court conducted an initial appearance and temporarily detained T. TATE. On August 27, 2026, the Court conducted a detention hearing and thereafter ordered that T. TATE be detained pending extradition proceedings. ECF No. 66. In compliance with the deadline set forth in Article 12(4) of the Treaty, the United Kingdom submitted its extradition request for T. TATE's extradition to the U.S. Department of State on September 9, 2026.[3] ECF

---

United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006), with Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument.

[2] T. TATE was arrested alongside his brother, Andrew Tate, who is also wanted for prosecution in the U.K. and is subject to separate extradition proceedings. *In the Matter of the Extradition of Emory Andrew Tate*, Case No. 26-mj-03260-Louis.

[3] The United States provided a redacted copy of the formal extradition request to the Tates on October 5, 2026. An unredacted copy was also offered, subject to the entry of a protective order over sensitive information contained within the formal extradition request. But, on October 8, 2026, T. Tate and A. Tate both rejected the Government's proposal and decided to forgo disclosure of unredacted copies.

No. 72-1 at 2. The State Department subsequently certified the authenticity of the request and related documents, in accordance with the Treaty. *Id*. at 3-4.

## II. THE U.K. OFFENSES

T. TATE has been charged with 17 criminal offenses in the United Kingdom:

- Five (5) counts of rape in violation of Section 1 of the Sexual Offenses Act 2003;
- One (1) count of assault by penetration in violation of Section 2 of the Sexual Offenses Act 2003;
- Six (6) counts of assault occasioning actual bodily harm in violation of Section 47 of the Offences Against the Person Act 1861; and
- Five (5) counts of human trafficking in violation of Sections 2(1) and 5(1) of the Modern Slavery Act 2015.

ECF No. 72-1 at 30.

These offenses were committed within the jurisdiction of the United Kingdom and are set forth in two separate warrants included in the United Kingdom's request. A warrant for T. TATE's arrest was first issued on January 19, 2024, by Senior District Judge Paul Goldspring, Chief Magistrate, of the Westminster Magistrates Court and includes eleven (11) charges. *Id*. at 33-34. Judge Goldspring issued a second warrant issued on August 5, 2026, which includes six (6) offenses.[4] *Id.* at 35-36. Both warrants remain valid and enforceable.

These allegations largely arise in connection with a webcam "business" T. TATE ran with his brother Andrew ("A. Tate" and collectively "the Tate brothers") wherein T. TATE is alleged to have used coercion, violence, and rape at times to compel his former "girlfriend" (Complainant 1) to work for him and A. Tate by performing commercial sexual acts online in Romania. It is

[4]As reflected in the extradition request, the count numbers referenced in the request run consecutively from the first warrant to the second warrant. ECF No. 72-1 at 154. For ease of reference, this Memorandum will mimic the count numbers in Detective Constable Lee-Anne Marshall's Statement of Facts but will use Arabic numerals instead of Roman numerals.

also alleged that T. TATE, together with A. Tate, facilitated the travel to Romania of 3 additional women who were in ostensible relationships with A. Tate for the purposes of their exploitation (Complainants 5, 6 and 7). Additionally, a woman who does not allege to have been trafficked by the Tate brothers (Complainant 4) has also accused T. Tate of raping and assaulting her in ways similar to the conduct alleged by the other Complainants.

According to the United Kingdom, the Tate brothers ran an operation beginning in 2014, in which they recruited young women to perform on webcam platforms and then produce bespoke sexual content for paying subscribers using different platforms. According to evidence in the case as further detailed below, these young women, referred to as "cam girls," performed sexual acts online for subscribers in exchange for money. When a "cam girl" performed sexual activity online, including in private chat rooms or through the production of bespoke videos, access to the chat room or delivery of the video was restricted to subscribers who had made the requisite payment set by the Tate brothers. The operation was initially based in the United Kingdom and was subsequently relocated to Romania, where the Tate brothers remained permanently resided beginning in 2017. ECF 72-1 at 45-46.

The United Kingdom alleges that A. TATE acted as the principal recruiter for the webcam enterprise. A. TATE identified women whom he perceived as vulnerable, established intimate relationships with them, and persuaded, coerced, and arranged for them to travel internationally for the purposes of commercial sexual exploitation.[5] T. TATE also established an intimate

[5] The U.K. alleges that A. Tate would falsely present himself as a romantic partner, sometimes using dating apps to "match" with unsuspecting women, demonstrating affection, attention, and apparent commitment in order to establish emotional dependency—features commonly associated with the "lover-boy" model of exploitation. A. Tate would also use, or attempt to use, rape and sexual violence as a method of obtaining control over these women. A. Tate would then use his emotional influence and control to convince or deceive the women into travelling to Romania in furtherance of the Tate brothers' webcam business.

relationship with one of the complainants (Complainant 1) using similar methods and later recruited her to travel from the United Kingdom to Romania to work for him and his brother in the webcam business. *Id*. at 46.

It is alleged that, while A. Tate was the principal recruiter, T. TATE also established an intimate relationship with one of the complainants and recruited her into the webcam industry. T. TATE and others provided operational and logistical support. T. TATE's role included arranging travel, collecting complainants from airports, transporting them to accommodation and facilitating the day-to-day running of the operation. Together with his brother, T. TATE directed webcam activities of the women who worked for them, including determining when women worked and the nature of the commercial sexual content they were expected to produce. *Id*. at 46.

Once these women arrived in Romania, they were subjected to a range of controlling measures. T. TATE played a significant role in maintaining their compliance and directing their activities thereafter. The women's passports were removed and retained at times, the women were accommodated in premises under the Tate brothers' control, and they became dependent on the Tates for accommodation, transport, and financial support. T. TATE and A. Tate both threatened to use, and did use, physical violence to maintain control and compliance. By means of manipulation, coercion, and violence, women were pressured to produce increasingly explicit and sexual pornographic material for subscribers on webcams for the Tate brothers' financial benefit. *Id.* at 49-50.

The U.K. authorities have identified four (4) alleged adult victims of T. TATE relative to his and his brother's commercial sex/webcam enterprise. The identities of these victims are known to U.K. authorities, as they have provided multiple recorded video statements memorializing their accounts, and have each identified a photograph of T. TATE as the accused. *Id*. at 43. While each

victim details her own unique experience, the *modus operandi* of T. TATE and his brother is readily apparent. The victims' highly detailed individual testimonies, and corroborating evidence in support thereof, are summarized as follows:

**A. Complainant 1: Counts 1-9 (rapes and assaults)**

Complainant 1 ("C1") first contacted the police in January 2023 after seeing media reports that T. Tate, her former romantic partner, was under investigation in Romania for sexual offenses. She was interviewed on multiple occasions by police, and her statements have been captured on video recording. There are 11 charges against T. Tate that relate to C1: three (3) counts of rape; six (6) counts of assault; and two (2) counts of human trafficking. ECF No. 72-1 at 51.

Prior to the facts giving rise to the two charges of human trafficking involving C1, C1 had been in a relationship with T. Tate starting when she was 19 years old.[6] *Id*. at 52. The relationship was often violent, including multiple allegations of anal and vaginal rape and physical abuse which left bruising, marks and welts on her body, face and neck from being choked and hit with a belt.

According to C1, she met T. TATE when he responded to a public message posted by C1 on Twitter. They communicated for several months before meeting. Following their initial meeting, C1 and T. TATE began a sexual relationship, and T. TATE asked C1 to be his girlfriend. A few months later, T. TATE told C1 that he enjoyed rough sex, strangling women, and anal sex. C1 stated that she had never experienced strangulation before but that she was willing to explore T. TATE's sexual preferences on the understanding that he would stop if she became uncomfortable or withdrew her consent. While she described much of the sexual activity during

[6] C1 recalled that, at the time they met, T. TATE had recently appeared on a U.K. reality television show and had developed a public profile; she described feeling in awe of him and feeling fortunate that he had shown an interest in her. ECF No. 72-1 at 52.

the relationship as consensual, she told police that T. TATE frequently escalated their sexual encounters beyond what C1 had agreed to. *Id*.

