UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 26-mj-03259-LFL

IN THE MATTER OF EXTRADITION OF
TRISTAN TATE
_______________________________________/

# TRISTAN TATE'S MEMORANDUM OF LAW IN OPPOSITION TO EXTRADITION

TRISTAN TATE, through undersigned counsel, respectfully asks this Court to deny the government's request to certify his extradition to the United Kingdom, and states as follows:

## Introduction

The United Kingdom seeks the extradition of Tristan Tate to be prosecuted for 17 offenses stemming from conduct that allegedly occurred in the United Kingdom and Romania between 2010 and 2017.

Yet neither the United Kingdom nor the United States identifies a single person who has accused Tristan Tate of a crime. The government has not submitted sworn statements from any of the five complainants, and the only account of what any complainant said that is before this Court is a "summary of evidence" prepared by a Bedfordshire detective. *See* ECF#72-1. Nor does the government dispute that each complainant came forward several years after the events she describes, sometimes only after police sought her out, and only after Tristan and his brother, Andrew, became internationally famous internet personalities. And the principal accuser, C1, describes

much of the sexual activity as consensual. On nothing more than the secondhand word of anonymous accusers, the government asks this Court to certify the extradition of an American citizen on 17 charges, some carrying life sentences.

The U.K. seeks to prosecute Tristan for the following criminal offenses:

- Five (5) counts of rape in violation of Section 1 of the Sexual Offences Act 2003;
- One (1) count of assault by penetration in violation of Section 2 of the Sexual Offences Act 2003;
- Six (6) counts of assault occasioning actual bodily harm in violation of Section 47 of the Offences Against the Person Act 1861; and
- Five (5) counts of human trafficking in violation of Sections 2(1) and 5(1) of the Modern Slavery Act 2015.

ECF#72-1 at 30.

The offenses are set forth in two separate warrants in the U.K.'s request. A warrant for Tristan's arrest was first issued on January 19, 2024, by Senior District Judge Paul Goldspring, Chief Magistrate, of the Westminster Magistrates' Court, and includes eleven (11) charges. *Id.* at 33–34. Judge Goldspring issued a second warrant on August 5, 2026, adding six (6) offenses. *Id.* at 35–36. However, the government has failed to amend its complaint to charge Tristan with Counts 10 through 17, meaning the Court lacks jurisdiction under 18 U.S.C. § 3184 to certify these counts.

Counts 1–11 relate to Complainant 1 ("C1") and include rape and assault charges as well as human trafficking charges related to C1's involvement in the Tates' webcam business. ECF#77, pp. 6–14. Counts 12–14 relate to Complainant 4 ("C4") and include

two counts of rape and one count of assault by penetration. Counts 15, 16, and 17 relate to the alleged human trafficking of Complainant 5 ("C5"), Complainant 6 ("C6"), and Complainant 7 ("C7").

All five accusers remain anonymous: the U.K. has not disclosed the identity of C1, C4, C5, C6, or C7 to the defense, the U.S. government, or this Court, and none has made a sworn statement. Neither the Due Process Clause nor the Extradition Treaty Between the United States and the United Kingdom (the "Treaty") permits the United States to surrender an American citizen on nothing more than anonymous allegations. The principal accuser concedes that much of the sexual activity she describes was consensual. On this record, the government has failed to establish probable cause to believe that Tristan committed the charged offenses.

The charges lack probable cause on other bases as well. The five trafficking counts rest on Andrew Tate's conduct, not Tristan's: for three of the four women, the only act connecting Tristan to her travel is an airport pickup. The C1 counts fare no better. C1 was in a relationship with Tristan in 2012 and 2013, when she claims he raped and assaulted her. By her own account, however, much of the sexual activity was consensual, and although she now claims he abused her throughout that relationship, she contacted him three years later, in 2016, to pursue webcam work.

Finally, three counts fail dual criminality. Count 5 charges consensual conduct, choking during sex, that is not a crime in the United States. Counts 10 and 11 would not be criminal in the United States under 18 U.S.C. §§ 2421 (transportation) and 2422

(coercion and enticement) because webcamming is legal in the United States and is not prostitution.

As shown below, the government has not carried, and cannot carry, its burden to establish that Tristan Tate is extraditable because (1) no sworn complaint supports Counts 10 through 17, as 18 U.S.C. § 3184 requires; (2) the warrant does not support Counts 7 and 8; (3) extraditing Tristan on anonymous allegations would violate due process; (4) the U.K.'s extradition packet fails to establish probable cause under the Treaty; and (5) Counts 5, 10, and 11 fail dual criminality. The extradition hearing is not a rubber stamp; the Court must rigorously analyze the facts and law. On this record, the Court should decline to certify Tristan Tate's extradition.

## Argument

### I. The Court Plays an Integral Role in Protecting the Integrity of Extradition Proceedings.

The courts play an essential role in the extradition determination. Ronald J. Hedges, International Extradition: A Guide for Judges 1 (Fed. Judicial Ctr. 2014) ("[T]he courts play an essential role in reviewing evidentiary and procedural issues."); *see also* Restatement (Third) of Foreign Relations Law § 326, cmt. b (1987) ("The courts . . . have the final say as to the meaning of an international agreement insofar as it is law of the United States applicable to cases and controversies before the courts."); *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning.").

