**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.** 26-mj-03259-LOUIS

**IN THE MATTER OF THE EXTRADITION**
**OF TRISTAN TATE,**

_____________________________________________/

## REPLY IN SUPPORT OF EXTRADITION

The United States respectfully replies to Tristan Tate's ("T. TATE") opposition to a certificate of extraditability. T. TATE has failed to overcome the strong evidence submitted by the United Kingdom ("U.K.") in support of certification of extradition. In his response, he seeks to avoid extradition by making procedural objections unsupported by the statute or the United States' extradition treaty with the U.K. (the "Treaty") and issuing demands for discovery unavailable in extradition proceedings. His arguments also rest on misunderstandings of the U.K. charges, a selective reading of the complainants' allegations, antiquated views of consent, and factual and credibility arguments reserved for trial in the U.K. The authenticated evidence establishes probable cause and dual criminality for the offenses presented, and the Court should certify T. TATE's extradition.

## ARGUMENT

### I. THE COURT'S EXTRADITION ANALYSIS IS ANCHORED TO THE U.K.'S EXTRADITION REQUEST, NOT THE PROVISIONAL ARREST COMPLAINT

T. TATE attempts to skirt extradition on nearly half of the charges for which the United States has sought certification (Counts 10 through 17) by erroneously claiming that the Court is prohibited from certifying his extraditability on charges that were not presented in the government's Provisional Arrest Complaint. ECF No. 84 at 5-8. His approach is tethered to an

incorrect interpretation of the extradition statute, ignores contrary treaty language, would cause unnecessary judicial inefficiencies, and gives more rights to extraditees than to domestic criminal defendants. The Court should reject it.

When interpreting a statute, the Court starts by discerning the text's ordinary meaning. *E.g.*, *Heyman v. Cooper*, 31 F.4th 1315, 1318-19 (11th Cir. 2022) (internal citations omitted). Here, T. TATE's argument turns on the meaning of 18 U.S.C. § 3184, which sets forth the Court's role in extradition proceedings. The first sentence of the statute explains that a judge "may, upon complaint made under oath," "issue a warrant for the apprehension of the person so charged" with "having committed within the jurisdiction of any foreign government ***any*** of the crimes provided for by such treaty or convention." 18 U.S.C. § 3184 (emphasis added). This sentence plainly means that a complaint seeking an arrest warrant need not allege every possible foreign crime for which the fugitive is accused. Rather, the complaint need only present sufficient information to justify the fugitive's arrest for the purpose of initiating extradition proceedings. This reading is confirmed by the next sentence of the statute, which addresses what happens after a fugitive is arrested. The statute directs the extradition court to hold a hearing to determine whether the request from the foreign country presents "evidence sufficient to sustain the charge[s] under the proper treaty or convention." *Id.* It is at this stage that the extradition court considers the full set of charges presented in the requesting country's extradition request and determines whether the fugitive is extraditable, and if so, on what charges. The procedure used in this case, and every other extradition case across the country, tracks the process laid out in the statute.

Importantly, neither the statute nor the Treaty requires crimes presented in the provisional arrest warrant to match exactly the charges later sought for extradition, and T. TATE does not present any legal authority to the contrary. ECF No. 84 at 5-8. Indeed, the Treaty in Article 12(4),

which carries the force of law, permits the government to swear to a complaint before the requesting state has even submitted its formal request for extradition outlining all of the charges and providing documents in compliance with the Treaty. Accordingly, it is simply of no consequence that the U.K. obtained an arrest warrant and formally sought extradition on new, additional charges after T. TATE's provisional arrest in the United States.[1] *See*, *e.g.*, *Koskotas v. Roche*, 931 F.2d 169, 174-75 (1st Cir. 1991) (rejecting fugitive's challenge to new charges presented in a formal extradition request after a provisional arrest); *Matter of Extradition of Mainero*, 990 F. Supp. 1208, 1215 (S.D. Cal. 1997) (same).

To the extent T. TATE attempts to portray the provisional arrest scheme as unusual or unfair, it is not. Indeed, it is reminiscent of ordinary criminal proceedings that are initiated by complaint. In such cases, the prosecution need not allege every possible offense in a complaint; rather, it must allege only sufficient facts to justify the person's arrest on at least one charge. The investigation then continues, and a grand jury ultimately decides on which charges the prosecution can proceed. T. TATE fails to acknowledge this similarity or to distinguish that process from the provisional arrest process in extradition proceedings.[2] He is also unable to establish prejudice when he is on full notice of the charges for which his extradition is sought and has a full and fair opportunity to present both written and oral argument against his extraditability. T. TATE's claim boils down to a legally unsupported complaint about the standard extradition process, which, if

---

1 This is consistent with the generally accepted principle that a provisional arrest request becomes moot after the requesting state submits its formal extradition request. *See*, *e.g.*, *Martinez v. United States*, 828 F.3d 451, 470 (6th Cir. 2016) (en banc).