1. Facts Supporting Counts 1 (rape) and Count 3 (assault)

For example, one explicit boundary C1 expressed to T. TATE was that she was willing to engage to anal sex so long as it was not forced upon her while she was unconscious. Notwithstanding C1's explicit statements about the scope of her consent, T. TATE penetrated C1's anus on multiple occasions after he had rendered her unconscious. When this occurred and after she regained consciousness, C1 would cry, scream, or tell T. TATE to stop, but he would continue regardless. *Id*. Police recovered messages between T. TATE and C1 that confirm C1's instructions. For example, in an October 21, 2012,[7] discussion where T. TATE proposed "viscous beatings and rape," C1 responded by telling T. TATE directly and explicitly, "*[o]nly thing I don't want is you raping my arse. Anal yes, but I don't want you to force it upon me*." *Id*. at 68, 125.

C1 told authorities about a specific incident after this exchange, in approximately mid-November 2012, when T. TATE anally raped her while she was unconscious at TATE's apartment in Luton, despite her prior explicit instructions to the contrary. During vaginal intercourse, T. TATE manually strangled C1 until she lost consciousness. When C1 regained consciousness, T. TATE was penetrating her anus with his penis. C1 experienced pain in her anus and to her eye or cheek area from T. TATE striking her in the face in an attempt to wake her. C1 recalls regaining consciousness in a confused and disoriented state, while T. TATE was penetrating her anus. She recalls feeling as though she was having an "out of body experience" and was unable to

[7] In the extradition request, paragraph 85 erroneously states that this text message was sent on December 21, 2012. The Crown Prosecution Service has clarified via supplement that this text message was sent on October 21, 2012. ECF No. 72-1 at 68, 125.

communicate properly. Her arms felt numb, and she was seeing what she describes as "stars." She also struggled to hear.[8] T. TATE continued penetrating her anus until he ejaculated. *Id*. at 54-55. This anal rape is charged in Count 1, and the accompanying assault is charged in Count 3. *Id*. at 55-57.

2. Facts Supporting Counts 2 (rape) and 4 (assault)

On at least three additional occasions (separate from the incident in mid-November 2012) between April 1, 2012, and December 26, 2012, T. TATE strangled C1 by applying pressure with both hands to either side of her neck until she lost consciousness and penetrated her anus without C1's consent. C1 describes seeing black spots and feeling numb before losing consciousness. T. TATE would then slap or hit C1 in order to revive her, leaving marks on her face. When C1 regained consciousness, T. TATE was penetrating her anus. On some occasions, C1 was restrained and tied using cable ties or other items that caused marks on her wrists and were used to pin her legs apart. On some occasions, C1 screamed for T. TATE to stop but he continued regardless. C1 told T. TATE she did not consent to anal penetration while unconscious and, on at least one occasion, T. TATE told C1 that anal sex was easier when she was unconscious because she was more relaxed. *Id*. at 55-56. C1 told police that T. TATE explained to her that he was restricting the blood flow to her brain rather than her airway, and she recalled that he appeared to derive pleasure from the control this gave him. *Id*. These additional incidents of anal rape as a pattern of behavior are charged collectively in Count 2. *Id*. The accompanying assaults (manual strangulation to the point of unconsciousness, being struck in order to be revived and being restrained resulting in marks on her body) are charged in Count 4. *Id*. at 57.

[8] Due to C1's condition, she could not recall whether she told him to stop or, if she had, whether it was coherent. ECF No. 72-1 at 55.

3. Facts Supporting Count 5 (assault)

C1 recalls T. TATE telling her that the more he liked someone, the more he wanted to hurt them. C1 told police that she came to believe that T. TATE hurt her because he loved her. Looking back, she recognizes now that his behavior was abusive. C1 also described a pattern of controlling and degrading behavior throughout the relationship, causing C1 to think she was unable to refuse T. TATE, either because she did not want to disappoint him or because she feared how he would react. T. TATE frequently called her weak, pathetic and stupid, made misogynistic comments, and referred to her as a "slut" if she spoke to other men. She says she became increasingly isolated from friends and family and recalls feeling "brainwashed." *Id*. at 53.

On one particular occasion, T. TATE assaulted C1 by strangulation, causing C1 to lose consciousness. Unlike the other incidents, C1 told police that she initially consented to being choked during vaginal intercourse. While, at first, she experienced the act as pleasurable, she then lost consciousness.

4. Facts Supporting Count 6 (assault)

On other separate occasions, T. TATE strangled C1 during vaginal intercourse frequently causing C1 to lose consciousness without discussing it beforehand or providing an opportunity for C1 to indicate consent. T. TATE would then strike C1 in the face, causing marks and hurting her jaw. Particularly after the incidents of anal rape while unconscious, C1 became fearful of being strangled but felt unable to prevent it. *Id*. at 58.

5. Facts Supporting Count 7 (assault)

On another occasion in approximately September 2012, T. TATE struck C1 with a belt repeatedly, causing immense pain and bruising. According to C1, T. TATE told her that he wanted to film her, and C1 initially agreed because she felt unable to refuse him. Once T. TATE pressed

record, he threw C1 face down on the bed and restrained her wrists with cable ties. T. TATE asked C1 to choose a number between one and ten and when she chose a number, he struck her with a folded belt to her buttocks and back of her legs. Because the room was dark and she was tied up and face down, C1 did not see T. TATE produce a belt until she felt the first blow. She was shocked and unprepared for the level of force used against her. Although the first strike was painful, the blows became progressively harder as T. TATE continued striking her, causing significant bruising. C1 screamed and repeatedly told T. TATE to stop, but he continued. C1 was unable to move away or protect herself, as she was secured with cable ties. *Id*. at 59-60.

6. Facts Supporting Count 8 (assault)

T. TATE used a belt on four or five additional occasions between September and December 2012. T. TATE would sometimes threaten her with a belt before striking her with it, and he would require her to choose a number to determine the number of strikes T. TATE would administer. C1 regularly screamed, cried, and asked T. TATE to stop, but T. TATE continued regardless. The strikes resulted in injuries that T. TATE asked C1 to photograph and often required her to clean his flat in her underwear so he could see the injuries. *Id*. at 60.

7. Facts Supporting Count 9 (rape)

On December 24, 2012, C1 visited T. TATE out of concern she may be pregnant and without any intent of having sex with him. T. TATE collected her from the train station and took her to his mother's house; T. TATE did not speak to her during the journey. T. TATE took C1 upstairs, immediately pushed her onto the mattress and pinned her down so she could not move. T. TATE pulled C1's trousers down and vaginally raped her, while hitting and grabbing C1's buttocks five or six times causing red handprint welts on her. C1 says that she did not have a choice to consent and that T. TATE did not take steps to check to see if she consented. *Id*. at 61.

Police recovered messages showing that C1 had disclosed to a friend in 2013 that she had sustained bruises, black eyes and cut lips during her relationship with T. TATE. *Id*. at 68. C1 provided police photographs of injuries she says that she sustained during the relationship.[9] *Id*.

**B. <u>Complainant 1: Counts 10 and 11 (human trafficking)</u>**

After the relationship broke down, C1's contact with T. Tate was limited, and she blocked him on social media accounts. ECF No. 72-1 at 62. Following renewed contact with the Tate brothers several years later, C1 traveled to Romania on two occasions to work for the Tates' webcam business, where C1 performed sexual acts for paying webcam customers at the Tates' direction and for their financial gain. *Id*. at 53-54. Allegations pertaining to these two trips form the basis of Counts 10 and 11, respectfully, as set forth in the January 2024 warrant.[10]

1. <u>Facts Supporting Count 10 (human trafficking)</u>

C1 told U.K. authorities that, in April 2016, several years after C1's relationship with T. TATE ended, she was contacted via Facebook by *ModelStars*, a webcam business established by T. TATE. T. TATE encouraged C1 to work as a webcam model in Liverpool, Amsterdam or Romania. C1 initially refused because she did not want to perform sexual acts online, but T. TATE nevertheless persisted in attempting to recruit her, describing the work as a lucrative opportunity in which some women earned up to £8,000 per month. *Id*. at 62.

Police have obtained emails between T. TATE and C1 from the same time period demonstrating T. TATE's efforts to recruit C1 to travel to Romania to perform commercial sex acts online. For example, T. TATE told C1 in an email, "*You know the business i'm in. I'll work*

---

[9] These injuries, however, cannot be linked to specific offences charged. *Id*. at 68.

[10] T. TATE and A. Tate are jointly charged with human trafficking based on C1's two trips to Romania; these offenses are charged as Counts 1 and 2 against A. Tate.