In extradition proceedings, the court is not "permitted to simply hand over a United States citizen on the word of a prosecutor, coupled with conclusory allegations and unsubstantiated, unreliable evidence. . . . [T]he Court is not merely a rubber stamp for a foreign government's decision that probable cause exists, such that an American citizen should be held to answer criminal charges in that country. In our system of justice, each case must be decided based on the particular evidence presented therein." *In re Extradition of Mazur*, 2007 WL 2122401, at *27 (N.D. Ill. July 20, 2007) (denying extradition).

That is because the rights at stake are the constitutional protections the United States guarantees its citizens, protections the courts, not the Executive, must enforce. *See United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999). Under 18 U.S.C. § 3184, the Court must determine whether the evidence is "sufficient to sustain the charge." *Id*. Thus, the Court must make individual determinations as to whether the government provided sufficient evidence to extradite Tristan on each count. In making this determination, the Court must look to the allegations set forth in the United Kingdom's request (ECF#72-1), not to the government's summary of the evidence.

## II. The Court May Not Certify Counts 10 through 17 Because They Are Not Charged in the Sworn Complaint.

The Court should deny certification of Counts 10 through 17 because no complaint made under oath charges Tristan with those offenses. Under 18 U.S.C. §

3184, the Court may act only "upon complaint made under oath, charging" the person sought "with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty." *Id*. The statute then directs the Court to determine whether the evidence is "sufficient to sustain the charge." *Id.* "The charge" is the charge made in the sworn complaint. The complaint defines what the Court may hear, what it may consider, and what it may certify to the Secretary of State. The Court has no authority under the statute to certify offenses that are not charged in the sworn complaint.

The government filed its Complaint for Provisional Arrest with a View Towards Extradition against Tristan on July 18, 2026. ECF#3. The complaint was sworn by AUSA Waxman. The complaint charges two offenses: rape, in violation of section 1 of the Sexual Offences Act 2003, and assault occasioning actual bodily harm, in violation of section 47 of the Offences Against the Person Act 1861. ECF#3, ¶ 5. Both concern a single complainant, C1. The complaint relies on a warrant issued by Judge Goldspring in the U.K. on January 19, 2024. *Id.* ¶ 6. The factual allegations in the complaint describe only alleged rapes and assaults said to have occurred in Luton between April 2012 and December 2013, and on or about December 24, 2012. *Id.* ¶ 7. The complaint does not charge human trafficking, does not cite the Modern Slavery Act 2015, and does not mention C4, C5, C6, or C7.

The complaint therefore corresponds, at most, to Counts 1 through 9 in the extradition request. The complaint does not charge Counts 10 and 11, which allege the

human trafficking of C1 under the Modern Slavery Act, ECF#77 at pp. 11–14, or Counts 12 through 17, which allege offenses against other complainants, *id.* at pp. 15–26. Indeed, the complaint could not have charged Counts 12 through 17 because those counts appear only in a second warrant issued by Judge Goldspring in the U.K. on August 5, 2026, more than two weeks after the complaint was sworn by AUSA Waxman on July 18, 2026. ECF#72-1 at pp. 35–36; ECF#3 at p. 6.

Since the issuance of the August 5, 2026 warrant in the U.K., the government has not amended the complaint. In a footnote in the complaint, the government reserved the right to proceed "on additional charges" once the U.K.'s formal request is "presented to the Court," ECF#3 at p. 3 n.1, but the government has not proceeded on those charges in the manner § 3184 requires: by a complaint made under oath. Instead, the government seeks certification on charges that appear only in the U.K.'s formal request, which was docketed as an unsworn "Notice of Filing," ECF#72, and in the government's unsworn memorandum of law, ECF#77. Filing notices and memoranda of law are not a substitute for an amended complaint, made under oath, charging offenses that were not alleged under oath in the original complaint. The August 5, 2026 U.K. warrant may be part of the evidentiary materials, but it does not amend the complaint or satisfy the oath requirement of § 3184.[1]

[1] 18 U.S.C. § 3190 permits properly authenticated foreign warrants to be admitted as evidence at an extradition hearing, but those warrants do not replace the sworn complaint required by § 3184. Nor does the declaration of State Department Attorney Adviser Tom Heinemann, included with the U.K.'s formal request, serve as the sworn

Under the rule of specialty, Tristan may be tried in the United Kingdom only for the offenses for which extradition is granted. Treaty, art. 18(1). The Secretary of State's surrender decision rests on what this Court certifies. If the Court certifies offenses that no sworn complaint has charged, it would authorize Tristan's surrender for crimes that were never properly before the Court under § 3184.

Because the Court may certify only offenses charged in a complaint made under oath, the Court should deny certification of Counts 10 through 17.

## III. The Court Should Deny Certification of Counts 7 and 8 Because the Warrant Does Not Charge the Conduct Alleged.

The Court should deny certification of Counts 7 and 8 because, contrary to the requirements of the Treaty, the United Kingdom has not provided an arrest warrant covering the conduct alleged in those counts and has not offered any evidence that Tristan committed the offenses that the warrant actually charges.

Article 8(3)(a) of the Treaty requires that "a request for extradition of a person who is sought for prosecution *shall be* supported by . . . a copy of the warrant or order of arrest issued by a judge or other competent authority . . ." Treaty, art. 8(3)(a). Here, the warrant issued on January 19, 2024 charges, in Counts 7 and 8, assaults committed "[b]etween 01/04/2013 and 26/12/2013," that is, between April 1, 2013 and December 26, 2013. ECF#72-1 at p. 33. But according to Detective Constable Marshall's

---

complaint. ECF#72-1 at pp. 1–3. That declaration attests only to the existence of the Treaty and to the formal requirements of the extradition process; it does not charge Tristan with any crime.