2 To the contrary, much of T. TATE's arguments against his detention were based on his allegation that extradition proceedings are criminal proceedings and should be held to the same standards. *See generally* ECF No. 24.

adopted, would give extraditees greater benefits than domestic criminal defendants. The Court should quickly dismiss it.[3]

T. TATE has presented a second challenge to extradition certification based on an alleged procedural defect, but that argument suffers the same fate. He argues that the Court is prohibited from certifying extradition on Counts 7 and 8 because the corresponding arrest warrant contains a typographical error in one of the years listed for the offenses, which the U.K. has acknowledged and has committed to correcting. *See* ECF No. 72-1 at 33, 39. With respect to Count 7, the warrant provides the correct dates when setting forth the charge but contains one incorrect year when setting forth the particulars. *See id.* at 33. For more than a century, courts have rejected arguments that "savor of technicality" because they are "peculiarly inappropriate in dealings with a foreign nation." *Bingham v. Bradley*, 241 U.S. 511, 517-18 (1916); *see also Aguasvivas v. Pompeo*, 984 F.3d 1047, 1056 (1st Cir. 2021) ("[E]xtradition law discourages reliance on mere technicalities to impede the joint efforts of the treaty parties to extradite."); *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) ("…[I]t has been presented as if this were the final stage and every technical detail were to be proved beyond a reasonable doubt. This is not the law. Form is not to be insisted upon beyond the requirements of safety and justice."). T. TATE's argument is nothing more than a technicality that the U.K. says will be corrected and does not affect the nature of or his participation in the underlying alleged criminal conduct. Moreover, T. TATE fails to acknowledge that he may

---

[3] Even if T. TATE's argument had merit, which it does not, any remedy would result in a waste of judicial resources because the principle of double jeopardy does not apply to successive extradition proceedings. *E.g.*, *Voloshin v. Ridenour*, 299 F. 134, 138 (5th Cir. 1924) (citing *Collins v. Loisel*, 262 U.S. 426 (1923)); *see also Matter of Extradition of Bravo*, Dkt. No. 19-mc-23851, 2023 WL 6462456, at *16 (S.D. Fla. Oct. 3, 2023). Thus, if the Court limited its review to Counts 3-9 solely because they were listed in the government's provisional arrest complaint, the government could simply file an amended complaint in a new proceeding based on a request that includes all of the charges.

also raise questions of U.K. criminal procedure in his criminal proceedings in the U.K. The Court should therefore reject T. TATE's ineffective attempt to preclude certification on Counts 7 and 8.

## II. THE UNITED KINGDOM'S ANONYMIZATION OF THE COMPLAINANTS' IDENTITIES DOES NOT PRECLUDE CERTIFICATION OF EXTRADITION

T. TATE repeatedly characterizes the allegations against him as "anonymous accusations" and argues that due process bars certification unless the complainants' identities are disclosed. ECF No. 84 at 4, 18. The premise is false, and the conclusion does not follow. Unsworn summaries of evidence, including anonymized victim and witness statements by foreign law enforcement or prosecutors, are typical and accepted forms of evidence to establish probable cause in extradition proceedings. Moreover, the requested alternative relief that the Court "direct the United States to request the complainants' identities and their recorded interviews from the United Kingdom," *id*. at 18, is unjustified and unauthorized under basic tenants of extradition law.

### A. The Victims are Anonymized but Not Anonymous

With respect to the faulty premise: the complainants are neither anonymous to the requesting state nor unknown to law enforcement. Each has been identified to U.K. authorities, provided statements, participated in interviews, and, in many instances, furnished corroborating evidence, such as photographs, travel records, banking records, electronic communications, and witness information. This is not a case in which U.K. authorities are relying on anonymous tips or have otherwise failed to establish that the unnamed complainants are sufficiently reliable.

Instead, their identities have been withheld from T. TATE pursuant to U.K. law in order to protect the complainants' privacy and safety at this stage of proceedings. If T. TATE voluntarily returns to the U.K., or is extradited there to face prosecution, the complainants' identities will be disclosed in accordance with U.K. law. Indeed, a U.K. Court has already rejected T. TATE's effort to obtain the complainants' identities before submitting to the jurisdiction of the U.K. courts. In

*The King (on the application of Tate) v. Director of Public Prosecutions*, [2026] EWHC 1600 (Admin) at ¶ 53, the U.K. Court observed that "[t]he claimants will be provided with the identities of the complainants if and when they are surrendered to and prosecuted in this jurisdiction." Thus, T. TATE seeks the very same relief that was already denied by the U.K. courts. The U.K. has essentially applied the same rule that United States' courts routinely apply when addressing whether a fugitive should be disentitled from pursuing claims or information prior to submitting to the jurisdiction of the U.S. court. *See*, *e.g.*, *United States v. Shaloub*, 855 F.3d 1255, 1259 (11th Cir. 2017) (discussing the fugitive disentitlement doctrine). This is not a novel concept at this stage of the proceedings.