*you from my place in Amsterdam or my studio… work 9-10 hours per day 5 days a week (it isn't easy) but I'll pay you every 2 weeks*." He told C1, "*There are girls on the Internet uglier than you making 8K a month," and told her to "quit your shitty… job and I'll book you a flight*." *Id*. at 69.

C1 subsequently began communicating on WhatsApp with A. Tate. A. Tate became involved in the recruitment process and ultimately arranged C1's travel from the United Kingdom to Kosice, Slovakia, on April 15, 2016, accompanied by another female intending to work for the business. *Id*. at 63. Flight records confirm C1's travel to Slovakia on that date. *Id.* at 69.

According to C1, A. Tate collected C1 and the second female from the airport and later created a *MyFreeCams* account for C1. After observing other women performing on webcam platforms, C1 determined that the work was not something she wanted to do; however, she briefly went online that evening because she did not want to disappoint A. Tate. The following day, A. Tate drove C1 and two other females to an apartment in Romania, where C1 remained for 4 or 5 days. A. Tate encouraged her to perform increasingly sexual acts online, telling her that the more sexual she was, the more money she would make. C1 recalls performing sexual acts on camera, including masturbation and nudity, under a pricing structure whereby subscribers paid tokens to view increasingly explicit content. C1 did so on the understanding that she would receive the payments promised by the Tate brothers. *Id*. at 63-64.

On approximately the fourth day, C1 told T. TATE that she no longer wanted to work online and wanted to return home. T. TATE then brandished a machete and told C1 that if she wanted to leave that she could walk down the hill and obtain a taxi herself. A. Tate was present during the altercation and laughed. A. Tate ultimately agreed to assist C1 after she repeatedly begged to leave. C1 was eventually driven to the airport, returned to the United Kingdom, and

never received any payment for the commercial sexual services she provided at the behest of T. TATE and A. Tate. *Id*. at 64.

2. <u>Facts Supporting Count 11 (human trafficking)</u>

Later that same year, in September 2016, C1 traveled again to Romania at the behest of A. Tate and T. TATE to perform commercial sexual services for their financial gain. According to C1, T. TATE contacted C1 and asked for her telephone number.[11] These messages have been recovered by U.K. law enforcement.

A. Tate subsequently contacted C1 and offered her the opportunity to work as a webcam "model" from a house in Bucharest, Romania. A. Tate told her that she would have better working conditions, be paid a percentage of what she earned, receive money every two weeks, and would be safe. C1 agreed to go. *Id*. at 70.

A. Tate arranged and paid for C1's travel, and C1 traveled to Bucharest on September 21, 2016, as confirmed by flight records. According to C1, she was collected from the airport and taken to a large house where numerous women were working on webcams. She recalled seeing one woman who was visibly distressed and wanted to return home. C1 resumed using the *MyFreeCams* account previously established by A. Tate, working overnight shifts from approximately 22:00 until 08:00. C1 did not have a choice whether to work through the night and often found it difficult to stay awake. *Id*. at 65–66. C1 performed sexual acts online, included masturbating vaginally and anally, using sex toys anally, and pretending to have orgasms, all for

[11] C1 told law enforcement that she had emailed T. TATE a few months prior in June 2016, asking whether he had any webcamming work available because she needed money. At the time, T. TATE told her that there was no space available. C1 told law enforcement that, reflecting back, she does not believe that she was in the right frame of mind when she contacted him because of the abuse that she had previously suffered during their relationship. ECF No. 72-1 at 65.

fees paid by customers through a token-based system. The customers provided instructions to C1 from both public and private chat rooms. *Id*. at 66.

According to C1, subscriber communications were controlled by a cousin of the Tate brothers, who responded to messages pretending to be C1. C1 recalled that her expressed boundaries were ignored, particularly her request not to perform sexual acts involving her anus. However, the person controlling the account ignored her wishes and ordered that she do whatever paying subscribers requested. She recalls feeling like "*they were willing to sell me for anything*." *Id*. For example, C1 described a subscriber paying a substantial amount of money to watch her spank herself 100 times. She complied and sustained bruising to her buttocks as a result. *Id*.

According to C1, the Tate brothers would closely monitor her movements while she was living at the property and would want to know where she was going and when she would return if she left the house. C1 recalls having very little money in Bucharest, often going without food, C1 felt uncomfortable asking A. Tate for money and did not feel able to approach him or T. TATE for financial assistance or payments as promised. *Id*. at 67.

C1's time in Romania ended after T. TATE accused her of attempting to sabotage the business. He drove her to a hotel near the airport, berating her along the way, and left her overnight. He returned the next morning with her belongings. A. Tate, however, offered C1 the opportunity to continue working from the apartment in Brasov, Romania. C1 declined, booked her own flight home, and returned to the United Kingdom. She received no payment for the commercial sexual acts she performed at the direction of A. Tate and T. TATE. *Id*.

In 2018, C1 disclosed to a colleague what had happened to her. That colleague has provided a statement to police regarding C1's disclosure. ECF No. 72-1 at 68.

### C. **Complainant 5: Count 15 (human trafficking)**[12]

Complainant 5 (hereinafter "C5") was contacted by police in February 2025. Her account that T. TATE and A. Tate trafficked her is memorialized in a video recorded interview. *Id*. at 80.

According to C5, she was in a relationship with A. Tate beginning in early 2015, throughout which he attempted to recruit her to work for him as a cam girl. C5 refused him on several occasions. A. Tate eventually persuaded C5 to travel to Romania in 2016 on the pretense of spending time together on holiday. *Id*. at 81.

A. Tate booked and paid for C5's flight, and C5 was met at the airport by T. TATE and another female who took her to the apartment.[13] *Id*. Though she had only met T. TATE a handful of times, she thought he was the nicer brother. She described him as the "cleverer younger brother, a bit more awkward but confident and quiet." *Id*. at 80. She believed that T. TATE was the "brains behind it all, and Andrew was the talk." *Id*. at 80.

That night, they all consumed alcohol in a hot tub, and A. Tate then told the females to get "to work," and he accompanied them into a room. *Id*. at 81. C5 was told to stay with T. TATE in the other room. *Id*. at 81. T. TATE was working on his laptop on the webcam platform when he asked C5 to try webcamming. C5 refused, telling T. TATE that she had already told A. Tate she was not participating. T. TATE told C5 that she was going to have to do it, but that all she had to do was sit there. C5 sat there, fully clothed, while T. TATE typed to the men online. T. TATE then told her to pretend that she was typing. She did not type convincingly, which she said annoyed

[12] T. TATE and A. Tate are jointly charged with this count of trafficking C5; this offense is charged as Count 21 against A. Tate.

[13] On arrival, A. Tate took possession of her passport under the pretense that he needed it to book flights for the two of them to go on holiday. *See* ECF No. 72-1 at 82-83.

T. TATE. He told her she needed to do it "properly." *Id*. at 81. He then told her that a man online wanted her to take her top off. C5 refused. *Id*.

T. TATE then left the room, and A. Tate entered. A. Tate pinned C5 against the wall and put his hand around her neck, telling her that she must do what T. TATE told her, "*you do what the captain says. You fucking do what he says*." C5 was scared so she got back on the bed and removed her top, becoming visibly distressed and crying. Because of this, they stopped. *Id*. at 82.

That night, she recalls being afraid when A. Tate came into the bedroom where she was sleeping. Though she says she did not want to have intercourse with him, she just laid there and "let him do it," which U.K. authorities assert demonstrates the level of control that A. TATE had over C5 by this time. *Id*.

The following night (C5's second night in Romania), A. TATE told the females to "get to work." *Id*. C5 refused and told him that she was not there to work. A. TATE threatened her and told her to get ready, which she did because, by this point, C5 was "utterly terrified" of him. *Id*. He told her that she was going to be in the room with two other women. A. TATE was in the same room typing on the laptop, and there were people logged into the chatroom watching them. A. TATE then instructed them all to perform oral sex on each other. They did as they were instructed, including C5. *Id*.

After, C5 vomited in the bathroom and spent the night in the bathroom with the door locked. C5 told A. Tate that she did not want to be there anymore. He told her that she was not allowed to leave (he still had her passport). At this point, C5 realized that he did not love her and only wanted to make money off of her. A. Tate only agreed to allow C5 to leave when she told A. Tate that her family knew she was there in Romania with him. A. Tate persisted in trying to

convince her to stay and threatened to kill her and her family if she told anyone about what occurred in Romania. *Id*. at 82-83.