September 7, 2026 statement of facts submitted in support of Tristan's extradition, Count 7 actually concerns a single incident "in approximately September 2012," *id.* at p. 59, ¶ 57, and Count 8 concerns incidents occurring "on approximately four or five occasions between September and December 2012," *id.* at 60, ¶ 63. Every act alleged in the extradition request in support of Counts 7 and 8 therefore predates the period charged in the warrant for those counts.

The United Kingdom concedes this failure in evidence. Detective Constable Marshall states that the warrant "contains an administrative error," that the dates for Counts 7 and 8 are "recorded incorrectly," and that the United Kingdom intends, "[i]f Tristan Tate is surrendered," to apply "at his first hearing" to "amend the particulars" of Counts 7 and 8 "to reflect the correct dates." *Id.* at p. 39, ¶ 6. But the question before this Court under 18 U.S.C. § 3184 is whether the evidence is "sufficient to sustain the charge" based on the warrant that the United Kingdom has submitted, not on some other amended warrant that the United Kingdom may obtain after surrender. Detective Marshall's promise to apply to change that charge after surrender does not satisfy the Treaty's mandatory requirement that the warrant submitted to this Court, and not another version of the warrant in the future, "shall" "support" the extradition request.

Certifying these counts on the current record would present an additional problem: it would contravene the rule of specialty. Under Article 18(1) of the Treaty, a person extradited may be detained, tried, or punished only for "any offense for which extradition was granted," or for "a differently denominated offense based on the same

facts as the offense on which extradition was granted." ECF#72-1 at p. 19. If this Court certifies Counts 7 and 8 as charged, it will certify assaults alleged to have occurred between April and December 2013. Yet the United Kingdom's extradition package alleges no assault in support of these counts during that period and instead states that it intends to prosecute Tristan for different conduct, on different dates, after he is surrendered. Certification under those circumstances would impermissibly authorize extradition for one set of offenses while the requesting state openly plans to try another.

Finally, the Court has been provided no factual or evidentiary support to accept the U.K.'s claim that the dates reflect an "administrative error." The United Kingdom has had every opportunity to correct the January 19, 2024 warrant, including during the months that Tristan has been detained without bail, and it has offered no explanation for its failure to do so. Indeed, on August 5, 2026, U.K. authorities appeared before Judge Goldspring, the same judge who issued the January 19, 2024 warrant with the purported error, and obtained a second warrant from him against Tristan. ECF#72-1 at pp. 35–36. They did not ask Judge Goldspring to correct or reissue his first warrant (or if they did, Judge Goldspring must have denied it).

One month later, on September 7, 2026, a second U.K. judge certified the January 19, 2024 warrant as "a true and redacted copy of the original warrant," *id.* at p. 34, while on the very same day Detective Constable Marshall signed her statement of facts to obtain Tristan's extradition, alleging that the warrant contained an "administrative error," *id.* at p. 96 (signature of Detective Constable Marshall dated

September 7, 2026). The United Kingdom then transmitted the "erroneous" warrant to the United States as part of its formal request. On these facts, the Court cannot determine that the dates are a clerical mistake rather than a reflection of what was alleged under oath when the warrant issued. The sworn information on which Judge Goldspring acted to issue the warrant has not been provided to the Court, the accuser remains anonymous and no recording of her alleged statements has been provided, and the only account of the "error" is the unsworn conclusory statement of the Detective Constable, prepared more than two and a half years after the warrant issued.

The Court should deny certification as to Counts 7 and 8 because the request for extradition on those counts is not supported by the warrant and therefore does not comply with the Treaty.

## IV. Certifying Tristan's Extradition on the Basis of Anonymous, Unsworn Allegations Would Violate Due Process.

Although relaxed procedural and evidentiary rules govern extradition hearings, "[t]he United States' actions in reviewing a request for extradition are, of course, subject to the constraints of the Constitution. The constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations." *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 829 (11th Cir. 1993) (citing *Geisser v. United States*, 513 F.2d 862, 869 n.11 (5th Cir. 1975)).

The Treaty requires a showing of "[s]uch information as would provide a reasonable basis to believe that the person sought committed the offense for which

extradition is requested." Treaty, art. 8(3)(c); *see, e.g., Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006); *Sindona v. Grant*, 619 F.2d 167, 175 (2d Cir. 1980); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433 (S.D. Fla. 1993), *aff'd*, 28 F.3d 116 (11th Cir. 1994). To certify the evidence to the Secretary of State, the Court must conclude that probable cause exists to believe that the crimes charged by the United Kingdom were committed and that the person before the Court committed them.

The standard for a finding of probable cause is defined by federal law. *Fernandez-Morris*, 99 F. Supp. 2d at 1365. Probable cause means that there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the guilt of the accused. *Id.*; *see also In re Extradition of Ernst*, 1998 WL 395267, at *9 (S.D.N.Y. 1998) ("[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.") (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).

Conclusory statements do not satisfy the probable cause standard. *Fernandez-Morris*, 99 F. Supp. 2d at 1365. The question is not whether the evidence would justify a conviction, but whether it is sufficient to hold the accused. *Id.* (citing *Collins v. Loisel*, 259 U.S. 309, 316 (1922)). The evidence must be sufficient to "block out those elements essential to a conviction." *Collins*, 259 U.S. at 317.