**B. <u>Unsworn Summaries of Evidence Are Typical and Sufficient in Extradition</u>**

. T. TATE protests that the extradition request "contains no sworn statement from any complainant" and relies on a summary of the U.K.'s evidence. ECF No. 84 at 14. He essentially argues that the U.K. should be forced to turn over all of its evidence before probable cause may be assessed. He does not point to any treaty provision, statute, or law that sets such a requirement—because none exists.[4]

Rather, it is hornbook extradition law that the requesting country need not submit the underlying evidence that supports probable cause. *See*, *e.g.*, *Matter of Extradition of Rangel*, Dkt. No. 24-cv-80208, 2024 WL 2219167, at *3 (S.D. Fla. May 7, 2024) ("[T]he country seeking extradition is not required to produce all its evidence at an extradition hearing") (quoting *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986)); *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984) (holding extradition court properly denied fugitive's discovery request for tapes containing

---

[4] For example, Article 8 of the Treaty sets forth the "Required Documents" necessary to support a request for extradition but does not require swearing of any statement of fact or law.

incriminating phone conversations intercepted by Italian police and which supported probable cause to extradite fugitive).

It is equally firmly established that hearsay evidence is admissible in extradition proceedings, and unsworn documents may support a probable cause showing. *See, e.g.*, *Collins*, 259 U.S. at 317 ("[U]nsworn statements of absent witnesses may be acted upon by the committing magistrate . . . ."); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005) (probable cause determination based on an unsworn bill of indictment); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *4 (S.D. Fla. May 28, 2015) ("A certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government."). In *Afanasjev*, the Eleventh Circuit upheld the extradition court's findings that were based on unsworn documents, explicitly stating that "[f]ederal law does not require all documents submitted for extradition purposes to be made under oath." 418 F. 3d at 1164. The Court should reject T. TATE's identical argument.

**C. <u>T. TATE is Not Entitled to Discovery of the Victims' Identities or Recordings</u>**

T. TATE is not entitled to disclosure of the complainants' identities during extradition because he has no right to discovery in these proceedings. *See, e.g., Rangel*, 2024 WL 2219167, at *3; *Prasoprat v. Benov,* 421 F.3d 1009, 1014 (9th Cir. 2005).[5] Because an extradition hearing is not intended to serve as a mini trial, courts routinely deny requests designed to obtain evidence

---

[5] In addition to having no *per se* constitutional right to discovery, international fugitives likewise do not have a statutory right to discovery. *See*, *e.g.*, *In re Koskotas*, 127 F.R.D. 13, 28 (D. Mass. July 13, 1989); Fed. R. Crim. P. 1(a)(5)(A). T. TATE's citation to Article 10 is misplaced, as this only calls for supplementation when the "Requested State," here the United States, believes that additional information is necessary to proceed.

for the future defense of the foreign prosecution. *E.g.*, *Koskotas*, 931 F.2d at 175; *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976).

The likely purpose of T. TATE's requested disclosure reveals why seeking such evidence is improper. A fugitive may not use an extradition hearing to contest or impeach witness credibility, litigate affirmative defenses, or introduce evidence that merely contradicts the requesting state's proof. *See*, *e.g.*, *In re Extradition of Martinelli Berrocal*, Dkt. No. 17-cv-22197, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017) (citing *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993); *Shapiro v. Ferrandina*, 478 F.2d 894, 900-01 (2d Cir. 1973); *Collins*, 259 U.S. at 316-17. As courts within this Circuit have repeatedly recognized, the "acid test" of witness reliability occurs at trial, not during extradition proceedings. *Shaw*, 2015 WL 3442022, at *9 (quoting *Cheng Na-Yuet v. Baird*, 734 F. Supp. 988, 996 (S.D. Fla. 1990)). Indeed, permitting competing factual accounts "would convert the extradition into a full-scale trial, which it is not to be." *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir. 1981).