**D. Complainant 6: Count 16 (human trafficking)[14]**

Complainant 6 (hereinafter "C6") was contacted by the police in January 2025. Her account of being trafficked by T. TATE and A. Tate is preserved in a video-recorded interview. ECF No. 72-1 at 84.

C6 met A. TATE through a dating app when she was 21 years old. A. TATE purported to engage in a romantic relationship with C6 while she was in a vulnerable state, experiencing family difficulties, the end of a difficult romantic relationship and feeling isolated from friends. *Id.* at 84.

During the relationship, A. TATE recruited C6 to work as a cam girl in Romania by telling her that she would be his girlfriend and that she could make money from doing the webcam work without taking her clothes off. C6 traveled to Romania on September 2, 2016; she did not pay for her flight but does not know who did.[15] *Id*. at 85.

On arrival in Romania, T. TATE and another female met her at the airport and took her to the house. *Id*. When C6 arrived at the house, her passport was taken from her and locked away. A. Tate showed her around the house on her first day, and within 24 hours of arriving in Romania, C6 was made to perform naked on webcams. She often worked a minimum of nine hour per day doing webcam sex work. Others, including T. TATE, controlled the webchat and accepted payments for sex acts regardless of her agreement, including masturbation and engaging in digital

---

[14] T. TATE and A. Tate are jointly charged with this count of trafficking C5; this offense is charged as Count 23 against A. Tate.

[15] Bank records from this time show transactions for C6's bank account occurring on September 2, 2016, at the departing airport in England and then thereafter in Romania until she returned to the United Kingdom on March 17, 2017, corroborating her account that she was there at this time. ECF No. 72-1 at 89.

anal penetration of other females. She was also required to produce bespoke pornographic videos for the Tate brothers' subscribers, including a bespoke video depicting herself urinating in the shower. *Id*. at 86. C6 recalls T. TATE and another individual taking her to Ikea to purchase items for her webcam room, including a transparent plastic chair that C6 was told to use to film herself engaging in sexual activity. *Id*. at 87.

C6 told authorities that, while in Romania, A. Tate orally raped her and committed non-sexual violent acts towards her, including on one occasion where he grabbed her by the throat, lifted her off the floor, and threatened to kill her for smoking. *Id*. at 88. C6 fled Romania on March 17, 2017, under the auspice of attending a funeral. *Id*. When she booked the flight, she was forced to purchase a return flight to Romania. Once she returned to the United Kingdom, she told A. Tate from the safety of the United Kingdom she was not returning to Romania. A. Tate suggested she continue to work with the webcam business from a flat in Luton. She agreed to the proposal only so that she could return to Romania to (safely) collect her belongings.[16] She did return to Romania to retrieve her belongings, and she was collected from the airport by T. TATE, who would not speak to her. She was told that T. TATE was "*disappointed*" with her. *Id*. at 89. T. TATE took her back to the airport to return to the United Kingdom, telling her she was a "*piece of shit*," for leaving them. *Id*. After leaving Romania for the second time, C6 did not undertake further webcam work for A. TATE and blocked the Tate brothers in her phone and on all social media. Screenshots from C6's phone confirm that the Tates were blocked contacts and social media. *Id*. at 89–90.

[16] Flight records also corroborate this account. ECF No. 72-1 at 90.

According to evidence obtained by the United Kingdom, C6 worked a total of 1,248 hours online between September 216 and March 2017, generating approximately £93,530.62, of which she was given a little more than a quarter. *Id*.

**E. <u>Complainant 7: Count 17 (human trafficking)</u>**[17]

Complainant 7 (hereinafter "C7") was contacted by police in March 2025 and later provided a formal account of her testimony to law enforcement in a video-recorded interview. ECF No. 72-1 at 91. The United Kingdom's extradition request for T. TATE details one count of human trafficking relative to C7 against both of the Tate brothers.

According to C7, she met the Tate brothers at a nightclub in England when she was 20 years old, and she exchanged phone numbers with A. Tate. They were in a relationship for approximately a year, and C7 described herself as young and naïve at the time. After the relationship ended, C7 got married. A. Tate would still occasionally contact her[18] and, in 2017, C7 responded leading ultimately to the events that gave rise to the allegations underlying Count 17. *Id*. at 91.

A. Tate encouraged C7 to leave her husband and move in with him in Romania. He told her he loved her. According to C7, A. Tate told her that she would not have to do webcam work,

---

[17] T. TATE and A. Tate are jointly charged with this count of trafficking C5; this offense is charged as Count 18 against A. Tate.

[18] Email correspondence was provided to law enforcement, which demonstrates the contact between C7 and A. Tate and corroborates C7's account. The emails show that A. Tate contacted the Complainant in 2013, 2014, 2016 and 2017. In 2013, he asked how she was and asked her to accompany him on a business trip to Kosice; he said she would spend three nights clubbing. She refused. In 2014, he asked for C7's phone number; she refused. He emailed her again in 2014 asking her to be a webcam girl on his webcam platform. He told her that fully- clothed girls made £700-£1000 per week. She refused. Later in 2014, he unsuccessfully tried again to obtain her phone number and to persuade her to do webcam work. This time, he said she would earn £1500-£2000 per week. He emailed C7 again in 2016 and 2017. ECF No. 72-1 at 95.

though she could if she wanted to earn money. If she did the webcam work, she was told that she would keep 80% of her earnings, and A. TATE would keep 20% to cover overhead. *Id*. at 92.

Emails between C7 and A. Tate from this time period were provided to law enforcement and corroborate C7's account. For example, in April 2017, A. Tate emailed C7 prior to her leaving for Romania. He wrote that she did not need to do webcam work in Romania if she did not want to, that "*daily life would be perfect*," she was his "*Number 1*," and he felt excited at the prospect of them being around each other. C7's email response demonstrates that she was unsure about the prospect of going to Romania. *Id*. at 95.

Ultimately, C7 agreed to travel to Romania, and A. Tate booked her flight. Together with T. TATE, he and another female picked C7 up at the airport upon arrival in Romania in June 2017. *Id*. at 92. Records provided by C7 confirm her flights to and from Romania. *Id*. at 95.

She was taken to a house where there were four or five other young females staying. There were webcams set up in the rooms, and each room was made to look like a bedroom. *Id*. at 92. Despite A. Tate's previous statements, C7 was quickly set up to work on webcams, often for 12 hours a day. Others in the house, including T. TATE, would control the chat function on the webcam broadcast and would accept payment for sex acts for C7 to carry out on camera irrespective of C7's agreement. *Id* at 93.

According to C7, A. Tate also used violence and death threats against C7 and other females in the house in Romania in order to maintain control over them. This included strangling, tripping, slapping and leaving C7 on the floor unconscious and throwing her in the pool. Her movements were restricted and controlled by the Tate brothers, and she feared for her personal safety. C7 would sometimes sleep in a studio room in order to avoid sharing a room with A. Tate, who would demand sex from C7. *Id*. at 93-94.

C7 reported experiencing a complete disregard for her autonomy and her consent to carry out sexual acts on camera. For example, C7 was clear that she did not want to do any anal sexual activity, but T. TATE and others controlling the webchat would accept payment for C7 to carry out anal sex acts – including inserting sex toys in her anus. She also describes having to "*fuck a bed knob for an hour*," and says that it felt like "sexual slavery." *Id*. at 93. She was only allowed to keep 20% of her earnings and had to pay her own living expenses.

After approximately three months, C7 left Romania. She booked a flight and waited until A. Tate was out. She ran to an apartment and created an elaborate lie about her mother being in the hospital in the United Kingdom. *Id*. at 94. She later disclosed details about her experience being trafficked to her ex-husband and friends. Some of the disclosure is retained in text messages recovered from digital devices. *Id*. at 94.

According to banking documents obtained by the United Kingdom, T. TATE made payments to C7 during the period she was in Romania. *Id*. at 95. Records show that C7 received four payments totaling only £2,711.01 from T. TATE during the approximate 3-month period when C7 was in Romania working for A. Tate and T. TATE. A further payment scheduled to take place on September 8, 2017, for £128.18 was cancelled, and C7 did not receive the money. *Id*.