As the Supreme Court has said in the analogous context of arrest warrants, the judicial officer "should not accept without question the complainant's mere conclusions

that the person whose arrest is sought has committed a crime." *Fernandez-Morris*, 99 F. Supp. 2d at 1366 (citing *Giordenello v. United States*, 357 U.S. 480, 486 (1958)). This independent review allows a magistrate judge to perform a "'neutral and detached' function and not serve merely as a rubber stamp" for the foreign government. *Id.* (citing *Aguilar v. Texas*, 378 U.S. 108, 111 (1964)). Indeed,

> [Magistrate judges] must, under Article III of the Constitution, exercise their independent judgment in a case or controversy to determine the propriety of an individual's extradition. The executive may not foreclose the courts from exercising their responsibility to protect the integrity of the judicial process. A court must ensure that it is not used for purposes which do not comport with our Constitution or principles of fundamental fairness.

*Id.* (quoting *Ahmad v. Wigen*, 726 F. Supp. 389, 412 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990)).

To be sure, a relator's right to present evidence at an extradition hearing is limited: he may offer only evidence that explains, rather than contradicts, the requesting country's proof. *Id.* (citing *Hooker v. Klein*, 573 F.2d 1360, 1368–69 (9th Cir. 1978); *Cheng Na-Yuet v. Hueston*, 734 F. Supp. 988, 995 (S.D. Fla. 1990), *aff'd*, 932 F.2d 977 (11th Cir. 1991)). The scope of such explanatory proof lies largely within the Court's discretion. *Id.* (citing *Hooker*, 573 F.2d at 1369). But probable cause remains a statutory requirement, 18 U.S.C. § 3184; without it, the requesting state's allegations are mere suspicions and the request must be denied. *Fernandez-Morris*, 99 F. Supp. 2d at 1366.

Evidence that "explains away or completely obliterates probable cause" is admissible at the final extradition hearing. *In re Extradition of Martinelli Berrocal*, 2017 WL 3776953 at *9 (S.D. Fla. Aug. 31, 2017). For example, in *Matter of Extradition of Ameen*, Ameen was accused of murder in Iraq but sought to prove to the extradition court that he was in Turkey when the murder took place. 2021 WL 1564520, at *8 (E.D. Cal. Apr. 21, 2021). The court permitted Ameen to provide substantial evidence to prove his alibi, including declarations, sign-in sheets from a Turkish immigration office, a polygraph test Ameen passed in which he stated he was not in Iraq on the day of the murder, and Ameen's cell phone records showing his phone was in Turkey on the day of the murder.

The U.K.'s request includes only the warrants signed by Judge Goldspring, a 59-page statement of facts by Detective Constable Lee-Anne Marshall, a copy of Tristan's passport photograph, and a statement of English law by solicitor Narinder Dhillon. ECF#72-1, p. 37. It contains no sworn statement from any complainant. The complainants' names appear nowhere in the record: the U.K. transmitted only "a true and redacted copy" of the arrest warrant, and every complainant's name is blacked out in the warrants before this Court. *Id.* at 33–36. Neither the U.S. government nor the Court knows who the complainants are.[2]

---

[2] The government offered an unredacted copy of the request subject to a protective order. *See* ECF#74, pp. 2–3 n.3. That copy would not have identified any complainant.

Additionally, the United Kingdom is in possession of the complainants' own recorded accounts and chose not to send them. Each complainant gave a video-recorded interview to police. ECF#72-1, ¶¶ 32, 90, 120, 132, 156. The United Kingdom describes those recordings as part of its evidence, admissible at trial as each complainant's evidence-in-chief, *id.* at 119–20, but neither the U.K. nor the U.S. government has put a single recording before this Court. Instead, the Court is asked to find probable cause on a detective's summary of evidence the United Kingdom holds but declined to produce.

Because the U.K. refuses to disclose the accusers' names, Tristan lacks meaningful notice of the accusations and cannot defend against them. He cannot even attempt to explain the complainants' statements, the one avenue extradition law leaves open to him. In the same vein, the U.K. has only provided general—and sometimes year-long—windows of time as to when the crimes allegedly occurred, making it impossible for Tristan to defend. One of the accusers claims to have been in a romantic relationship with Tristan; if he knew who she was, and when the alleged offense specifically occurred, he could offer evidence, such as her own text messages, that explains her allegations. *See, e.g., Ameen*, 2021 WL 1564520, at *8. Without the complainants' identities or the dates of the alleged offenses, his hands are tied. More importantly, this Court cannot assess "the reliability of the source," which the probable cause standard requires. *Ernst*, 1998 WL 395267, at *9.

Moreover, under the rule of specialty, Tristan may be prosecuted only for the offenses on which extradition is granted. Treaty, art. 18. If the Court certifies extradition on anonymous accusations, neither Tristan nor this Court will have any way to confirm, after the surrender, that Tristan is being prosecuted for those offenses and no others. If Complainant 1 is Jane Doe, nothing in this record would reveal whether the U.K. instead tried him on the allegations of Mary Roe.