Most tellingly, T. TATE never explains what admissible, explanatory evidence he might uncover with the disclosure of the complainants' identities. He identifies no possible evidence that would negate, much less obliterate, probable cause instead of merely contradicting the requesting state's evidence or attacking witness credibility. That omission is dispositive.[6] This is

---

[6] T. TATE's declination of the government's offer to provide an unredacted version of the U.K.'s Extradition Request under Protective Order is revealing. *See* ECF No. 74 at 2-3, n.3; ECF No. 84 at n.2. If T. TATE truly needed the complainants' identities or more specific dates on which the alleged offenses occurred so that he could present "explanatory evidence," he most certainly would have taken the offer. The unredacted version contains information that would aid in the identification of the complainants, such as dates related to their relationship with T. TATE, residential locations, airport transits, and the identity of others present in Romania during the relevant time periods.

also what distinguishes his case from *Matter of Extradition of Ameen*, on which he so heavily relies. *See* ECF No. 81 at 12-15. In *Ameen*, 2:18-mj-152, 2021 WL 1564520 (E.D. Cal. Apr. 21, 2021), the extradition court recognized it was going against a large body of caselaw in weighing the fugitive's alibi evidence against the reliability of the evidence in the extradition request but felt it was obligated to do so based on the strength of the respective parties' evidence. Unlike *Ameen*, there is no apparent reliability concern with the complainants' statements in this case. Plus, nothing would preclude T. TATE from raising an alibi defense during proceedings in the U.K.

The Court's task is to determine whether competent evidence establishes probable cause, not to facilitate pretrial investigation into the credibility of anticipated witnesses. The Court can readily assess contextual source reliability without knowing the victims' names, as it frequently does in the domestic criminal context. *See, e.g.*, *United States v. Martinelli*, 454 F.3d 1300, 1307 (11th Cir. 2006) (upholding probable cause for search warrant where complainants were unnamed, noting, "[a]lthough the affidavit does not specifically name the twenty-three businesses or individuals listed on the report from the Better Business Bureau, or the specific names of the complainants the officer contacted, those people and entities were neither anonymous nor confidential. Indeed, the affiant officer actually contacted several of them. Plainly they were not unknown. They were simply named victims of a crime who relayed information to the police.").

**D. <u>The Rule of Specialty is Not Implicated</u>**

To the extent that T. TATE suggests that nondisclosure of the complainants' names implicates the Rule of Specialty, *see* ECF No. 84 at 16, that argument also lacks merit. The Rule of Specialty is a doctrine that is "based on international comity" and "stands for the proposition that the requesting state, which secures the surrender of a person, can prosecute that person only for the offense for which he or she was surrendered by the requested state," with certain exceptions.

*Gallo-Chamorro v. United States*, 233 F.3d 1298, 1305 (11th Cir. 2000) (quotation omitted); *see also* Treaty, Art. 18. As a preliminary matter, T. TATE's argument regarding the Rule of Specialty is speculative and unripe, as he has not even been found extraditable yet.

Setting that aside, however, there is no rational reason to believe the U.K. would violate the Rule of Specialty due to T. TATE being surrendered on charges supported by anonymized complainants. Here, the charged offenses, statutory provisions, approximate dates, and underlying factual allegations have all been disclosed, and T. TATE is on ample notice of the offenses for which he has been charged in the U.K.[7] The complainants' identities are known to the U.K. authorities and are merely redacted in the warrants and anonymized in the remaining materials submitted in support of extradition.[8] There is no reasonable risk that the U.K. will engage in the sort of bait-and-switch T. TATE hypothesizes, substituting one complainant for another after extradition has been granted.

T. TATE asks this Court to do what neither extradition law nor due process authorizes or requires and what a U.K. court has already refused to do: compel pre-surrender disclosure of the complainants' identities.[9] This Court should decline. The limited nature of extradition

---

[7] T. TATE contends that he "lacks meaningful notice of the accusations and cannot defend against them," see ECF No. 84 at 15, but also separately admits that "extradition law does not permit him to defend on the merits." *Id.* at 18.

[8] As the Romanian court previously recognized in granting the U.K.'s extradition request, anonymization creates "no fear whatsoever" of difficulties concerning observance of the rule of specialty because the identities are known to the British authorities and are withheld only to protect the complainants' privacy and safety. ECF No. 30-1 at 6; ECF No. 30-2 at 8.

[9] A court in the United States does not have the authority to demand that a foreign country provide specific documents to support or resolve questions in that country's extradition request. *See In re Extradition of Drayer*, 190 F.3d 410, 414-15 (6th Cir. 1999); *see also* U.S. Const., Art. III, § 2 (addressing the U.S. courts' scope of authority).

proceedings, longstanding restrictions on discovery and credibility challenges, and principles of international comity all point in the same direction. The complainants' identities are not necessary to the certification determination before this Court, and their redaction in the U.K.'s extradition request provides no basis to deny extradition.