**F. <u>C4: Counts 12–14 (rapes and assault by penetration)</u>**

Complainant 4 (hereinafter "C4") contacted police in September 2025 to report two instances of rape and one instance of assault by penetration by T. TATE that occurred in the summer of 2010. She provided a formal account to police over two interviews, both of which are captured on video. ECF No. 72-1 at 70.

According to C4, she traveled to London, England, in June 2010 with a female with whom she was in a relationship. C4's girlfriend knew A. Tate, had reconnected with him on social media,

and made arrangements for her and C4 to stay at A. Tate's place while they were visiting the United Kingdom. *Id*. at 70. C4 has provided photographs to U.K. law enforcement of her trip to London, including photographs of the apartment and of T. TATE. *Id*. at 79. The apartment had two bedrooms and, for the first couple of nights, C4 and her girlfriend slept in T. TATE's bed, and he slept on the couch. *Id*. at 71.

For the first few days of their visit, the Tate brothers both made a lot of comments that C4 considered inappropriate, including repeated misogynistic comments (that women should "submit" to men). T. TATE told her that he had made a woman submit to anal sex because she had annoyed him. T. TATE questioned her relationship with her girlfriend and whether she was really gay. *Id*.

C4 told police that both of the Tate brothers pressured C4 and her girlfriend to drink alcohol. T. TATE would pretend to control them by putting a belt around their necks and pretending that he was going to beat them with it, refusing to remove the belt until they had done what was requested (for example, getting him a glass of water). On at least one occasion T. TATE pulled the belt hard enough that C4 could not breathe properly. C4 said it was scary and that there was bruising on her neck as a result. On another occasion, T. TATE removed his belt, put it around C4's neck, and forcibly lifted her off the couch. *Id*. She could not speak and recalled that her heart was pounding. T. TATE laughed and removed the belt from her neck. *Id*.[19]

On one night during their stay, the Tate brothers pressured C4 and her girlfriend to drink alcohol by putting a belt around their necks and refusing to remove it until they drank. T. TATE suggested making a punch with Kool-Aid and alcohol. C4 did not want to drink it because it

[19] C4 provided U.K. law enforcement with three photographs of T. TATE with his belt around C4's girlfriend's neck. C4 also showed police screenshots of Facebook messages with T. TATE, including references to T. TATE using a belt. ECF No. 72-1 at 79.

seemed strong and said that she would have beer. She got away with this for a while, taking sips of beer, until T. TATE figured out what she was doing and put the belt around her neck. C4 eventually drank most of her drinks, as the belt was very tight and "freaking her out." *Id*. at 72.

C4 recalled feeling very drunk, very quickly, including feeling very unsteady and falling over at one point. C4 recalled being pulled onto T. TATE's lap and that, at some point, T. TATE tried to kiss her. Her head was pounding and she did not know what was happening. *Id.*

1. <u>Facts Supporting Count 12 (rape)</u>

C4 realized at some point that A. Tate and C4's girlfriend had left the room, and she was alone with T. TATE. C4 describes having delayed processing at this point and being confused. *Id*. at 72. T. TATE suggested that he and C4 go to his bedroom to lie down, as the couch was uncomfortable. C4 declined T. TATE multiple times, but she recalled that she tried to do it in a way that would not upset him. For example, she told him that she was too drunk, that she had never had sex with a man before, and did not want to cheat on her girlfriend. *Id*. at 73.

C4 next recalls that T. TATE picked C4 up off the couch. She describes flying through the hallway and very suddenly being on her back on T. TATE's bed. She did not recall having a shirt on. T. TATE took his clothes off and climbed into the bed. She recalls feeling like she did not have any control over what was happening. C4 continued to say that she wanted to go back to the living room, but T. TATE did not listen. He told her she was feeling guilty and not to listen to her thoughts. *Id*. at 72–73.

T. TATE was then on top of her very suddenly and put his penis inside her vagina. She was not feeling her body properly and recalled feeling like what was happening was "not real." *Id*. at 73. The room was spinning and she felt nauseous. She did not fight him physically. She did, however, tell T. TATE that she "needed to stop." *Id*. He continued without regard. At some

point, C4 started feeling what was happening, and she said it was sore and painful with a burning feeling. She wanted it to stop. *Id*. at 73. T. TATE told her he would ejaculate soon and that C4 should "*just relax*." *Id*. at 73–74.

As T. TATE continued, C4 again asked T. TATE to stop and at one point, out of desperation, offered to give him oral sex if he would stop. T. TATE said no and continued. T. TATE only stopped when C4 began to gag. She rolled to her side but could not go to the bathroom. T. TATE said that they should just finish, which propelled her to get out of bed. C4 stumbled, feeling very dizzy. She made it to the bathroom. She vomited and ended up lying on the hallway floor, as she tried to make it back to the living room, continuing to vomit intensely. She recalls blue liquid coming out, that she could not catch a breath and that her arms and legs were tingling. She felt cold and ashamed and could not even stand up until 4 or 5am, at which point she cleaned up her own vomit. *Id*. at 74.

2. Facts Supporting Count 13 (rape)

The following day, C4's girlfriend woke up and complained of being sick and unable to remember much. C4 recalls feeling pain when she urinated and not feeling well for the rest of the day. T. TATE acted friendly and normal, as if nothing had happened. Overall, C4 describes that all was brushed off as if they had just had a wild night together. That night, T. TATE said he could not sleep on the couch because he was hungover and needed to be in a bed. Though they slept in the same bed that night, and T. TATE asked C4 to have sex with him, he apparently listened this time when she refused. *Id*. at 75.

The following night, however, it is alleged that T. TATE again vaginally and digitally penetrated C4 without her consent. C4 told police that she had gone to bed early that night. T. TATE later came in and C4 pretended to be asleep. T. TATE asked if C4 was asleep, and C4 did

not respond. T. TATE made efforts to wake C4, including pushing his erection against her bottom. C4 said no; she told him she was not drunk, that she was too drunk the other night and that never should have happened. *Id*. at 76.

T. TATE responded that C4 could not expect to come to stay in his apartment and sleep in his bed and he would not want to have sex with her. He said that her relationship was not a "real" one and that the only thing men respect is another man. He told her that men have a right to have sex with women who do not have boyfriends. *Id*.

At this point, C4 started outright telling T. TATE "*No*" and stopped trying to do it in a nicer way. *Id*. T. TATE continued to push his erect penis between C4's legs and vagina over her shorts causing pain to C4, as if he was trying to have sex with her through her clothes. C4 told T. TATE to stop. T. TATE told C4 to take her shorts off and C4 refused, again telling him to stop. T. TATE continued thrusting against C4 causing pain by pressing his erect penis into her vagina through her shorts. T. TATE continued insisting that C4 take off her shorts, and C4 kept saying no. *Id*.

T. TATE had hold of her and tugged at her shorts, pulled them down, and continued to try to penetrate C4's vagina with his penis. It was painful and she kept asking him to stop, bringing up her girlfriend again. C4 tried to leave the bed to get away, but T. TATE followed her, saying they would have sex on the floor then. T. TATE seemed annoyed and irritated that C4 mentioned her girlfriend. He told her he was an "*alpha*," and that it was impossible for women not to be attracted to him. *Id*. at 77. He told her she was only saying "no" because she felt guilty. *Id*.

T. TATE pushed C4's head and shoulders down on the floor and repeatedly penetrated her vagina with his penis from behind. He kept telling her to relax and threatened to get the belt. At one point, he told her to "*submit*," and C4 was fearful that he would anally rape her. *Id*. T. TATE leaned over and grabbed his belt from the floor. He put it round her neck and pulled on it; she felt

lightheaded, confused, and her hands and feet were tingling. She recalled he told her that her body wanted it, even though her brain was saying "no"; that girls wanted to be dominated and that they only respect men who can do that. T. TATE became intense and aggressive, pushing her face and shoulders down into the ground as he ejaculated. *Id*. at 78.

3. Facts Supporting Count 14 (assault by penetration)

After this second incident of rape, C4 said she was going to take a shower, and T. TATE said he was going to take a shower as well. C4 told T. TATE "no," but she also described being in a fog and questioning what was happening. C4 asked him to be quiet, to leave her alone, and to go away. He found this funny and was laughing loudly. T. TATE followed C4 into the shower during which he began washing her body. She just stood there, and he began penetrating her vagina with his fingers without her consent, saying they could have sex again in the shower. She told him off, and he just found it funny. She felt powerless. She got out of the shower, dried off and put her clothes on quickly. Over the next two days she saw blood every time she went to the toilet. *Id*. at 78-79.