Courts have denied requests for extradition based on deficiencies in affidavits or documents provided by the requesting country. *See, e.g., Matter of Extradition of Singh*, 124 F.R.D. 571, 577 (D.N.J. 1987) ("when a court in an extradition proceeding is presented with evidence through affidavits, the court may conclude, on a review of the affidavits submitted, that there are insufficient indicia of reliability or credibility to establish probable cause."); *In re Extradition of Joseph Ben-Dak*, 2008 WL 1307816, at *16 (S.D.N.Y. Apr. 11, 2008) (denying extradition where the affidavits' description of the scheme was "vague" and "disjointed" and provided no competent evidence of what the scheme actually was). The "materials submitted must set forth facts from which both the reliability of the source and probable cause can be inferred." *Ernst*, 1998 WL 395267, at *9 (denying extradition where a Zurich court decision failed to establish probable cause). For example, in *Ameen*, the court rejected witnesses' accounts that placed him in Iraq during the murder, stating: "Implicit in the purpose of these probable cause proceedings is the court's ability to reject witness testimony for want of reliability. The court does not determine guilt or innocence, true, but it must assure itself that the

standards for probable cause under United States law are satisfied." 2021 WL 1564520, at *12. The court found that the witness's statements were "vague and ultimately unreliable," based in part on the fact that the witness did "not offer a date, even an approximate one, on which Person 7 claims to have seen Ameen in [Iraq]." *Id.* at *14. The court found a second witness's account unreliable in part because the allegations were "derived from summations of an FBI agent's interview notes rather than Person 1's own words," stating "[t]he distinction is subtle, but meaningful. A summation captures the fundamentals of a witness's claims, but it can omit nuance or important details that the interviewing agent(s) might, at the time, have thought inconsequential." *Id.* at *15.

Here, the Court has even less: no affidavit from any complainant, only a detective's secondhand summary of what unnamed women told police years after the fact, with very broad temporal limits. Although the government cites several cases in arguing that the anonymous victim statements are "sufficient to establish probable cause for the charged offenses," the cited cases involved sources known to the government. ECF#77, p. 38.

In *United States v. Martinelli*, the court rejected Martinelli's argument that affidavits failed to set forth probable cause "because they are 'silent as to the basis of knowledge of any of the individuals or entities or their veracity or reliability;'" because the people and entities listed "were neither anonymous nor confidential…the affiant officer actually contacted several of them." 454 F.3d 1300, 1307 (11th Cir. 2006).

Moreover, there was "a high level of corroboration." *Id.* Here, neither the government nor the Court (nor the Tates) knows the identities of the complainants.

In *United States v. Golden*, the Eleventh Circuit affirmed a finding of probable cause based on an 11-year-old's witness statement, where the statement was "detailed, prompt, and certain facts were corroborated by the victim's father." 545 F. App'x 920, 921 (11th Cir. 2013). *Golden*, too, involved a known complainant. And Fla. Stat. § 794.022(1) is inapplicable here because it is an evidentiary rule regarding a victim's testimony at trial and the need for corroboration. It has no bearing on the reliability of a detective's third-person summary of an anonymous statement.

Extraditing Tristan on these anonymous allegations would violate due process, and the Court should not certify extradition on this record. At a minimum, the Court should direct the United States to request the complainants' identities and their recorded interviews from the United Kingdom under Article 10 of the Treaty and to provide them to the Court and to counsel.

## V. The Request Does Not Establish Probable Cause on Any of the Counts.

The United Kingdom seeks Tristan's extradition on five trafficking counts, five rape counts, six assault counts, and one count of assault by penetration. At the outset, Tristan categorically denies each and every allegation in the request and its supporting materials. He is innocent and will contest every charge, vigorously and in full, at trial. Because extradition law does not permit him to defend on the merits here, his response is limited to the questions properly before this Court; his decision not to address any

particular allegation, assertion, or characterization in the government's papers results from those limits alone and is not an admission, concession, or acquiescence of any kind. Tristan expressly reserves all rights, defenses, and objections, including the right to contest every allegation in any subsequent proceeding.

**a. The Trafficking Offenses (Counts 10, 11, 15, 16, and 17)**

Counts 10, 11, 15, 16, and 17 charge that Tristan "arrange[d] or facilitate[d] the travel" of a complainant "with a view to" exploitation. ECF#72-1 at 112. But according to the request itself, Andrew Tate arranged the trips charged in Counts 10, 11, 15, and 17, ECF#72-1 ¶¶ 69, 76, 123, 162, and C6 does not know who paid for hers, *id.* ¶ 137. For three of the four complainants, the only act connecting Tristan to the complainant's travel is that he picked her up at the airport. That cannot establish probable cause:

COUNT 10: Although C1 claims that Tristan spoke with her about doing webcam work, she alleges that it was Andrew who "ultimately arranged C1's travel from the United Kingdom to Kosice, Slovakia," and Andrew who drove her to an apartment in Romania the next day. ECF#77, p. 12. Nothing alleges that Tristan forced C1 to remain in Romania. Even in recounting the night that Tristan allegedly "brandished a machete," C1 says he told her she was free to leave and could "obtain a taxi herself." C1 was then "driven to the airport" and returned to the United Kingdom. By C1's own account, she stayed in Romania four to five days, disliked the work, asked to leave, and immediately returned home. That is not "human trafficking." *Id.*; ECF#72-1, ¶¶ 67–75.

COUNT 11: Two months after her April 2016 trip, C1 emailed Tristan looking for webcam work because she needed money; Tristan turned her down because there was no space available. ECF#77, n. 11. The following month, Andrew, not Tristan, contacted her and offered her webcam work in Romania again. ECF#72-1, ¶ 76. C1 alleges that Andrew facilitated her travel. The only act attributed to Tristan before she traveled to Romania is that he asked for her telephone number. *Id*. There is therefore no probable cause to believe that Tristan "arranged and facilitated C1's travel to Romania with a view to her exploitation through commercial sexual webcam work." *See* ECF#77-1 at 2. And again, C1 stayed in Romania only for six or seven days and then left of her own free will: Tristan drove her to a hotel near the airport and brought her belongings, and she booked her own flight home. ECF#72-1 ¶ 82.