## III. PROBABLE CAUSE REMAINS UNDEFEATED

None of the additional arguments raised by T. TATE defeat probable cause. They largely amount to attempts to litigate guilt instead of extraditability, including repeated arguments that the complainants consented to the conduct and invitations for the Court to assess the complainants' credibility. However, for purposes of determining probable cause, the extradition court "must accept as true all of the statements and offers of proof by the demanding state," reserving the weighing of evidence and making of credibility determinations for the courts in the requesting country – which is where the determination of guilt will be made. *Schmeer v. Warden of Santa Rosa Cty. Jail*, 2014 WL 5430310, at *4 (N.D. Fla. Oct. 22, 2014) (citation and internal quotation marks omitted); *see also, e.g.*, *Collins*, 259 U.S. at 316; *Quinn*, 783 F.2d at 791; *Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997) (evidence submitted in the extradition request must be considered as true); *Extradition of Marzook*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996) (same); *Extradition of Atta*, 706 F. Supp. 1032, 1050-52 (E.D.N.Y. 1989) (same). The Court "need only 'determine whether there is competent evidence to justify holding the accused to await trial, not whether the evidence is sufficient to justify a conviction.'" *Bozilov v. Seifert*, 983 F.2d 140, 143 (9th Cir. 1992) (quoting *Collins*, 259 U.S. at 316); *see Kastnerova v. United States*, 365 F.3d 980, 987 (11th Cir. 2004). Several themes emerge from T. TATE's probable cause challenge that warrant correction:

T. TATE repeatedly attempts to isolate individual allegations, individual statements, and individual counts from the broader evidentiary record, but that is not how probable cause is assessed. *See*, *e.g.*, *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (reaffirming the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations). The evidence presented by the U.K. does not consist of a series of unrelated accusations viewed in a vacuum. Rather, multiple independent complainants describe remarkably similar patterns of sexual and physical violence, recruitment, manipulation, coercion, and exploitation. Those accounts are, in turn, frequently corroborated by documentary evidence, including travel records, financial records, electronic communications, photographs, and witness statements. The Court should therefore reject T. TATE's invitation to parse individual allegations or statements strictly in isolation and instead evaluate the evidence as probable cause jurisprudence requires: as a whole.

### A. **<u>The U.K.'s Trafficking Charges Do Not Rise or Fall on Which Brother Arranged the Flights</u>**

T. TATE argues that probable cause cannot be established for the U.K.'s trafficking offenses because the allegations are that his brother Andrew was the principal recruiter and travel organizer for Counts 10, 11, and 15 through 17, and that, for three of the four complainants, "the only act connecting Tristan to the complainant's travel is that he picked her up at the airport." ECF No. 84 at 19. That argument misunderstands both the nature of the U.K. trafficking charges and the evidence supporting them.

The U.K. trafficking statute criminalizes conduct where the accused "arranges or facilitates the travel of another person ("V") with a view to V being exploited." ECF No. 72-1 at 112. Under U.K. law, "a person may in particular arrange or facilitate V's travel by recruiting V, *transporting*

*or transferring* V, *harbouring or receiving* V, or transferring or exchanging control over V."[10] *Id.* at 113 (emphasis added). By his own admission, T. TATE is accused of transporting or transferring three of the four complainants from the airport to the webcamming house in Romania.

Further, the evidence attributed to T. TATE in furtherance of the complainants' exploitation upon arrival extends far beyond merely "picking complainants up at the airport." To be sure, multiple complainants describe T. TATE meeting them at the airport upon arrival in Romania, a circumstance from which a reasonable inference may be drawn that T. TATE was aware of, and participated in, the travel arrangements previously made by his co-conspirator and brother, Emory Andrew Tate ("A. Tate"). But the evidence does not stop there. Complainants describe T. TATE as controlling webcam chats, directing sexual content, furnishing and equipping webcam rooms, facilitating payments, managing day-to-day operations, and otherwise overseeing the commercial exploitation that allegedly followed the complainants' arrivals in Romania. Indeed, T. TATE acknowledges many of those allegations himself. *Id.* at 22.

T. TATE's response repeatedly emphasizes that many of his actions occurred after the complainants arrived in Romania.[11] But that does not undermine probable cause. It strengthens it. The evidence supports a reasonable inference that A. Tate recruited the complainants to travel to Romania and that T. TATE received, transported, managed, controlled, and profited from them

---

[10] There is no requirement that the travel or transport occur between countries.

[11] T. TATE largely ignores his involvement in the recruitment of C1, which is corroborated by recovered emails that Police obtained. For example, T. TATE told C1 in an email, "*You know the business i'm in. I'll work you from my place in Amsterdam or my studio… work 9-10 hours per day 5 days a week (it isn't easy) but I'll pay you every 2 weeks*." He told C1, "*There are girls on the Internet uglier than you making 8K a month," and told her to "quit your shitty… job and I'll book you a flight*." ECF No.72-1. at 69.

once they arrived.[12] Those are not disconnected acts. They are complementary components of the same alleged trafficking enterprise.[13] The fact that A. Tate may have acted as the principal recruiter while T. TATE acted as a principal facilitator and manager does not defeat probable cause that both participated in arranging or facilitating travel or transport with a view to exploitation. It supports precisely that conclusion.