After the trip, C4 disclosed the alleged sexual assaults to friends, including to one friend in October 2010. Also in 2010, C4 sought support from a rape crisis charity. *Id*. at 79.

## APPLICABLE LAW

### I. THE ROLE OF THE JUDGE IN EXTRADITION PROCEEDINGS

"The power to extradite derives from the President's power to conduct foreign affairs." *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828 (11th Cir. 1993) (citing U.S. Const. art. II, § 2, cl. 2). Thus, extradition is primarily an executive responsibility. Nevertheless, the Executive delegates "an independent review function" to the judiciary, as defined by the extradition statute. *Id.* So the judicial officer presiding over an extradition hearing does not exercise "any part of the

judicial power of the United States" but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted).

Pursuant to Section 3184, the extradition court holds a hearing to consider the evidence of criminality presented by the foreign country and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If any evidence is offered by the fugitive, the judge rules on its admissibility. Once the record is complete, the judge should make written findings of fact and conclusions of law as to each of the elements for certification. *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). If the judge finds that the evidence is sufficient, he or she "shall certify [his or her findings] . . . to the Secretary of State." *Id.*[20] The Secretary of State, and not the Court, ultimately decides whether to surrender the fugitive. 18 U.S.C. § 3186.

## II. PROCEDURES DURING THE EXTRADITION HEARING

### A. <u>An extradition hearing is not a criminal proceeding.</u>

An extradition proceeding "is not a criminal proceeding," *Martin*, 993 F.2d at 828, and "[t]he magistrate does not inquire into the guilt or innocence of the accused," *Kastnerova v. United States*, 365 F.3d 980, 987 (11th Cir. 2004) (internal quotation marks and citation omitted); *see also*, *e.g.*, *Benson v. McMahon*, 127 U.S. 457, 463 (1888) ("[T]he proceeding before the [extradition judge] is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him . . . ."); *Arias v. Warden*, 928 F.3d 1281,

[20] If the extradition court certifies the matter to the Secretary of State, it must commit the fugitive to the custody of the United States Marshal to await further determination by the Secretary regarding surrender to the representatives of the requesting state. *See* 18 U.S.C. § 3184 (following certification, the judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made").

1286 (11th Cir. 2019) ("A United States court dealing with an extradition request for an accused is obliged to resist any temptation to judge the guilt or innocence of the accused." (internal quotation marks and citation omitted)). A fugitive's guilt or innocence is determined by a foreign court through "a trial according to the modes established in the country where the crime was committed[.]" *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *see Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008) ("Determining the ultimate guilt of the accused, therefore, is a function committed to the justice system of the requesting country."). Accordingly, in an extradition proceeding, the government must show only "probable cause that the fugitive is guilty." *Kastnerova*, 365 F.3d at 987 (internal quotation marks omitted); *see also*, *e.g.*, *Collins v. Loisel*, 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.").

**B. Usual constitutional rights and criminal procedures do not apply.**

"By design, the procedural framework of international extradition gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation." *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011) (internal quotation marks and citation omitted). Given the unique and limited nature of extradition proceedings, and the United States' international obligations under extradition treaties, limited procedural and evidentiary rules apply to extradition hearings. By their express terms, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include … the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to … miscellaneous proceedings such as extradition or rendition.").

Hearsay evidence is admissible at an extradition hearing and may sustain a determination that the fugitive is extraditable. *See, e.g.*, *Collins*, 259 U.S. at 317 ("[U]nsworn statements of absent witnesses may be acted upon by the committing magistrate . . . ."); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005) (probable cause determination based on an unsworn bill of indictment); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-34 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd*, 28 F.3d 116 (11th Cir. 1994); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *4 (S.D. Fla. May 28, 2015) ("A certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government.").

The circumscribed nature of extradition proceedings also limits the fugitive's opportunity to challenge the evidence introduced against him. "Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017) (internal quotation marks, citation, and emphasis omitted); *see also, e.g.*, *Collins*, 259 U.S. at 315-17; *Castro Bobadilla*, 826 F. Supp. at 1433. As such, "[t]estimony that merely gives the opposite version of the facts does not destroy the [probability] of guilt and is therefore inadmissible." *Martinelli*, 2017 WL 3776953, at *9 (internal quotation marks omitted). This allowance of "explanatory evidence" and prohibition on "contradictory evidence" is rooted in the fact that an extradition judge may not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986). A contrary rule might compel the "demanding government to produce all its evidence …

both directing and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (citation omitted). The admission of such explanatory evidence is largely within the discretion of the Court. *E.g.*, *Matter of Extradition of Ben-Tov*, 2006 WL 8463565, at *2 (S.D. Fla. Feb. 27, 2006); *In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) (citing *Collins*, 259 U.S. at 315-17).

Additionally, the fugitive is not entitled to certain rights normally attendant criminal proceedings in the United States. Because extradition hearings "are not to be converted into a dress rehearsal trial," a fugitive has no right to discovery in extradition proceedings. *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) (upholding denial of discovery); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976) (same). Relatedly, an extradition hearing is not the time to weigh affirmative defenses to the charges. *See, e.g.*, *Shapiro*, 478 F.2d at 900-01 (explaining that a judicial officer may properly exclude "evidence of alibi," "facts contradicting the demanding country's proof," or proof of a defense); *see also Charlton v. Kelly*, 229 U.S. 447, 462 (1913); *Collins*, 259 U.S. at 316-17. "And an extraditee is also not permitted to introduce evidence that seeks to impeach the credibility of the demanding country's witnesses." *See Martinelli*, 2017 WL 3776953, at *9 (citing *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993)); *see also, e.g.*, *United States v. Peterka*, 307 F. Supp. 2d 1344, 1349 (M.D. Fla. 2003). Such issues, which require factual or credibility determinations, are for the courts in the requesting country to resolve.

Moreover, the fugitive's constitutional rights are limited. For example, the fugitive has no right to cross-examine a witness who might testify, *Skaftouros*, 667 F.3d at 155 n.16; there is no right for the fugitive to confront his accusers, *id.* (citing *Bingham*, 241 U.S. at 517; there is no right to a speedy extradition, *Martin*, 993 F.2d at 829; and the Fourth Amendment's exclusionary rule is not applicable, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980).

**C. <u>Extradition hearings rely on written submissions, not live testimony.</u>**

A certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information that the foreign government requesting extradition has provided. *See, e.g.*, *Afanasjev*, 418 F.3d at 1164; *cf. Collins*, 259 U.S. at 317 (noting that "unsworn statements of absent witnesses may be acted upon" even if such statements would ordinarily be prohibited). Indeed, extradition treaties do not contemplate the introduction of live witness testimony at extradition proceedings because to do so "would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Treaty governs the certification of documents introduced during an extradition hearing. Article 9 of the Treaty, as amended, provides that documents bearing "the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization." Here, the United Kingdom has complied with the Treaty's requirements for authentication by submitting documents that bear the certificate or seal of the U.K. Home Office. Thus, the documents provided by the United Kingdom are admissible in these proceedings.

**D. <u>The rule of non-inquiry: the Executive considers all matters other than sufficiency.</u>**

In extradition proceedings, the rule of non-inquiry "precludes courts from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request . . . [Courts] have neither the power nor competence to consider a foreign fugitive's concerns about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch." *Arias*, 928 F.3d at 1295. In other words, a judicial officer reviews only the sufficiency of the evidence, *see* 18 U.S.C.

§ 3184, and the Court is "bound by the existence of an extradition treaty to assume that the trial" in the requesting state "will be fair," *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911); *Martinelli*, 2017 WL 3776953, at *28–29. All other matters fall within the ambit of the Executive's power to conduct foreign affairs. In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali v. I.N.S.*, 107 F.3d 191, 195 n.7 (3d Cir. 1997); *see also Hurtado v. U.S. Atty. Gen.*, 401 F. App'x 453, 456 (11th Cir. 2010). The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the receiving country. *See Ntakirutimana v. Reno*, 184 F.3d 419, 430 (5th Cir. 1999). This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act … performed through the Secretary of State" within the Executive's prerogative. *See In re Kaine*, 55 U.S. 103, 110 (1852); *Martin*, 993 F.2d at 828.