COUNT 15: According to C5, it was Andrew who persuaded C5 to travel to Romania after she repeatedly refused webcam work, "under the pretence that it would be the two of them spending time together on holiday." ECF#72-1, ¶ 122. It was Andrew who booked and paid for C5's flight. *Id*., ¶ 123. As to her travel, Tristan is alleged only to have picked C5 up at the airport. *Id*. When Tristan asked C5 if she wanted to try webcamming, she declined. *Id*., ¶ 124. When she also declined his request to remove her top, he left the room. *Id*., ¶ 125. C5 alleges that Andrew, not Tristan, coerced her to remove her top on camera. *Id*. On these allegations, there is no probable cause that Tristan "arranged or facilitated the travel of Complainant 5" or that he forced her to engage in webcamming. *See* ECF#72-1 at 42. The government relies on C5's

account that Tristan told her she was "going to have to" try webcamming and that Andrew then told her to "do what the captain says." ECF#77 at 15–16. Both events took place after C5 arrived in Romania, so neither shows that Tristan arranged or facilitated her travel, and C5 attributes the only force used against her, the hand on her neck, to Andrew. ECF#72-1 ¶ 125.

COUNT 16: C6 also alleges that it was Andrew who "recruited C6 to work as a cam girl in Romania by telling her that she would be his girlfriend and that she could make money from doing the webcam work without taking her clothes off." ECF#77, p. 17. She does not allege that Tristan recruited her. She does not know who paid for her flight. As to her travel, she alleges only that Tristan picked her up at the airport, and she admits that he drove her back to the airport when she returned to the U.K. ECF#72-1, ¶ 148. Again, that is not probable cause that Tristan engaged in human trafficking. *See* ECF#77-1, p. 3.

COUNT 17: C7 alleges that she dated Andrew in 2011 and 2012, broke up with him, and married someone else in 2016. ECF#72-1, ¶¶ 158–59. She kept in touch with Andrew, who encouraged her to leave her husband and move in with him in Romania. *Id.*, ¶ 161. According to C7, she eventually agreed to go to Romania, and Andrew booked her flight. *Id.*, ¶ 162. As to her travel, C7 alleges only that Tristan picked her up at the airport. *Id.* Again, that is not probable cause to support the allegations that Tristan "arranged or facilitated the travel of Complainant 7." ECF#72-1 at 43.

The government's remaining assertions, that Tristan was among those who controlled the webchat and accepted payments, that he took C6 to buy furnishings for her webcam room, and that he made payments to C7, ECF#77 at 17–18, 20–21, all concern what happened after C6 and C7 arrived in Romania. As to C6, the government also overstates the request, which says the webchat was usually controlled by someone else and only sometimes by Tristan. ECF#72-1 ¶ 140. None of these assertions shows that Tristan arranged or facilitated anyone's travel, which is the conduct each of these counts charges. His relationship to Andrew is not enough: "[f]amilial relationships are clearly insufficient, in and of themselves, to establish probable cause." *Fernandez-Morris*, 99 F. Supp. 2d at 1368. The Court should decline to certify all five trafficking counts because nothing alleged supplies probable cause to believe that Tristan arranged or facilitated the travel of C1, C5, C6, or C7 or that he intended to exploit these women.

**b. The C1 Offenses (Counts 1 through 9)**

C1 first contacted police in 2023, approximately ten years after these events allegedly occurred. C1's own account of her sexual encounters with Tristan shows that they were consensual or, at a minimum, that Tristan reasonably believed C1 consented. Under the U.K. law submitted by British authorities,

> (1) a person commits rape if
>
> (a) he intentionally penetrates the vagina, anus or mouth of another person with his penis, and
>
> (b) the other person does not consent to the penetration, and

> (c) he does not reasonably believe that the other person consents.
>
> (2) Whether a belief is reasonable is to be determined having regard to all the circumstances, including any steps the person has taken to ascertain whether the other person consents.

ECF#72-1, p. 101. Nothing in the summary establishes element (c): that Tristan did not reasonably believe his romantic partner consented to these sexual acts.

According to C1, she dated Tristan in 2012 and 2013. *Id.*, ¶ 34. Tristan told her that "he enjoyed rough sex, choking women, and anal sex," and C1 "was willing to explore Tristan Tate's sexual preferences on the understanding that he would stop if she became uncomfortable or withdrew her consent." *Id.* C1 "described much of the sexual activity during the relationship as consensual." *Id.*

C1 alleges that she limited her consent to anal sex "so long as it was not forced upon her while she was unconscious," and "[p]olice recovered messages … that confirm C1's instructions." ECF#77, p. 7. The government relies on a text C1 sent to Tristan in October 2012: "Anal yes, but I don't want you to force it upon me." *Id.* But the full exchange shows that C1 first told Tristan he was "being too nice" to her, to which Tristan replied, "viscous [sic] beatings and rape then." C1 responded: "Only thing I don't want is you raping my arse. Anal yes, but I don't want you to force it upon me." ECF#72-1, p. 125.