### B. <u>The Rape and Assault Charges Relative to C1 are Amply Supported Because Consent to One Act is not Consent to Every Act</u>

A recurring flaw in T. TATE's probable cause arguments is his erroneous assumption that evidence of consent to one act necessarily establishes consent to all acts occurring within the same encounter, or future encounters. It does not. Throughout his response, T. TATE repeatedly points to allegations that C1 voluntarily began a relationship with him, engaged in consensual sexual activity, participated in rough sex, or willingly engaged in certain sexual practices, like choking. He then treats those facts as dispositive of charges involving different conduct. But consent is act specific. Consent to a relationship is not consent to every sexual act within that relationship. Consent to one form of sexual activity is not consent to another. Consent to choking is not consent to strangulation to the point of unconsciousness, or sexual activity whilst unconscious. Nor does prior consent preclude a complainant from withdrawing consent or establish that consent existed throughout an encounter. Accordingly, to the extent T. TATE's count-specific challenges rely on the premise that evidence of partial consent defeats all allegations arising from the same relationship or encounter, that premise is legally and logically unsound. T. TATE's arguments

---

12 It is also alleged that T. TATE brandished a machete when C1 no longer wanted to work.

13 T. TATE is charged as part of a joint criminal enterprise with A. Tate. The U.K.'s theory is that A. Tate and T. TATE performed complementary roles within the same organization. It is not, as T. TATE argues, their familial relationship that is incriminating—it is their business one.

repeatedly blur the distinction between evidence that C1 consented to some sexual conduct and evidence that she did not consent to the particular conduct charged. The former does not negate probable cause for the latter.

For example, the evidence plainly establishes one explicit boundary that C1 expressed to T. TATE that he repeatedly violated. C1 told T. TATE that she was willing to engage in anal sex so long as it was not forced upon her while she was unconscious. Her account is unequivocal on that point and is further corroborated by her contemporaneous text exchange with T. TATE, in which she expressly wrote: "*[o]nly thing I don't want is you raping my arse. Anal yes, but I don't want you to force it upon me.*" ECF No. 72-1 at 68, 125. The evidence readily establishes probable cause as to the rape counts set forth in Counts 1 and 2, both of which charge T. TATE with anal penetration committed while C1 was unconscious and without her consent.[14] Likewise, probable cause exists for the accompanying assaults by strangulation charged in Counts 3 and 4. According to C1, T. TATE strangled her to the point of unconsciousness and then exploited that unconsciousness to facilitate the charged anal rapes.[15] At the extradition stage, that evidence is more than sufficient to support a reasonable belief that the charged rapes, and accompanying assaults, occurred as C1 describes.

---

[14] T. TATE's argues that C1's account lacks reliability because she also told police that she would frequently scream for him to stop. See ECF No. 84 at 25 ("[S]he also claims she would 'scream for him to stop'--something she could not have done while unconscious. An account that cannot keep straight whether the complainant was even conscious does not supply the reliable facts that probable cause requires…"). This argument ignores C1's account that, after rendering her unconscious, T. TATE would then slap C1 in order to revise her, leaving marks on her face. When C1 regained consciousness, T. TATE was penetrating her anus. ECF No. 72-1 at 52, 57. Presumably her report of crying, screaming or telling T. TATE to stop took place after she regained consciousness.

[15] C1 stated that T. TATE told her that anal sex was easier when she was unconscious because she was more relaxed. ECF No. 72-1 at 55-56.

In each instance, the argument rests on the same mistaken premise: that consent to one act forecloses the possibility that a complainant did not consent to another. T. TATE's arguments as to the vaginal rape charged in Count 9 following his use of violence, namely, pinning her down and hitting and grabbing her buttocks, also ignores a legal presumption that, under U.K. law, the use of violence immediately before or during the sexual act gives rise to a presumption that the complainant did not consent and that the defendant lacked a reasonable basis to believe otherwise. *See* ECF No. 72-1 at 102-104.[16] Probable cause is established on this basis alone.

With respect to the remaining assault counts set forth in Counts 5and 6 (strangling to the point of unconsciousness and being struck in the face or jaw to revive) and Counts 7 and 8 (being beaten with a belt over repeated screams for T. TATE to stop), a lack of probable cause cannot seriously be argued on the basis of lack of consent, especially in light of the U.K.'s legal holding that "a person cannot validly consent to the infliction of actual bodily harm or more serious injury unless the conduct falls within a recognized exception, such as properly conducted sport." *Id*. at 111. Even without the presumption, any issue relative to consent would be a triable issue of fact for a U.K. judge or jury- not a U.S. extradition court- to resolve.