## III. THE REQUIREMENTS FOR CERTIFICATION

At the extradition hearing, a court's review is limited to determining whether: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the applicable treaty covers the crimes for which extradition is requested; and (5) sufficient evidence exists to support a finding of probable cause as to each charge for which extradition is sought. *E.g.*, *Shaw*, 2015 WL 3442022, at *5 (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)); *see also, e.g.*, *Martinelli*, 2017 WL 3776953, at *10. Each of these five requirements is satisfied; the Court, therefore, should issue a certification to the Secretary of State.

**A. <u>The Court is authorized to conduct the extradition hearing.</u>**

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State[.]" 18 U.S.C. § 3184. The extradition statute therefore expressly permits a magistrate judge to render a certification, and this District's local rules expressly authorize magistrate judges to "[c]onduct extradition proceedings, in accordance with 18 U.S.C. § 3184." *See* Magistrate Judge Rules for the U.S. District Court for the Southern District of Florida, Rule 1(a)(3). Thus, the Court is authorized to preside over the extradition proceedings.

**B. <u>The Court has jurisdiction over T. TATE.</u>**

A court has jurisdiction over a fugitive found within its jurisdictional boundaries. *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction … issue his warrant for the apprehension of the person so charged."). When the Court's provisional arrest warrant was executed, T. TATE was in Miami, Florida, which is in the Southern District of Florida. Thus, the Court has jurisdiction over T. TATE.

**C. <u>The Treaty is in full force and effect.</u>**

Extradition is appropriate when a treaty or convention is in full force and effect between the requesting state and the United States. 18 U.S.C. § 3184; *see also Kastnerova*, 365 F.3d 980, 987 (11th Cir. 2004) (dismissing habeas petition challenging certification of extradition, because, among other reasons, district court did not err in determining extradition treaty to be valid).

Here, an Attorney Adviser in the Office of the Legal Adviser for the Department of State submitted a declaration attesting that the Treaty is in full force and effect between the United States and the United Kingdom. *See* ECF No. 72-1 at 1, ¶ 2. When determining whether a treaty is in

full force and effect, a court defers to the determination of the Department of State. *See Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Charlton*, 229 U.S. at 468; *Arias*, 928 F.3d at 1288 ("[C]ourts *must* defer to the determination of the executive branch in deciding whether an extradition treaty remains in force." (emphasis in original, internal quotation marks omitted)). Moreover, the Treaty itself prescribes termination procedures that have not occurred. Treaty at Art. 22.

**D. The Treaty covers the crimes for which the United Kingdom seeks extradition.**

An extradition treaty creates an obligation for the United States to surrender fugitives under the circumstances the treaty specifies. Here, the Treaty provides for the extradition of "persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses." ECF No. 72-1 at 12 (Treaty at Art. 1). The Treaty further states, in relevant part, that "an offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty." *Id.* at Art. 2(1).[21] Also, an offense is extraditable regardless of whether (a) "the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology;" or (b) "the offense is one for which United States federal law requires the showing of such matters as interstate transportation…such matters being jurisdictional only." *Id.* at Art. 2(3).

In assessing whether the Treaty covers the offenses for which the United Kingdom seeks extradition and the State department has authorized proceeding on, the Court should examine the description of criminal conduct that the United Kingdom has provided and determine whether that conduct, if it had been committed in the United States, would be criminal under U.S. federal law,

[21] Art. 2(5) of the Treaty permits extradition for an offense punishable by less than one year's deprivation of liberty, provided that the other requirements for extradition are met, and that extradition has been granted for at least one extraditable offense. ECF No. 72-1 at 12.

the law of the state in which the hearing is held, or the law of a preponderance of the states. *See Wright v. Henkel*, 190 U.S. 40, 60–61 (1903); *Arias*, 928 F.3d at 1292-93; *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000). This is commonly referred to as the dual criminality requirement.

A requesting country need not establish that its crimes (or the elements of the crimes) are identical to crimes in the United States. *Zhenli Ye Gon v. Holt*, 774 F.3d 207, 217 (4th Cir. 2014) (collecting cases). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312. Thus, the fact that the foreign offense may be broader than its U.S. analogue, or vice versa, does not defeat dual criminality. *See Arias*, 928 F.3d at 1293 (citing *Man-Seok Choe v. Torres*, 525 F.3d 733, 738 (9th Cir. 2008)); *see also, e.g.*, *id.* ("Dual criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours." (internal quotation marks and citation omitted)); *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged.").

In fulfilling its function under § 3184, the Court should construe liberally the applicable extradition treaty to effectuate its purpose, namely the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 293, 303 (1933). Because extradition treaties should be "interpreted with a view to fulfil[l] our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court "must approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *cf.*

*Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (*en banc*) ("The point of an extradition treaty after all is to facilitate extradition[.]").

To assist the court in its dual criminality analysis, the United States has composed a chart, attached here as Exhibit A, containing: 1) the U.K. count number; 2) the U.K. charge and statute; 3) the U.K. penalty; 4) a description of the basic facts underlying each charged offense; 5) the U.S. and/or Florida statute that would apply to the criminal conduct as alleged;[22] and 6) the U.S. and/or Florida penalty. As demonstrated therein, all of the offenses at issue in this extradition matter are dually criminal and thus extraditable offenses under the Treaty.

**E. <u>The United Kingdom's submission establishes probable cause that T. TATE committed the charged offenses</u>.**

The domestic probable cause standard governs whether the foreign country's evidence is "sufficient to sustain the charge," as required under Section 3184. *See, e.g.*, *Kastnerova*, 365 F.3d at 987. To certify the evidence to the Secretary of State, the Court must conclude that probable cause exists to believe that the crimes charged by the United Kingdom were committed and that the person before the Court committed them. *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006); *Sindona v. Grant*, 619 F.2d 167, 175 (2d Cir. 1980); *Castro Bobadilla*, 826 F. Supp. at 1432. Probable cause exists where it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted).

As detailed above in the "U.K. Offenses" section, the authenticated U.K. submission puts forward evidence from which a person of ordinary prudence and caution could entertain a reasonable belief of T. TATE's guilt as to all offenses. Further analysis follows:

[22] Exhibit A does not include each and every possible U.S. federal or Florida state statute that might apply to the underlying conduct.

1. Rape and Assault

T. TATE is alleged to have committed five (5) counts of rape in violation of Section 1 of the U.K. Sexual Offences Act 2003; one (1) count of assault by penetration in violation of Section 2 of the Sexual Offences Act 2003; and six (6) counts of assault occasioning actual bodily harm in violation of Section 47 of the Offences Against the Person Act 1861. With respect to the rape charges, Section 1 the U.K.'s Sexual Offences Act 2003 provides that a person "(A) commits an offence of rape if (a) he intentionally penetrates the vagina, anus or mouth of another person (B) with his penis; (b) B does not consent to the penetration, and (c) A does not reasonably believe that B consents." Further, "[w]hether a belief is reasonable is to be determined having regard to all the circumstances, including any steps A has taken to ascertain whether B consents" See ECF 72-1 at 101. Under U.K. law, "penetration is a continuing act from entry to withdrawal so that it follows that consensual intercourse will become rape if the woman or man ceases to consent during the intercourse and the accused with the necessary mens rea continues the intercourse." *Id*. at 101. Section 74 of the Sexual Offences Act 2003 provides that "a person consents if he agrees by choice and has the freedom and capacity to make that choice." *Id*. at 102. Under Section 75, violence used immediately before or during the act gives rise to a presumption that the complainant did not consent and that the defendant lacked a reasonable basis to believe otherwise. *Id*. at102-104.

With respect to assault by penetration, Section 2 of the U.K.'s Sexual Offences Act 2003 provides that a person (A) commits an offence if (a) he intentionally penetrates the vagina or anus or another person (B) with a part of his body or anything else, (b) the penetration is sexual, (c) B does not consent to the penetration, and (d) A does not reasonably believe that B consents. *Id*. at 108. The same definitions of and presumptions regarding consent, as described above, apply.