Counts 1 and 2 are for rapes that allegedly occurred between April 1, 2012, and December 26, 2013. As to Count 1, according to C1, while having consensual

intercourse with Tristan, Tristan strangled her until she lost consciousness and when she regained consciousness, Tristan was penetrating her anus. *Id.*, ¶ 42. She "cannot recall whether she told him to stop, or, if she did, whether it was coherent." *Id.*, ¶ 43. C1 "draws a clear distinction between consensual anal intercourse and anal penetration whilst unconscious." *Id.*, ¶ 44. She claims that the text between them demonstrates she did not consent; however, the text makes clear that she consented to anal sex with Tristan. This, coupled with the facts that she is unsure whether she told Tristan to stop, and that the allegations are anonymous and more than ten years old, establishes there is no probable cause to support this count.

Count 2 is based on "further occasions…during which [C1] alleges Tristan Tate penetrated her anus after rendering her unconscious by strangulation." *Id.*, ¶ 45. For the same reasons, this claim fails. Count 2 charges rape on "not less than 3 occasions" at unspecified times within a twenty-one-month window. *Id.* at 32, 39. C1 describes those occasions only as "broadly the same" as the incident charged in Count 1, *id.* ¶ 46, and says that "on some occasions" she screamed for Tristan to stop, *id.* ¶ 47. The request does not say which occasions, how many, or when. It gives no date and no circumstance that separates one occasion from another. The Court must determine probable cause count by count, *see* Part I, *supra*, and an account that does not identify the acts charged gives the Court nothing to test. Nor could the Court or Tristan confirm after surrender that he is tried only for the occasions certified. *See* Part IV, *supra* (rule of specialty). Additionally, C1's account of these occasions contradicts itself: Count 2 rests on

penetration while she was unconscious, yet she also claims she would "scream for him to stop"—something she could not have done while unconscious. An account that cannot keep straight whether the complainant was even conscious does not supply the reliable facts that probable cause requires, particularly when it comes to the Court only through an unsworn, secondhand summary prepared a decade after the fact.

Counts 3 through 6 are for assault related to Tristan's alleged strangling of C1 during sex. These counts lack probable cause because nothing in C1's account shows that she ever objected to the choking itself. In fact, C1 admitted that on one of the occasions she "consented to being choked...[and she] recalls trusting Tristan Tate and initially experiencing the act as pleasurable." *Id.*, ¶ 53. Her statement that "strangulation became a regular feature of sexual encounters and occurred on most occasions during sexual intercourse" is likewise consistent with an accepted practice within the relationship. Id., ¶ 55. Although C1 claims she never had "an opportunity" to indicate consent, there are no allegations that she told Tristan not to choke her. Her statement that she later became fearful of being choked but "felt unable to prevent it," *id.* ¶ 56, describes her own state of mind; she does not say she ever communicated it to Tristan.

Counts 7 and 8 relate to a "specific incident in approximately September 2012" where Tristan struck C1 "repeatedly with a belt, causing bruising" and other occasions where Tristan "used a belt on approximately four or five occasions between September and December 2012." *Id.*, ¶¶ 57, 63. C1 claims that she did not consent, but she agreed to be filmed by him "because she wanted to please him." *Id.*, ¶ 58. Again, this cannot

satisfy probable cause when it is clear from the allegations that the parties agreed to engage in rough sex and had discussed Tristan's interest in using a belt. *Id.* ¶¶ 34, 61. C1's statement that she told Tristan to stop once the blows began, *id.* ¶¶ 60, 63, comes to the Court only through the same unsworn summary, prepared more than a decade later. Counts 7 and 8 also fail on the face of the warrant. See Part III, *supra*.

Finally, Count 9 charges that on December 24, 2012, C1 went to see Tristan and "had no intention of having sex with him." ECF#72-1, ¶ 65. According to C1, when they got to Tristan's home, Tristan took her upstairs and immediately began to have sex with her. C1 claims "she did not have the choice to consent," but she does not allege that she told Tristan to stop. *Id*. There are no allegations that C1 ever said no, asked Tristan to stop, or resisted. Nothing in this account suggests that Tristan, then in a relationship with C1, did not reasonably believe she consented. C1's account that Tristan pinned her down and struck her buttocks, *id.* ¶ 65, describes conduct that, by her own account, had become an established feature of their sexual relationship. *Id.* ¶¶ 34, 38. That cannot suffice as probable cause that Tristan committed rape.

**c. The C4 Offenses (Counts 12-14)**

C4 did not make any allegations against Tristan until September 2025, when she contacted U.K. police. C4 claims that Tristan raped her twice and penetrated her vagina without consent when she stayed at Andrew Tate's apartment in the U.K. with her girlfriend sometime in 2010. These anonymous allegations are more than 15 years old and effectively uncorroborated. The corroboration C4 provided consists of photographs

from the trip, including three of Tristan with his belt around C4's girlfriend's neck, and screenshots of messages between C4 and Tristan. She also provided a 2025 email where an unnamed friend states "she told him in October 2010 that she was sexually assaulted but did not…name her assailant." *Id.*, ¶¶ 118-19. C4 also told police that she sought support from a rape crisis charity in 2010, *id.* ¶ 119, but the request contains no record from that charity and does not say that C4 named anyone to it. None of this corroborates the charged conduct. Photographs involving a different woman say nothing about what happened to C4, and the friend's email confirms only that C4 named no assailant at the time. Fifteen-year-old, anonymous, unsworn allegations, with nothing to corroborate them, cannot establish probable cause on Counts 12 through 14.