At an extradition hearing, the Court need not determine whose account – that of C1 or T. TATE's– is to be believed. The relevant question is whether the United Kingdom has presented competent evidence supporting probable cause for the charged U.K. offenses. The fact that a complainant voluntarily entered or stayed in a relationship following abusive conduct, or consented to some sexual activity throughout that relationship, does not preclude her from

---

[16] Relevant, though not necessary for probable cause on Counts 1 and 2, given C1's expressed boundary *not* to be anally penetrated while unconscious, is the fact that a complainant being asleep or "otherwise unconscious at the time of the relevant act" gives rise to the same presumption. *Id*. at 103.

declining consent to other conduct, whether violent or sexual, that occurred during said relationship. To hold otherwise would effectively convert agreement to continue in a domestic relationship into a blanket authorization for any subsequent sexual or violent act, regardless of its nature or degree, a proposition unsupported by law or logic.

### C. The Evidence is Sufficiently Reliable and Corroborated to Support a Finding of Probable Cause that T. TATE Committed the Offenses Against C4

T. TATE does not allege—nor could he—that C4 consented to either of the rapes or the assault by penetration (Counts 12, 13, 14), nor does he otherwise claim that the facts as alleged fail to satisfy any element of the U.K. offense. *See* ECF No. 84 at 26-28. Because he is unable to cast the alleged conduct against C4 as lawful, he instead attacks the reliability of C4's statement to authorities. *Id.* Specifically, he claims that the facts alleged in the extradition request are insufficient to establish probable cause because C4's identity is unknown to him, her allegations were approximately 15 years' old when she first presented them to the U.K. authorities, and, according to him, her claims are "effectively uncorroborated." *Id.* These arguments have no merit.

As discussed *supra* pp. 5-10, the anonymization of C4's identity is not an appropriate basis upon which to deny certification of extradition. Neither is the 15-year period between the alleged offenses and C4's initial report to the police.[17] Additionally, T. TATE improperly discounts the value of the corroboration described in the extradition request while simultaneously disparaging

---

[17] Delayed reporting and police investigation are not indicative of fabrication. Courts recognize that delays are common in sexual-assault cases. *E.g.*, *United States v. Kollmar*, No. 19-mj-70677-MAG-1 (KAW), 2021 WL 179606, at *3, 7 (N.D. Cal. Jan. 19, 2021)-("The fact that a rape victim delays reporting does not suggest a credibility problem; delay in reporting is common in such cases.").

the U.K. for not providing more evidence to support the U.K. law enforcement official's statement of facts.[18] *See* ECF No. 84 at 27. But as discussed above, *supra* pp. 6-7, more is not required.

In support of C4's claims, the U.K. authorities have obtained photographs showing C4 and her girlfriend in T. TATE's apartment, T. TATE's use of a belt around the neck of C4's girlfriend, text messages confirming T. TATE's use of a belt, and information about a disclosure C4 made to her friends about the alleged rapes and assaults a couple of months after they occurred in 2010. ECF No. 72-1 at 79. This evidence confirms critical portions of C4's allegations, including her presence at T. TATE's apartment with her girlfriend, who had a belt tied around her neck at some point while they were in the apartment. The summary of C4's statement and corroborating evidence easily establishes probable cause that T. TATE committed the offenses alleged by C4 in Counts 12, 13, and 14.

## IV. DUAL CRIMINALTIY EXISTS ON ALL COUNTS

In assessing whether the Treaty covers the offenses for which the United Kingdom seeks extradition and the State Department has authorized to proceed, the Court should examine the description of criminal conduct, taken as true, that the United Kingdom has provided and determine whether that conduct, if it had been committed in the United States, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See*, *e.g.*, *Arias v. Warden*, 928 F.3d 1281, 1292-93 (11th Cir. 2019); *Gallo-Chamorro*, 233 F.3d at 1306. This is commonly referred to as the dual criminality

---

[18] The inherent tension in this argument begs the question of whether, had the U.K. provided them, T. TATE would have accepted as reliable and corroborative the specific documents he claims the U.K. should have included in its extradition request.

requirement. T. TATE contests dual criminality for only three of the 17 offenses- none of his arguments hold water.

**A. The Assault Alleged in Count 5 is Dually Criminal**

T. TATE does not contest dual criminality on any of the rape charges and contests on only one of the assault charges—Count 5. T. TATE alleges that his choking of C1 as charged in that count was consensual and therefore would not be unlawful if it occurred in the United States. However, as explained above in the probable cause section, even if C1 initially consented to being choked, the evidence is that she was choked to the point of losing consciousness, to which she at least arguably did not consent or was unable to provide consent. The facts and conduct as alleged would thus be dually criminal under the U.S. statutes presented by the government in its previously submitted dual criminality chart. *See* ECF No. 77-1.