With respect to assault occasioning bodily harm under Section 47 of the U.K.'s Offences Against the Person Act, "an assault is any act, and not a mere omission to act, by which a person intentionally or recklessly causes another to apprehend immediate and unlawful violence." *Id*. at 110. To be liable for assault occasioning bodily harm, the prosecution must prove the assault "occasioned," or caused, the bodily harm. "Bodily harm" has its ordinary meaning and also includes a momentary loss of consciousness. *Id*. Under U.K. law, a person cannot consent to the infliction of actual bodily harm, unless it falls within a recognized exception, such as sport. *Id*. at 111. Accordingly, where sexual activity involves the intentional infliction of actual bodily harm, including injury caused by choking, strangulation or other forms of rough sexual violence, consent does not provide a defense. *Id*.

The five (5) counts of rape (Counts 1, 2, 9, 12, 13), one (1) count of assault by penetration (Count 14), and six (6) counts of assault occasioning actual bodily harm (Counts 3, 4, 5, 6, 7, 8) pending against T. TATE in the United Kingdom rest on highly detailed, firsthand accounts from two independent complainants. Each is memorialized in video-recorded statements to law enforcement and summarized above. Standing alone, these comprehensive victim statements are sufficient to establish probable cause for the charged offenses. *See, e.g., United States v. Martinelli*, 454 F.3d 1300, 1306-07 (11th Cir. 2006) (holding that firsthand testimony from victim-witnesses can establish probable cause); *see also United States v. Golden*, 545 F. App'x 920, 921 (11th Cir. 2013) (upholding a search warrant based on uncorroborated testimony from a minor victim); Fla. Stat. § 794.022(1) (providing that victim testimony need not be corroborated in prosecutions for specified offenses, including rape and human trafficking).[23]

[23] The Background section above contains a detailed account of the key facts and evidence in support of probable cause for each count. For a streamlined review of the facts and evidence underlying each count, please refer to Exhibit A, Dual Criminality Chart.

While the highly detailed victim testimony can alone be found sufficient to support probable cause, the United Kingdom's request for extradition does not rely on victim testimony alone. It sets forth independent corroboration for each complainant, including incriminating communications with T. TATE that reference sexual violence, including use of a belt, and rape, including anal rape, disclosures to friends and family, and, with respect to C1, photographs of injuries and physical marks allegedly inflicted by T. TATE. Additionally, for C1, the request further details evidence corroborating her accounts of commercial sexual exploitation, including recruitment communications with T. TATE, travel records, and banking records. This evidence provides powerful indicia of reliability that reinforces and independently supports the alleged victims' accounts of rape, assault by penetration, and assault occasioning bodily harm.

2. Human Trafficking

The United Kingdom has charged T. TATE with five (5) counts of human trafficking (Counts 10, 11, 15, 16, 17), jointly with A. Tate, based on their recruitment of several women to work as "cam girls," leading to the facilitation of transportation for four of these women to Romania for the purpose of commercial sexual exploitation, namely, to perform sexual services for the Tates' webcam operation for the Tates' financial gain, in violation of Sections 2 and 3 of the Modern Slavery Act.

Under U.K. law, a person violates Section 2(1) of the Modern Slavery Act 2015 if they "arrange[] or facilitate[] the travel of another person ("V") with a view toward V being exploited." ECF No. 72-1 at 112. Under Section 3 of the Act, a person is "exploited" under Section 2(1) if, for example, "something is done to or in respect of the person- which involves the commission of an offense under… Part 1 of the Sexual Offences Act 2003." *Id*. at 114-115. Part 1 of the Sexual Offences Act 2003 includes, but is not limited to, sexual offences against adults and children and

controlling prostitution for gain. *Id*. at 115. The offense of controlling prostitution for gain is defined as "intentionally control[ing] any of the activities of another person relating to that person's prostitution[24] in any part of the world… for or in the expectation of gain for himself or a third person." *Id*. at 116-117. A person is also "exploited" under the meaning of Section 2(1) of the Modern Slavery Act 2015 if the person is subjected to "force, threats or deception designed to induce him or her- (a) to provide services of any kind…" *Id*. at 115.

The evidentiary support for the human trafficking allegations against T. TATE is substantial. The United Kingdom relies not only on the detailed accounts of the complainants themselves, but also on communications documenting recruitment efforts, promises of earnings, and efforts to persuade women to work for the operation; travel records corroborating the victims' movements and dates of transportation; financial records reflecting payments made to victims in exchange for their commercial sex work;[25] and other contemporaneous documentary evidence corroborating the existence and operation of the enterprise.

Notably, the complainants' accounts contain recurring details that naturally reinforce one another. Multiple women describe being recruited through romantic promises (C5, C6 and C7), transported to Romania at the Tates' arrangement and/or expense (C1,[26] C5, C7 and likely C6),

---

[24] Prostitution involves the provision of "sexual services" to another person in return for payment or a promise of payment. "Sexual services" is not statutorily defined, but "sexual" is defined in Section 78 of the Sexual Offence Act 2003, which provides that "penetration, touching or any other activity is sexual if a reasonable person would consider that-(a) whatever its circumstances or any person's purposes in relation to it, it is because of its nature sexual, or (b) because of its nature it may be sexual and because of its circumstances or the purpose of any person in relation to it (or both) it is sexual." ECF No. 72-1 at 117.

[25] *See* footnote 23, *supra*.

[26] The Tate brothers arranged for C1 to travel more than once to Romania for purposes of online prostitution and is the subject of two separate counts as a result.

pressured to engage in increasingly explicit sexual performances and finding themselves unable to exercise the autonomy they had been promised (C1, C6 and C7). More than one complainant reported having her passport retained after arrival (C5 and C6). Others described restrictions on their freedom of movement, fear of retaliation if they left, or the need to beg, fabricate emergencies, or otherwise devise means of escape before being allowed to depart. One complainant ultimately fled only after concocting a false family emergency (C7); another repeatedly begged to be permitted to leave (C1); still another was told she could not leave after expressing a desire to return home and only secured her release after invoking concern from her family members (C5), while another reported leaving Romania under the guise of attending a funeral (C6). These recurring circumstances permit a reasonable inference that the alleged exploitation was not accidental or ad hoc but reflected a deliberate method of operation.

In sum, each complainant's account and corroborating evidence viewed individually easily clears the probable cause hurdle. Taken together, the evidence soars above, revealing a coherent and highly consistent pattern in which vulnerable women were recruited through promises of romance and economic opportunity, transported or directed into commercial sexual services, subjected to varying forms of control and coercion and violence, and exploited for the financial benefit of T. TATE, A. Tate and their associates. The complainants' mutually reinforcing accounts, together with the documentary corroboration of travel records and payments, decisively establishes probable cause for the human trafficking charges.

**Conclusion**

For the foregoing reasons, the United States requests that the Court determine that the submission on behalf of the United Kingdom is sufficient to sustain the charges under the

provisions of the applicable Treaty and certify the extradition of T. TATE for those charges to the Secretary of State for possible surrender to the United Kingdom.

Dated: October 26, 2026

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: */s/ Alejandra L. López*
ALEJANDRA L. LÓPEZ
Assistant United States Attorney
Fla. Bar No. 37132
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9241
Email: Alejandra.Lopez@usdoj.gov

By: */s/ Abbie D. Waxman*
ABBIE D. WAXMAN
Assistant United States Attorney
Fla. Bar No. 109315
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9240
Email: Abbie.Waxman@usdoj.gov

A. TYSEN DUVA
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

By: */s/ Kerry A. Monaco*
KERRY A. MONACO
Associate Director
Office of International Affairs
U.S. Dep't of Justice, Criminal Division
Court ID: A5503560
1301 New York Avenue NW
Washington, DC 20530
Tel.: (202) 616-4798
Email: Kerry.Monaco2@usdoj.gov

By: */s/ Rachel M. Yasser*
RACHEL M. YASSER
Trial Attorney
Office of International Affairs
U.S. Dep't of Justice, Criminal Division
Court ID: A5503561
1301 New York Avenue NW
Washington, DC 20530
Tel.: (202) 674-5702
Email: Rachel.Yasser2@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on October 26, 2026, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF, which caused the same to be served on Howard Srebnick, Esquire, Jackie Perczek, Esquire, Thomas Maniotis, Esquire and Joseph McBride, Esquire, counsel for the Defendant.

*/s/ Abbie D. Waxman*________
Abbie D. Waxman
Assistant United States Attorney