The details in C4's account are insufficient to establish probable cause. C4 did not give police a formal account of these events until February and April 2026, more than fifteen years after the events she describes. ECF#72-1 ¶ 90. C4 first contacted police in September 2025, twenty months after Judge Goldspring issued the first warrant for Tristan's arrest. *Id.* ¶¶ 5, 90. The materials must "set forth facts from which both the reliability of the source and probable cause can be inferred." *Ernst*, 1998 WL 395267, at *9. C4 places her girlfriend with her in the apartment for the length of the stay. ECF#72-1 ¶¶ 91–92, 105. Yet there is no corroboration from C4's girlfriend. The request also relies on screenshots of Facebook messages between C4 and Tristan that, it says, refer to Tristan using a belt. *Id.* ¶ 119. The request does not quote the messages or say when they were sent. Without C4's identity, Tristan cannot locate that

correspondence and offer it to explain her account, the only evidence extradition law permits him to present. *See* Part III, *supra*.

## VI. Counts 5, 10, and 11 Are Not Dually Criminal.

### a. Count 5 is Not Dually Criminal Because the Complainant Consented to the Conduct Charged.

Extradition requires that "the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312. In Count 5, Tristan is accused of assault occasioning actual bodily harm (Section 47 of the Offences Against the Person Act 1861) for choking C1 during intercourse. C1 admitted that she "initially consented to being choked during vaginal intercourse" and "at first, she experienced the act as pleasurable" before she lost consciousness. ECF#77, p. 9.

The charge is viable in England only because, as the government acknowledges, under English law "a person cannot consent to the infliction of actual bodily harm" outside recognized exceptions such as sport. ECF#77, p. 38; ECF#72-1, p. 111 ("consent was no defence where the activity caused actual bodily harm and exposed the complainant to a risk of serious injury.").

That rule has no counterpart in the statutes the government offers as analogues. Exhibit A to ECF#77 lists, as analogues for Count 5, 18 U.S.C. § 113(a)(8), Fla. Stat. § 784.041, and Fla. Stat. § 784.031. ECF#77-1, p. 1. But Florida's domestic battery by strangulation statute reaches only a person who impedes breathing or circulation *against the will* of the other person. Fla. Stat. § 784.041(2)(a). Section 784.031 likewise reaches

only nonconsensual conduct. And 18 U.S.C. § 113(a)(8) requires an assault, which is, by definition, nonconsensual. None of these statutes criminalizes consensual conduct. Because the consensual choking charged in Count 5 is not a crime in the United States, certification on Count 5 must be denied.

**b. Counts 10 and 11 Are Not Dually Criminal Because Webcam Work is Lawful and is Not Prostitution in the United States.**

Similarly, certification on Counts 10 and 11 must be denied because the conduct alleged is not criminal in the United States. The government identifies 18 U.S.C. §§ 2421 and 2422 as the American analogues for these counts. Both statutes require that the travel or enticement be for the purposes of "prostitution, or . . . any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. §§ 2421 and 2422. Neither applies. C1 did not engage in prostitution; she claims only that she engaged in webcam work for a few days on two occasions in 2016. Florida defines prostitution as "the giving or receiving of the body for sexual activity for hire," and the sexual activity must involve the sexual organ "of another" or penetration "of another." Fla. Stat. § 796.07(1). A woman performing alone on camera for viewers gives her body to no one—no customer touched her, and she touched no customer. Nor was her performance "sexual activity for which any person can be charged with a criminal offense." And adult webcam performance is lawful in the United States, and the government identifies no statute that it violates. Because Counts 10 and 11 are not dually criminal, the Court should decline to certify the extradition on these charges.

## VII. Tristan Tate Preserves Every Objection Committed to the Secretary of State.

Tristan Tate expressly preserves for the Secretary of State every ground for denying surrender that the Treaty and the extradition statute commit to the Executive, including that the request is politically motivated, Treaty, art. 4(3), and that the United Kingdom delayed in seeking his extradition. *See Martin*, 993 F.2d at 829.

## **Conclusion**

The Court should decline to certify Tristan Tate's extradition because certifying it on anonymous allegations would deny him the due process needed to defend against the charges. The Court should also deny certification on the six counts added by the August 5, 2026 warrant because no sworn complaint supports them. At a minimum, the Court should deny certification on Counts 1 through 17 because there is no probable cause that Tristan committed these offenses, and on Counts 5, 10, and 11 because they are not crimes in the United States.

Respectfully submitted,

*/s/ Thomas Maniotis*
**THOMAS MANIOTIS**
Florida Bar No. 122414
EQUITY LEGAL, PLLC
5201 Blue Lagoon Drive, Floor 8
Miami, Florida 33126
(305) 629-3219
tamaniotis@equitylegal.net

*/s/ Joseph D. McBride*
**JOSEPH D. MCBRIDE**
New York Bar No. 5445879
THE MCBRIDE LAW FIRM, PLLC
305 Broadway, Suite 700
New York, New York 10007
(917) 757-9537
jmcbride@mcbridelawnyc.com
Admitted Pro Hac Vice
Co-Counsel for Tristan Tate

/s/ *Howard Srebnick*
*/s/ Alexa Klein*
**HOWARD SREBNICK** (FBN 919063)
**JACKIE PERCZEK** (FBN 042201)
**ALEXA KLEIN** (FBN 1002299)
**JAKE GOLDMAN** (FBN 1074657)

/s/ *Stephen James Binhak*
**STEPHEN JAMES BINHAK**
Florida Bar Number 736491
LAW OFFICE OF STEPHEN JAMES BINHAK, PLLC
One Southeast Third Avenue, Suite 1800
Miami, Florida 33131
(305) 361-5500
binhaks@binhaklaw.com