**B. Enticement or Transport for "Any Sexual Activity for which Any Person can be Charged" is Unlawful in the United States**

T. TATE does not challenge dual criminality for all five charged human trafficking offenses. Rather, he has waived any challenge to Counts 15, 16, and 17, and instead focuses on a claim that Counts 10 and 11 are not dually criminal because "webcam work is not prostitution in the United States." ECF No. 84 at 29. However, the dual-criminality inquiry does not turn on whether the sexual activity occurred through a webcam rather than face-to-face. The question is whether the underlying conduct would be criminal if committed in the United States.

With respect to Counts 1 and 2 involving C1, federal law prohibits knowingly persuading, inducing, enticing, coercing, or transporting another person "with intent that such individual" engage in prostitution ***or*** "any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. §§ 2421, 2422. These provisions do not require a completed act of prostitution or sexual activity, only that the transportation or enticement occurred with the intent that such

individual engage in the unlawful sexual activity.[19] Given the underlying allegations that T. TATE and A. Tate attempted to coerce the women they recruited and transported to engage in increasingly sexualized conduct, up to and including sex acts with other people for money (*i.e.* prostitution), dual criminality is established. Further, even if completed sexual acts were required, the phrase "unlawful sexual activity" is not limited to physical sexual intercourse between two persons.[20] Under Florida law, it is unlawful to offer, procure, induce, or otherwise cause a person to engage in prostitution *or any other lewd or indecent act*. Fla. Stat. Ann. § 796.07(2)(b). At a minimum, the commercial sexual webcam performances alleged by the U.K. with respect to C1, which included masturbation and nudity performed for paying customers, plainly constitute "sexual activity for which any person can be charged with a criminal offense" because such conduct falls within Florida's prohibition on lewd and indecent acts.

## **CONCLUSION**

For the foregoing reasons, the United States requests that the Court determine that the submission on behalf of the United Kingdom is sufficient to sustain the charges under the

---

[19] The Supreme Court in *Cleveland v. United States*, 329 U.S. 14, 20, *rehearing denied*, 329 U.S. 830 (1946), stated that "guilt under the Mann Act turns on the purpose which motivates the transportation, not on its accomplishment," citing *Wilson v. United States*, 232 U.S. 563, 570-571, (1914). *See, also e.g.*, *United States v. Wilkerson,* 702 Fed. App'x 843 (11th Cir. 2018) (finding evidence sufficient for jury to find beyond a reasonable doubt that defendant, if he had completed sex act he attempted to induce, would have violated Florida statute that criminalized such sexual activity).

[20] The term "sexual activity" is not limited to physical sexual contact between two persons. *See* 18 U.S.C. § 2427 ("In this chapter, the term 'sexual activity for which any person can be charged with a criminal offense' does not require interpersonal physical contact."); *see also United States v. Fugit*, 703 F.3d 248, 256 (4th Cir. 2012) ("[T]he phrase 'sexual activity' in § 2422(b) denotes conduct connected with the 'active pursuit of libidinal gratification' on the part of any individual—nothing more, nothing less—and, therefore, does not incorporate an invariable requirement of interpersonal physical contact.").

provisions of the applicable Treaty and certify the extradition of T. TATE for the charges sought to the Secretary of State for possible surrender to the United Kingdom.

Dated: November 25, 2026

Respectfully submitted,

YARA LORENZO KLUKAS
ACTING UNITED STATES ATTORNEY

By: */s/ Alejandra L. López*
ALEJANDRA L. LÓPEZ
Assistant United States Attorney
Fla. Bar No. 37132
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9241
Email: Alejandra.Lopez@usdoj.gov

By: */s/ Abbie D. Waxman*
ABBIE D. WAXMAN
Assistant United States Attorney
Fla. Bar No. 109315
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9240
Email: Abbie.Waxman@usdoj.gov

A. TYSEN DUVA
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

By: */s/ Kerry A. Monaco*
KERRY A. MONACO
Associate Director
Office of International Affairs
U.S. Dep't of Justice, Criminal Division
Court ID: A5503560
1301 New York Avenue NW
Washington, DC 20530
Tel.: (202) 616-4798
Email: Kerry.Monaco2@usdoj.gov

By: */s/ Rachel M. Yasser*
RACHEL M. YASSER
Trial Attorney
Office of International Affairs
U.S. Dep't of Justice, Criminal Division
Court ID: A5503561
1301 New York Avenue NW
Washington, DC 20530
Tel.: (202) 674-5702
Email: Rachel.Yasser2@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 25, 2026, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF, which caused the same to be served on Howard Srebnick, Esquire, Jackie Perczek, Esquire, Thomas Maniotis, Esquire and Joseph McBride, Esquire, counsel for the Defendant.

*/s/ Alejandra L. López*________
Alejandra L. López
Assistant United States Attorney